IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

JOHN B., CARRIE G., JOSHUA M., MEAGAN A.   )
and ERICA A., by their next friend L.A.;   )
DUSTIN P., by his next friend, Linda C.;   )
BAYLI S. by her next friend, C.W.;   )
JAMES D. by his next friend, Susan H.;   )
ELSIE H. by her next friend Stacy Miller;   )
JULIAN C. by his next friend, Shawn C.;   )
TROY D. by his next friend, T.W.;   )
RAY M. by his next friend, P.D.;   )
ROSCOE W. by his next friend, K.B.;   )
JACOB R. by his next friend, Kim R.;   )
JUSTIN S. by his next friend, Diane P.; and   )
ESTEL W. by his next friend, E.D.;   )
individually and on behalf of all others   )
similarly situated,   )
  )
       Plaintiffs,   )
  )
v.   )    No. 3-98-0168
  )
DAVE GOETZ, Commissioner, Tennessee   )    Judge Haynes
Department of Finance and Administration;   )
J.D. HICKEY, Assistant Commissioner,   )
Bureau of TennCare; and VIOLA P. MILLER,   )
Commissioner, Tennessee Department of   )
Children's Services,   )
  )
       Defendants.   )

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION TO COMPEL DISCOVERY

      Pursuant to Rule 37(a)(2), F.R.C.P., and Local Rule 37.01, the Plaintiffs have filed a

motion to compel the State to make discovery. In accordance with Local Rule 37.01(a), the

parties have prepared a joint statement of the matters at issue, and a copy of that statement is

attached to the motion. The Plaintiffs respectfully submit this brief in support of their motion to

compel.

# I. Background and Summary

The Court is familiar with the procedural history of this class action, which involves the enforcement of a 1998 Consent Decree applying to the TennCare program the early and periodic screening, diagnosis and treatment (EPSDT) requirements of federal Medicaid law. There was a lengthy compliance hearing in 2001, culminating in extensive factual findings that supported the Court's conclusion that TennCare was continuing to violate each of the major elements of the EPSDT mandate. (Doc. 227)

In February 2004, the state proposed a radical restructuring of TennCare that would result in redirection of EPSDT staff resources and cuts to TennCare that could impact class members' ability to receive EPSDT services. See e.g. Tenn. Code Ann. § 71-5-144 and (Doc. 420: Martins 6-24-04 John B. Deposition p. 132, lines 8-23.). During the summer of 2004, the Plaintiffs asked the Court to focus on the State's compliance with the Consent Decree, and eventually asked the Court to hold the State in contempt. (Doc. 376, 403) The Court allowed discovery and then it asked the parties to "focus on the future" and to agree to a process whereby there would be no finding of contempt, but instead a plan to assure children the medical services they need. (Doc. 454, 455) The Court granted that motion for further relief based on admissions contained in senior state officials' depositions and in October 2004 ordered the parties to respond to a proposed plan for compliance by the special master and his experts. (Doc. 465)

In response to this order the State attacked the special master, the Court, and the plaintiffs' counsel in a series of pleadings spanning over the next year. The State asked repeatedly for discovery to determine whether recusal by the Special Master and the judge was necessary. (Doc. 474, 475, 476, 511, 560) During the same period, the Defendants asked to subdivide the class and disqualify Plaintiffs' counsel (Doc 512, 513) Simultaneously, the State was moving forward on TennCare changes that put the Plaintiffs' counsel in the position of defending three major and complicated class actions at once in order to protect due process rights of both children and adults on TennCare. Plaintiffs asked that the case be held in abeyance

temporarily. (Docs. 482, 483, 499, 504, 505) The Court granted that motion in November 2004. (Doc. 495) In December 2005, the Court reactivated the case, vacated the Special Master's proposed plan with the agreement of the parties and asked the State for their own compliance plan. (Doc. 558)

Earlier this year, the Court appointed five Monitors to assess the State's compliance, and they are engaged in the development of a report to be filed by December 31, 2006. (Doc. 657, 661) In the meantime, the parties are authorized to exchange written discovery. (Doc. 601)

The plaintiffs propounded interrogatories and requests for production on March 31, 2006. The State responded on May 15. In their response, the defendants objected to some of the discovery requests but provided a large volume of documents. Upon review of the responses, the plaintiffs raised concerns regarding their adequacy. In discussions extending over four months and described in the joint statement filed with the plaintiffs' motion, the parties substantially narrowed their disputes regarding the sufficiency of the State's responses.[1] In some instances, the State agreed to supplement its answers to meet the plaintiffs' concerns. With respect to other issues, the State provided clarifications or assurances that allayed the Plaintiffs' concerns. In still other instances, the Plaintiffs agreed to modify their request to satisfy the State's objections or acceded entirely to the State's concerns.

The motion to compel raises only those remaining discovery requests that the Plaintiffs have not been able through diligent negotiations to resolve *and* that seek discoverable information that is essential for a fair and accurate development of the record. With respect to some of the State's justifications for refusing to make discovery, the Court considered and rejected the same arguments when the Defendants attempted to rely upon them in 2001. Effective discovery is especially important in this case, because of the stark asymmetry in the parties' control of the relevant records. In order to prove their case and respond effectively to the

---

[1] The Plaintiffs are filing the parties' correspondence relating to these discovery disputes in order to provide the Court the context for the issues being presented in the motion to compel. Please see Notice of Filing, Exhibits A and B.

Defendants' contentions, the children who comprise the plaintiff class are almost wholly dependent on information and documents controlled by the State and its contractors. The State's refusal to make discovery compromises the Plaintiffs' ability to adequately test or refute the Defendants' claims and threatens to undermine the factual record on which the Court will rule. The refusal violates the Federal Rules of Civil Procedure and applicable case law, including prior discovery rulings in this case.

## II. Discovery Issues in Dispute

As set out in the Parties' Joint Statement Regarding Discovery Dispute, which is attached to the Plaintiffs' Motion to Compel, the Motion requests that the Court adjudicate the following disputes:

### A. *Cross-cutting issues potentially affecting all of the Defendants' responses to all interrogatories and requests for production*

1. All of the interrogatories and requests for production propounded by the Plaintiffs sought to elicit information regarding the status of the State's compliance with its EPSDT obligations. Regarding responsive information or documents in the possession of the State's TennCare contractors, the State produced such information or documents as part of its response only if the information or documents were already in the State's own files. The Plaintiffs contend that, in order to fully and accurately respond to their discovery requests relating to EPSDT compliance, the Defendants must ask for potentially responsive information or documents from contractors to which the State has delegated responsibility for EPSDT implementation and compliance. The State contends that it can fully and accurately respond to Plaintiffs' discovery requests and that it need not require its EPSDT contractors to search their files for potentially responsive information or documents, and that the Defendants are only obligated to produce documents or information that the contractors have already provided to the State because the rules only require the production of documents in a parties' possession, custody or control. Further,

the State contends that to require its contractors to have to independently respond to Plaintiffs' discovery requests would be unduly burdensome and prohibitively expensive.

2. The Plaintiffs' requests for the identification and production of documents included "all drafts, alterations, modifications, changes and amendments" thereto. The State objects on the grounds of burdensomeness to providing other than the final version of documents for which they possess earlier drafts because for every final version of, for example, a Semi-annual Report ("SAR") there are multiple earlier drafts of the document that would require the production of thousands of pages. When all of the reports produced by Defendants in this production are considered, requiring the production of drafts would mean producing possibly tens of thousands of additional pages. Further, in the case of drafts of the SAR, the Defendants also object on the additional ground of work product, based on the contention that such reports are pleadings compiled at the direction of counsel.

3. There are remaining questions, which the parties have not been able to resolve, regarding the production of documents which the Plaintiffs believe may exist, or may have existed, in the custody, possession or control of certain senior state officials. The Defendants contend that they have discharged their responsibility to preserve, search and produce all non-privileged information or documents responsive to the Plaintiffs' discovery.

## B. Specific Interrogatories and Document Requests

<u>INTERROGATORY NO. 49</u>

Identify all present and  former employees of the Defendants, their contractors or consultants, other than those already listed in your answers to previous interrogatories, who possess information concerning whether Defendants have complied or failed to comply with the Consent Decree during the period since December 2001. For each individual identified, in addition to the other information specified in the instructions that precede these interrogatories, please provide the time period during which he/she was involved, and the category for which the individual can provide such information (outreach, screening, diagnosis and treatment, coordination of services, and DCS).

The Defendants object on the grounds of burdensomeness to providing more than the

names of those individuals who have or had substantial responsibility related to EPSDT

compliance. Further, Defendants specifically object to providing more than the name and title of

current employees of the State and its contractors, asserting that the contact information the State

has for current employees is the general contact information for the State and its various

contractors themselves and that the State can provide contact information for former employees

only to the extent it has such information. Finally, Defendants object to Plaintiffs' counsel

contacting any employees (current or former) who Plaintiffs contend speak for the State and

whose testimony is a party admission as such individuals may only be contacted through counsel

for the State or its contractors.


DOCUMENT REQUEST NO. 9

For the period since April 1, 2005, please produce all communications and documents in
the possession of the Defendants and/or the Title V Maternal and Child Health/Crippled
Children's Services and/or Children's Special Services programs and that pertain to any child
who was a member of the plaintiff class and on whose behalf services were sought from the Title
V Maternal and Child Health/Crippled Children's Services and/or Children's Special Services
program(s).

The Defendants object on the grounds of burdensomeness to producing these

documents and assert that any potential probative value from these documents is wholly

outweighed by the burden of producing files for these children, the majority of whom are

on TennCare, who receive services through the CSS program, which is not a Title XIX

program and is wholly irrelevant to the issues in dispute in this litigation. The original

request would have required the production of files on approximately 6300 children;

Plaintiffs agreed to limit their request to 100 randomly selected CSS and TennCare files,

as well as any CSS and TennCare files involving medical foods for children with

Phenylketonuria (PKU). Defendants have maintained their objection that even this

amount is burdensome especially given Plaintiffs' position that this document request is

not limited to CSS and TennCare files but also includes all records any MCC might have

pertaining to any request for and denial of any service that is the subject of a CSS file.

Defendants, however, have agreed to produce 50 case files from CSS and any

corresponding TennCare appeal files.

### III. Argument

#### A.  *The Federal Rules of Civil Procedure favor liberal discovery*

Federal Rule 26(b)(1) provides:

> Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party.... For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

The discovery regime set out by the Federal Rules of Civil Procedure is an extremely

permissive one to which courts have long "accorded a broad and liberal treatment to effectuate

their purpose that civil trials in the federal courts [need not] be carried on in the dark."

*Schlagenhauf v. Holder*, 379 U.S. 104, 114-15, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964) (quoting

*Hickman v. Taylor*, 329 U.S. 495, 501, 507, 67 S.Ct. 385, 91 L.Ed. 451 (1947) (internal

quotation marks omitted).  Generally, the discovery rules should be given broad, liberal

interpretation. *See Blue Bell Roots, Inc. v. Equal Employment Comm'n*, 418 F.2d 355 (6th Cir.

1969) In particular, relevancy in the discovery context is extremely broad, and a court must

consider a discovery request relevant unless it is clear that the information sought has no bearing

upon the subject matter of the action. *Mead Corp. v. Riverwood Natural Res. Corp.*, 145 F.R.D.

512, 522 (D.Minn.1992); see also *Gladfelter v. Walmart Stores, Inc.*, 162 F.R.D. 589

(D.Neb.1995) (stating that a request for discovery should be considered relevant if there is any

possibility that the information sought may be relevant to the subject matter of the action).

**B. *Cross-cutting issues potentially affecting all of the Defendants' responses to all interrogatories and requests for production***

1. *Disputed Issue: Information and Documents in the Possession of the State's Contractors*

All of the interrogatories and requests for production propounded by the Plaintiffs sought to elicit information regarding the status of the State's compliance with its EPSDT obligations. Regarding responsive information or documents in the possession of the State's TennCare contractors, the State produced such information or documents as part of its response only if the information or documents were already in the State's own files. The Plaintiffs contend that, in order to fully and accurately respond to their discovery requests relating to EPSDT compliance, the Defendants must ask for potentially responsive information or documents from contractors to which the State has delegated responsibility for EPSDT implementation and compliance.

*Defendants' Response*

The State has objected that it would be unduly burdensome to ask its contractors to provide information and documents sought by the Plaintiffs.

*The requested information is discoverable and owed the Plaintiffs by law*

Pursuant to Federal Rule of Civil Procedure 34(a)(1), any party may serve a request to produce documents within the "possession, custody or control" of another party. Because the State has "control" of the documents of all of its contractors within the meaning of Rule 34, including control over the managed care organizations, it should be compelled to produce all such documents that are responsive to the plaintiff's discovery requests and in the hands of those contractors.

For purposes of Rule 34, "control" is "the legal right to obtain the documents requested upon demand." *Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984*); see also General Envtl.*

*Science Corp. v. Horsfall,* 25 F.3d 1048, n15 (6th Cir. 1994); *Gerling Int'l Ins. Co. v. Commissioner*, 839 F.2d 131 (3rd Cir. 1987); *Chaveriat v. Williams Pipe Line Co.,* 11 F.3d 1420 (7th Cir. 1993); *7-UP Bottling Co. v. Archer Daniels Midland Co. (In re Citric Acid Litig.),* 191 F.3d 1090 (9th Cir. 1999); *Norex Petroleum Ltd. v. Chubb Ins. Co. of Can.,* 384 F. Supp. 2d 45 (D.C. Cir. 2005). Documents held by the party's contractor are deemed to be within the party's control. *Mercy Catholic Medical Center v. Thompson*, 380 F.3d 142, 160 (3rd Cir. 2004). Moreover, where federal law or agency guidance specifically requires that the contractor make all documents available to the party at "all reasonable times," control is also established. Id.

Here, the State has a legal right and a contractual right to obtain documents from the managed care organizations acting as its contractors and therefore has control of those documents. The Medicaid statute requires that the State plan provide for methods of administration that the Secretary finds "necessary for the proper and efficient operation of the plan." 42 U.S.C. § 1396a(a)(4). The implementing regulations require that all contracts under the State plan for the provision of Medicaid services "include provisions that define a sound and complete procurement contract." 42 C.F.R. § 434.6(a)(1). Such "provisions" include the right of the State or any federal agency to "timely and unrestricted access to any books, documents, papers, or other records of recipients that are pertinent to the awards, in order to make audits, examinations, excerpts, transcripts and copies of such documents." 45 C.F.R. § 74.53(e). Accordingly, the State's contracts with its managed care organizations contain a provision requiring the contractors and their subcontractors to

> make all records (including but not limited to, financial and medical records) available at the contractor's and/or subcontractor's expense for administrative, civil and/or criminal review, audit, evaluation, inspection, investigation and/or prosecution by authorized federal, state, and Comptroller of Treasury personnel, including representatives from the OIG, the MFCU, DOJ and the HHS OIG, TennCare or any duly authorized state or

federal agency.   (Amended And Restated Contractor Risk Agreement Between The State Of Tennessee D.B.A. TennCare And Its Managed Care Organizations, § 2-12.B.) The contracts further require that all subcontracts entered into by the contractors include provisions granting such entities "immediate and complete access to all records pertaining to the medical care or services provided to TennCare enrollees." Id. at § 2-12.a. (Please see Notice of Filing, Exhibit C.)

The State thus has both the legal and contractual authority to obtain documents from its contractors, upon demand, consequently meets the control test necessary for such documents to be discoverable under Rule 34(a), and should be compelled to produce all documents of its contractors that are responsive to Plaintiffs' discovery requests.

The same control exercised by the State over its contractors and subcontractors requires that the State obtain information from them in responding to interrogatories propounded under Rule 33, Fed.R.Civ.P.  Rule 33 requires parties to "furnish such information as is available to the party" in response to interrogatories.  Specifically, under Rule 33, "it is undisputed that a party has a duty to provide all information available to him." *Trane Co. v. Klutznick*, 87 F.R.D. 473, 476 (W.D. Wis. 1980) (citing *Hickman v. Taylor*, 329 U.S. 495 (1947)); 8 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2172.  Further, "[i]nformation which is controlled by a party is available to him." *Id.*  Also, "[i]nformation readily obtainable from a third-party is discoverable through an interrogatory." *Hitachi, Ltd. v. Amtran Tech. Co., Ltd.*, 2006 U.S. Dist. LEXIS 52361 (N.D. Cal. Jul. 18, 2006).  Given the State's control over its contractors, it should be compelled in answering interrogatories to provide responsive information held by them.[2]

---

2    By entrusting the MCCs with large parts of Consent Decree compliance, the state has also assumed a duty to  preserve evidence that these agents have in their control.  *See Jordan F. Miller Corporation the Mid-Continent Aircraft Service, Inc.,* No.97-5089,1998 U.S. APP

(Continued…)

Apart from the contractual terms that give the Defendants control over their contractors' compliance-related documents, Medicaid law creates an agency relationship that imposes state control over the actions of the contractors, and that makes the contractors' records subject to discovery in this case. The Medicaid statute requires that a state must "provide for the establishment or designation of a single [s]tate agency to administer or supervise the administration" of the state's Medicaid plan. 42 U.S.C. § 1396a(a)(5). The implementing regulations in turn require the state to "specify a single [s]tate agency established or designated to administer or supervise the administration of the plan." 42 C.F.R. § 431.10(b)(1). The Medicaid regulations also provide that the agency must not delegate its authority to "exercise administrative discretion in the administration or supervision of the plan, or … issue policies, rules and regulations on program matters." 42 C.F.R. § 431.10(e)(1). If other state or local agencies or offices perform services for the single state agency, those other entities "must not have the authority to change or disprove any administrative decision of the single state agency or otherwise substitute their judgment of that of the Medicaid agency with respect to the application of policies, rules, and regulations issued by the Medicaid agency." 42 C.F.R. § 431.10(e)(3); *see Linton v. Commissioner*, 779 F. Supp. 925, 936 (M.D. Tenn. 1990), *aff'd on other grounds*, 65 F.3d 508 (6th Cir. 1995), cert. den. sub. nom. *St. Peter Villa v. Linton*, 517 U.S 1155 (1996).

Pursuant to these single state agency provisions, the Sixth Circuit has held that TennCare's managed care organizations act on behalf of the State and are therefore the State's agents, at least for the purpose of carrying out the functions of the State's Medicaid program. *Tenn. Ass'n of Health Maint. Orgs., Inc. v.* Grier, 262 F.3d 559, 565 (6th Cir. 2001). The

LEXIS 2739 (10th Cir. Fed. 20, 1998). The state's attorneys should have notified its contractors that a lawsuit existed and/or was foreseeable and requested that evidence be preserved. Failure to do so would make the State liable for any spoliation by its state contractors *Sanchez v. Stanley-Bostitch, Inc*., 1999 U.S. Dist. LEXIS 12975 (S.D.N.Y).

Defendants' past attempts to refuse to produce discovery of documents possessed by their contractors on the grounds that such documents are beyond their control have been rejected; this Court has required the production of documents from state contractors. *See Newberry v. Neel*, No, 3:98-1127, Doc. 180 (M.D. Tenn. 2002).(Please see Notice of Filing, Exhibit D)

Accordingly the Defendants have a non-delegable duty under the "single state agency" provisions of Medicaid law to ensure compliance with EPSDT. They therefore must retain control of documents sufficient to evaluate and prove their compliance, whether those documents are in state records or in the custody of contractors. The Defendants cannot contend that relevant records in the custody of contractors charged with implementing EPSDT are beyond their control.

The State's objection of burdensomeness is without merit. Courts have consistently held that an objection to a discovery request cannot be merely conclusory, and that intoning the "overly broad and burdensome" litany, without more, does not express a valid objection. See, *McLeod, Alexander, Powel and Apffel, P.C. v. Quarles*, 894 F.2d 1482 (5th Cir.1990); *Josephs v. Harris Corp.*, 677 F.2d 985 (3rd Cir.1982); *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16 (N.Y.1984); *Roesberg v. Johns-Manville Corp.*, 85 F.R.D. 292 (Pa.1980). The party opposing discovery shoulders the burden of showing that discovery request is overly broad and burdensome, Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co., 132 F.R.D. 204 (Ind. 1990), and the written objection must allege facts which demonstrate the extent and nature of the burden imposed by preparation of a proper response. Cf., *Chubb Integrated Systems, Ltd. v. National Bank of Washington*, 103 F.R.D. 52 (D.C.1984).

 *The requested information is absolutely indispensable for the fair and accurate adjudication of the State's claims of compliance.*

It is troubling that the Defendants would purport to answer questions regarding their compliance with the Consent Decree without bothering to ask the TennCare contractors who actually administer most EPSDT services.[3]  As the Court observed in its December 20, 2001 findings of fact, "**most of what TennCare does has to happen through its contracts with the MCOs and BHOs.**" (Doc. 227 at 25)(emphasis added).  Throughout those findings, the Court contrasted state officials' claims of compliance with the reality that, because of their reliance on deficient contractors, those contractors undermined those claims:

- "The record reflects the fact that the Defendants mostly delegated the responsibility to conduct outreach to MCOs and BHOs, who have not successfully implemented the outreach requirement in the Consent Decree." (Id. at 8)

- "… the State has failed to adequately assure that its contractors conduct regular screens for all children." (Id. at 31)

- "As discussed above in relation to outreach and screening, systemic deficiencies have also made compliance with the Consent Decree's diagnosis provisions difficult. First, where there are overlapping medical and mental health issues, the MCOs and BHOs quibble over which entity is responsible for providing coverage. The State's TennCare contracts contribute to this ambiguity by sometimes failing to specify the responsible party, even though the BHOs do have coordination agreements with the MCOs. In practice, individuals with overlapping issues sometimes 'fall in the cracks' and fail to receive services form either a BHO or MCO, …."(Id. at 16)

- "… the MCO and BHO contractors often refuse to authorize health assessments….Even worse, the State's managed care system often provides incentives for financially motivated denials of coverage by both MCOs and BHOs… Further, as discussed above,

---

[3] An example of what could most charitably described as carelessness on the Defendants' part in answering the interrogatories is found in their response to Interrogatory 18(h), which asked them to "Identify each class member whose death or injury has come to the attention of state officials *or their contractors* and that may have followed a denial of health care to the child or the child's inability to access health care…and identify any documents relating to any investigation or corrective action contemplated or taken by the Defendants *or their contractors* in response to the injury or death." The Defendants purported to answer the question. Only after much probing did they disclose that they had never forwarded the question to their contractors, which are of course the entities most likely to be aware of such deaths, since it is their personnel who manage the children's care.

MCOs and BHOs often lack adequate provider networks, creating a barrier to adequate diagnostic evaluations. The lack of provider networks is attributable, in part, to the failure of the BHOs and MCOs to pay its providers for services rendered." (Id. at 17)

- "… the State has failed to adequately monitor the BHO's provision of EPSDT and Consent Decree-mandated services. More specifically, the State has not ensured that the BHO strictly mandate that its providers offer adequate services to their patients." (Id. at 19)

- "TennCare oversight, while seemingly well-intentioned, is insufficient in a managed care system, where BHOs must be closely monitored." (Id. at 20)

- "Defendants disclaim responsibility for the ultimate provision of EPSDT-compliant services by a once-removed provider. However, as stated by another court in the Medicaid context, '[t]he public policy implications of Defendants' position, if accepted, would be devastating. It is patently unreasonable to presume that Congress would permit a state to disclaim federal responsibility by contracting away its obligations to a private entity.' *J.K By and Through R.K. v. Dillenberg*, 836 F.Supp. 694, 699 (D. Az. 1993). Clearly, the failure of State contractors to follow the federal requirements does not relieve the State Defendants of their responsibilities. The State has failed to ensure compliance with all aspects of the EPSDT mandate: outreach, screening, treatment and coordination."

The Court could not have made any of those findings, or reached the legal conclusions that were based on those findings, had the Defendants been able to rely, as they now attempt to do, on their own claims of compliance, and had the Plaintiffs not been able to obtain and produce evidence of what the State's contractors were actually doing, or failing to do. The State should not be allowed to maintain its "don't ask/don't tell" relationship with its contractors, in order to insulate both it and them from judicial scrutiny of EPSDT compliance. The Court's ability to fairly and accurately adjudicate the Defendants' claims of compliance with the mandates of EPSDT and this Court's Consent Decree is severely compromised if Plaintiffs are not afforded access to responsive information or documents in the possession of these State agents.


2.  *Disputed Issue: State's Refusal to Produce Drafts or Modifications of Discoverable Documents*

The Plaintiffs' requests for the identification and production of documents included "all drafts, alterations, modifications, changes and amendments" thereto. The Defendants refuse to provide other than the final version or, in the case of electronic documents, only a version that has been altered by its conversion to hard copy.

*The requested information is discoverable and owed the Plaintiffs by law*

The State should be compelled to identify and produce (1) any drafts of non-privileged documents, including e-mails and attachments, which the Defendants have produced only in final hard copy form; and (2) any electronic versions of such drafts, with metadata preserved. This Court possesses the authority to compel such production from the State.

    a.   The State improperly failed to produce drafts of documents sought by Plaintiffs' March 31, 2006 request for production that are relevant and therefore discoverable.

Rule 34 permits a party to request production of documents or "any tangible things" that are relevant to the claim or defense of any party or appear reasonably calculated to lead to the discovery of admissible evidence. Fed. R. Civ. P. 34(a); Fed. R. Civ. P. 26(b). As such, drafts of documents are discoverable if they are relevant and nonprivileged. *Booker v. United States*, 2006 U.S. Dist. LEXIS 68769, at *4 (D. Tenn. 2006). The United States Supreme Court has liberally construed the parameters of the term "relevance." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978); *see also* 7-34 MOORE'S FEDERAL PRACTICE § 34.12[2] (3d ed. 2006).

Plaintiffs' request defines "documents" to include "all drafts, alterations, modifications, changes, and amendments." Nevertheless, the State only produced hard copies and only the final version of those. In the case of electronic documents, the State actually altered the documents by converting them to hard copy from the electronic format in which they existed when the Plaintiffs requested them. For example, in the case of documents that exist as word processing

files, their conversion to a printed copy strips out metadata that tracks edits, dates and authors. In the case of emails, by producing them only in printed copy, the Defendants altered them to delete such metadata, as well as potentially important information regarding the identity of individuals who received blind copies. The Defendants, while giving the appearance of making discovery by producing massive amounts of paper, quite calculatedly withheld discoverable information by refusing to produce the documents as they actually existed, and in the format requested.[4]

    b. The State's refusal to produce electronic documents in their original, unaltered form violates their duty under Rule 34, FRCP, and applicable case law.

"Computer records and other electronically stored data are clearly within the permissible scope of discovery." 7-34 MOORE'S FEDERAL PRACTICE § 34.12[3][a] (3d ed. 2006). Fed. R. Civ. P. 34 was amended in 1970 specifically to include "data compilations." *Id.*; *see also Daewoo Elecs. Co. v. United States*, 650 F. Supp. 1003, 1006 (Ct. Int'l Trade 1986). Thus, like other types of information, electronic information is generally discoverable if it is relevant to the claim or defense of any party or appears reasonably calculated to lead to the discovery of

---

4   The Defendants fully understood the evidentiary importance of the drafts and electronic documents they refused to produce. That is evident from their own discovery requests, which demanded that the Plaintiffs produce "all …written, printed, recorded or graphic matter, photographic matter, sound reproductions, or other retrievable data (whether recorded, taped, or coded electrostatically, electromagnetically, optically or otherwise on hard drive, diskette, compact disk, primary or backup tape, audio tape or video tape) from whatever source derived and however and by whomever prepared, produced, reproduced, disseminated or made. Without limiting the generality of the foregoing, "Document(s)" includes the original and any non-identical copy and also every draft and proposed draft of all correspondence, internal memoranda, notes of meetings, telegrams, telexes, facsimiles, electronic mail, reports, transcripts or notes of telephone conversations, diaries, notebooks, minutes, notes, tests, reports, analyses, studies, testimony, speeches, worksheets, maps, charts, diagrams, computer printouts, and any other writings or materials of any nature whatsoever, whether or not divulged to other parties, together with any attachments thereto and enclosures therewith. In addition, the word "Document(s)" encompasses all forms and manifestations of electronically or optically coded, stored, and/or retrievable information, including but not limited to "e-mail," "voice mail," digital images and graphics, digital or analog audiotapes and files, and digital or analog videotapes and files." The Plaintiffs provided the Defendants all non-privileged documents thus described, including electronic originals and copies.

admissible evidence. 7-34 MOORE'S FEDERAL PRACTICE § 34.12[3][a] (3d ed. 2006); *see also Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 317 (S.D.N.Y. 2003) ("'[E]lectronic evidence is no less discoverable than paper evidence.'" ) (internal citations omitted); *Medtronic Sofamor Danek, Inc. v. Michelson*, 229 F.R.D. 550 (W.D. Tenn. 2003) (recognizing the relevance of electronic data, including computer network back-up tapes containing electronic mail and other electronic data not contained in backed-up format); *In re: Telxon Corp. Sec. Litig. v. PricewaterhouseCoopers, LLP*, 2004 U.S. Dist. LEXIS 27296 (N.D. Ohio July 16, 2004) (recommending motions for sanctions be granted where party failed to, among other things, produce certain relevant metadata).

The metadata embedded in the requested documents is no less discoverable than the documents' visible text, because

> …embedded data in computer-generated information can reveal the evolution of a document. A record of earlier drafts, dates of subsequent revisions or deletion, and the identity of persons revising a document are routinely captured in software applications. Embedded data may also identify anyone downloading, printing, or copying a specific document . . . [and] also assist in evaluating the authenticity of a document.

7-37A MOORE'S FEDERAL PRACTICE § 37A.03[1] (3d ed. 2006). Embedded data is often even more valuable than a hard copy of the information. "The embedded data may be more useful than a hard copy of the data or document because it contains information that is not revealed in a printout but that can be essential to a full understanding of that document." *Id.* As with the production of drafts, the State is required to produce the metadata.

   c.  Plaintiffs' March 31, 2006 request for production is not unduly burdensome.

The State objects to producing electronic and drafts on the basis of burdensomeness. Any burdensomeness is of the State's own making. The Defendants could have directed those

individuals who were making discovery to provide drafts along with the final versions of the documents they were producing, which would have been a relatively small matter at the time. As for electronic documents, the Defendants well knew that conversion of electronic documents to hard copies was more costly and burdensome to all parties, but they produced the documents in their altered versions, rather than produce the unaltered documents in the manner requested by the Plaintiffs and required by the law.[5] They cannot be heard to complain now if the Court orders them to make production as they should have done originally, and in the same manner that they demanded and received discovery from the Plaintiffs. A party who raises a burdensomeness objection has the burden of showing that the burdens are unreasonable and outweigh the potential evidentiary value of the disputed discovery. Here, the State cannot meet this burden. The drafts and metadata that Plaintiffs' seek are exclusively in the State's control, and their potential evidentiary value outweighs any claim of burdensomeness.

    d.  Drafts of the Semi-annual Progress Reports (SAR) are not protected by the work product privilege.

The State makes the additional objection that drafts of the Semi-annual Progress Reports (SAR), even when prepared by state employees or contractors without any involvement of counsel, are protected by the work product doctrine. The State contends that such reports are "pleadings," prepared at the direction of counsel, and all documents that go into their drafting are attorney work product.

---

[5]  The comparative cost of paper production is so much greater that courts have sometimes directed the conversion of paper documents to a more cost-effective electronic format, such as by computer disc rather than by paper printout. *See Daewoo Elecs. Co. v. United States*, 650 F. Supp. 1003, 1006 (Ct. Int'l Trade 1986) (Department of Commerce ordered to produce sequential data files recorded on magnetic tape).

That argument reflects a telling misconception of the nature and purpose of the SARs. They are required by the terms of Paragraph 104 of the Consent Decree. Their purpose is not to plead the State's case, but to provide:

> … information, validated by the applicable audit and testing procedures outlined herein, which accurately and fully reflects the status of the state's compliance with each of the applicable requirements of this order.

There is no basis for the State's claim that drafts of these reports are entitled to the same protection as drafts of pleadings, motions or briefs that would betray protected mental impressions or legal theories of defense counsel. The SARs are supposed to provide unvarnished accurate information, not put either party's "spin" on the facts. The fact that the State has nonetheless been drafting the reports as if they were pleadings only makes it all the more important for the Plaintiffs to see the drafts and related documents before the information they contained was edited for to serve the State's forensic purposes.

*The requested information is absolutely indispensable for the fair and accurate adjudication of the State's claims of compliance.*

The purpose of discovery is to gather facts, not a party's altered or sanitized version of the facts. By withholding discoverable information and producing only the altered or edited versions of non-privileged documents, the State distorts reality and undermines the purpose of discovery, thereby endangering the accuracy and integrity of the fact-finding process.

A good illustration of the importance of requiring disclosure of drafts is found in a comparison of two documents recently produced by the State. In its order of February 14, 2006 (Doc. 601), the Court ordered the State to produce documents relating to the activities described in the Declaration of Thomas Catron, Ph.D., (Doc. 581). That declaration was filed by the State January 31, 2006, in support of the State's claim that it is now in compliance with the Consent

Decree. In March, the State produced, among other things, notes of meetings of the Governor's Office of Children's Care Coordination (GOCCC) staff and various workgroups to discuss EPSDT matters. The State produced a set of such notes in hard copy, all of which appeared to be final versions. The notes, including notes of a meeting on August 17, 2005 of the Diagnosis and Treatment Workgroup, were unremarkable. (See Notice of Filing, Exhibit E)

In May, the State responded to the Plaintiffs' document requests with the production of 129 boxes of paper. Amid the mass of paper was another set of GOCCC meeting notes, labeled "DRAFT", for an August 18, 2005 meeting with the Diagnosis and Treatment Director. That draft had not been disclosed with the other meeting notes produced in March, and it appears to have only been disclosed in May by inadvertence, since the State took the position that it would not produce draft documents. The draft contained the following information, which has not otherwise been disclosed:

> Dr. Catron stressed that the Governor is looking to seek relief on the John B. Lawsuit and that the DTW [Diagnosis & Treatment Workgroup] needs to move forward with making some recommendations that will assist the governor in obtaining relief from the court.

The notes went on to say that, "In seeking relief from the lawsuit, the DTW needs to assist the GOCCC to compare Tennessee's standings regarding EPSDT screenings with those of other states." (See Notice of Filing, Exhibit F) This casts a different light on the purpose and priorities of the GOCCC and the impetus for the State's claims of compliance. It also belies the State's assertion that senior officials, including the Governor, "were NOT actively involved in EPSDT issues over the last two years". (Please see further discussion on this issue below.)

3. *Disputed Issue: Plaintiffs' Request for Specific Assurances that the State has met its obligations to preserve, identify and produce documents in the custody, possession or control of senior State officials.*

The Plaintiffs' document requests were directed to "all persons, and agents or staffs of such persons, who exercise authority to direct the actions of the Defendants in relationship to the Defendants' duties under orders entered in this case." The Plaintiffs seek specific assurances that the State preserved, identified and produced all responsive documents that have been in the possession, custody or control of certain senior State officials.

*The State's ambiguous response:*

The Plaintiffs received approximately 129 boxes of documents in response to their discovery requests. By August, the Plaintiffs' review of the documents had progressed to the point where a striking anomaly was apparent: the massive production included few or no documents from each of several key senior officials who are known to have been actively involved in formulating and directing the implementation of TennCare policy since 2003. These included the Commissioner of Finance and Administration, whose department includes the TennCare Bureau, the Governor, and the Governor's senior policy staff.

Beginning on August 9, the Plaintiffs exchanged a series of letters with defense counsel seeking unambiguous assurances that the State had met its discovery obligations. They asked for assurances specifically with respect to the preservation and production of documents, including e-mails and other electronic records, in the possession, custody or control of senior State officials. The Plaintiffs made precisely worded requests for assurances or clarification; those requests reflected the case law governing the duties of a party making discovery with respect to the preservation, identification and production of responsive documents. In reply, the Defendants asserted broad claims of compliance, but their specific responses failed in subtle but important ways to meet the precise questions posed by the Plaintiffs. It was unclear to Plaintiffs whether the ambiguity of the Defendants' responses reflected simple miscommunication or artfully

drafted evasion.

The parties' counsel conferred by phone on August 31, 2006, and during that conversation this issue was discussed for approximately 25 minutes. See Notice of Filing: Exhibit B and Exhibit G, Declaration of Gordon Bonnyman. Participating in the phone conference were Gordon Bonnyman and Michele Johnson on behalf of the Plaintiffs, and Ms. Nicole J. Moss for the Defendants. Plaintiffs' counsel took extensive notes during the phone conference and memorialized the conversation in a file memorandum that same day. In a September 5 letter to Ms. Moss, Plaintiffs' counsel sought to confirm the facts as she had stated them during the conversation. Of particular significance were her repeated statements that:

- The State could *not* confirm that it had not destroyed documents related to this litigation;

- During the period [between November 24, 2004 and December 15, 2005] when there was a moratorium in the case, the State considered the case to be "inactive". The Defendants had no duty to preserve documents during that period

- It was the State's position that it would be "unreasonable and extraordinarily costly" for the State to have to retain records when the case was inactive.

In a September 13 response to the confirming letter, Ms. Moss asserted that Plaintiffs' counsel had misunderstood or mischaracterized the conversation. She said that the State had complied with its obligations, and denied that the State "had an obligation to do *more* than instruct state officials to preserve documents relevant to this litigation, which the State has done." The explanation left crucial questions unanswered.

In a September 16th letter, Plaintiffs sought again to clear up the ambiguities and reconcile the inconsistent statements made by the Defendants. The letter quoted verbatim the Defendants' most recent written statement of their position, then made a number of requests for

specific assurances or clarifications. The State refused to answer, contending broadly that senior individuals, including the Governor and the Commissioner of Finance and Administration, "were NOT actively involved in EPSDT issues over the last two years".

That claim, in particular, is no substitute for specific answers to detailed questions about whether the Defendants discharged their responsibilities to preserve and produce discoverable documents. If one thing is certain from the public record, it is that the State's senior officials have been extensively involved over the last three years in the shaping and implementation of TennCare policies, including those affecting TennCare. As noted above, Dr. Catron received directions that the Governor himself was seeking relief from the Consent Decree and expected GOCCC and its workgroups to assist in achieving that goal. Mr. Martins up until June 2004 had weekly meetings with the Governor about the status of TennCare Martins 6-24-04 John B. Deposition p. 204 line 13-24 (Doc.420)

The former TennCare Director, J.D. Hickey, testified in *Rosen v. Commissioner* that he met weekly, or even more often, with the Governor and with Dave Goetz, Commissioner of Finance and Administration, to discuss TennCare. (Notice of Filing, Exhibit H) He frequently gave PowerPoint presentations to the one or both officials. (Notice of Filing, Exhibit I, Wheelbarger letter, Rosen PX 400). The Governor's deputy, Tam Gordon, was described by state officials as having key responsibilities for EPSDT, and the Governor created a special division within his own office, the Governor's Office for Children's Care Coordination, so that EPSDT issues would receive the attention of senior state officials.(Notice of Filing, Exhibit J, Collective Exhibit) The Governor's counsel has been directly involved in this and all other TennCare litigation, attending hearings and dealing directly with counsel for the former Plaintiffs-Intervenors, a role that speaks to the extraordinarily high level of involvement of

Administration officials in all things TennCare. For the State to account for the lack of document production by senior officials, and to brush off the Plaintiffs' reasonable requests for assurances, by declaring that senior officials simply "were NOT actively involved in EPSDT issues over the last two years" requires the strenuous suspension of disbelief.

The Defendants refused to respond to the following requests that they confirm that the State had fulfilled itsobligations to preserve, identify and produce all non-privileged documents covered by the Plaintiffs' discovery requests.

1. You refer to our questions as to whether "any responsive documents could have been destroyed pursuant to the State's normal document retention policies." We also asked whether any responsive documents were *otherwise* destroyed or disposed of, and we remain unclear regarding the State's response. Please confirm that no potentially responsive documents that were within the possession, custody or control of any of the relevant officials at any time since May 2003 have been destroyed or otherwise disposed of in a manner that resulted in their not being reviewed or produced in response to our 2004 or 2006 discovery requests.

2. The State issued instructions to preserve documents that "might be relevant to any additional litigation involving the State's Medicaid reform efforts." This statement is ambiguous, since the State has asserted that children in the plaintiff class in this case were and are unaffected by its "Medicaid reform efforts." Please provide copies of all instructions on which you rely to satisfy the State's obligations with respect to the preservation of documents potentially related to *this* litigation, and please identify the parties to whom they were delivered.

3. The State asserts that it has no obligation beyond the issuance of instructions to preserve relevant documents. That assertion is clearly not consistent with the law, which requires that the State take all reasonable steps to ensure that those instructions have been and are being actually followed. Please confirm that you have asked all of the relevant officials, included those named above, and they have certified that they followed the instructions and did in fact preserve all paper and electronic documents that were potentially relevant to this litigation.

4. You assert that we are confused about the State's archiving and back-up policies. Please clear up any misunderstanding on our part by confirming that:
   a. If the relevant officials archived emails and associated attachments as instructed, those documents remain readily accessible to them;
   b. Each of the relevant officials certified that they did in fact review their archived emails and associated attachments for documents responsive to our 2004 and 2006 discovery requests;
   c. If the relevant officials failed to archive emails and associated attachments as instructed, those documents "rolled off" the system;

    d. If an email and associated attachment "rolls off" the system, it is not readily available to the relevant official, although it is stored in a back-up file and can be accessed with the assistance of information technology personnel.

5. Your letter states that, for a period of time, "back-up tapes storing emails were preserved and not recycled, but this suspension had nothing to do with this litigation. Back-up tapes were preserved due to a public records request. When that request was fulfilled, information technology personnel were instructed to resume the normal document retention practices." Please confirm that these back-up tapes were reviewed for documents responsive to our 2004 and 2006 discovery request and that they contained no emails or other documents that were potentially responsive to our 2004 or 2006 discovery requests. Please identify the individuals who reviewed the tapes.

6. The relevant officials, including those named in my August 9th letter, never *generated or caused to be generated* (e.g., via an assistant) any electronic or paper documents responsive to any of the following:
    a. the Plaintiffs' Second Interrogatories, propounded June 4, 2004;
    b. the Plaintiffs' Second Request for Production of Documents, propounded June 4, 2004;
    c. the Plaintiffs' Third Interrogatories, propounded March 31, 2006;
    d. the Plaintiffs' Third Request for Production of Documents, propounded March 31, 2006.

7. The relevant officials, including those named in my August 9th letter, never *received*, either directly or through another person (e.g., an assistant), any electronic or paper documents responsive to any of the following:
    a. the Plaintiffs' Second Interrogatories, propounded June 4, 2004;
    b. the Plaintiffs' Second Request for Production of Documents, propounded June 4, 2004;
    c. the Plaintiffs' Third Interrogatories, propounded March 31, 2006;
    d. the Plaintiffs' Third Request for Production of Documents, propounded March 31, 2006.

8. No *paper* documents that were ever in the possession, custody or control of any of the relevant officials, including those named in my August 9th letter, and that were or would have been responsive to any of the Plaintiffs' 2004 or 2006 discovery requests have been destroyed, lost, thrown away or transferred out of their possession, custody or control.

9. No *electronic* documents that were ever in the possession, custody or control of any of the relevant officials, including those named in my August 9th letter, and that were or would have been responsive to any of the Plaintiffs' 2004 or 2006 discovery requests have been destroyed, lost, thrown away or transferred out of their possession, custody or control.

10. No electronic documents that were or would have been responsive to any of the Plaintiffs' 2004 or 2006 discovery requests were deleted, transferred or otherwise altered with the result that they were outside the scope of the State's search for documents responsive to such discovery.

11. In response to the Plaintiffs' 2004 and 2006 discovery requests, and in supplementing the 2004 discovery requests, the relevant officials, including those named in my August 9th letter, searched all *paper* records within their possession, custody or control and produced all responsive documents located in either their public or personal records.

12. In response to the Plaintiffs' 2004 and 2006 discovery requests, and in supplementing the 2004 discovery requests, the relevant officials, including those named in my August 9th letter, searched all *electronic* records within their possession, custody or control and produced all responsive documents located in either their public or personal files, stored on either public or personal computers, and stored in either a public or private domain (including but not limited to the State's computer domain and any domains assigned to or controlled by the Governor personally or by his campaign).

As discussed below, these requests were supported by the case law governing the duties of a litigant to preserve and retrieve potentially discoverable documents.

*The Plaintiffs are entitled to assurances that the State has met its discovery obligations as prescribed by law.*

a. The Defendants' duty to preserve evidence

The State had a duty to preserve all potentially relevant documents, whether hard copy or electronic, if litigation was pending or could be reasonably foreseen. *Fujitsu Ltd. v. Federal Express Corps.*, 247 F.3[rd] 423, 436 (2nd Cir. 2001); *Howell v. Maytag*. 168 F.R.D. 502, 505 (M.D. Pa. 1996); *Shaffer v. RWP Group, Inc*., 169 F.R.D. 19, 24 (E.D.N.Y. 1996); *Baliotis v. MCNeil*, 870 F. Supp 1285 (M.D. Pa. 1994); *Stevenson v. Union Pac. R.R. Co.*, 365 F. 3rd 739 (8th Cir. 2004)

With electronic data it is clear that a party is not under duty to keep every email or electronic document. However, a party must not destroy "unique relevant evidence that might be useful to an adversary.  This includes *any document made by an individual likely to have discoverable information that the disclosing party may use to support its claims or defenses*." Fed.R.Civ.P.26(a)(1)(A). *Clark Constr. Group v. City of Memphis*, 229 F.R.D.131(W.D.Tenn

2005)(emphasis added).[6]

The duty to preserve attaches as soon as litigation becomes reasonably foreseeable. While litigation often involves the issue of foreseeability, that is not an issue here, since the case has been pending since 1998, and the Defendants have been under an active, continuous duty to track and document their compliance with the Consent Decree. Until the Court finds that the State has achieved compliance with the Consent Decree, the State must afford Plaintiffs' counsel, on 30 days notice, access "to any public records relating to the state's compliance with the terms of the order, or to the monitoring, auditing or testing of such compliance". (Doc. 12 at 50 Para. 105). Moreover, the Defendants have known since early 2003, even before the Governor announced his plans to overhaul TennCare, that those plans might conflict with the Consent Decree. (See Notice of Filing, Exhibit K: 7-5-05 Testimony of Manny Martins in *Grier v. Goetz,* No. 79-3107 (M.D. Tenn.), 7-7-05 , Trans.  Vol. IV-A (Martins Test.) at 714-15.) The former Special Master cautioned state officials that their new definition of "medical necessity," unveiled in the spring of that year, would violate EPSDT. (Doc. 465 and the Report of the Special Mater which was attached) In May 2003, the Plaintiffs filed a motion to determine their compliance. The following month the Plaintiffs moved for an order to show cause and propounded written discovery. In October 2004, on the eve of the moratorium, the Defendants received a copy of a lengthy and detailed letter to the Centers for Medicare and Medicaid Services asserting that the State's plans would violate EPSDT.

The duty to preserve required the Defendants to determine what was relevant or might lead to relevant information, defining "relevance" broadly. The *Zubulake IV* court explained the

---

6    The duty to preserve includes an obligation to ensure that agents , such as managed care contractors, preserve any potentially relevant evidence that is in their control.  *See Jordan F. Miller Corporation the Mid-Continent Aircraft Service, Inc., NO.97-5089,1998U.S.APP LEXIS2739 (10th Cir. Fed. 20, 1998).*

broad contours of the duty to preserve saying that the duty "should certainly extend to any document … 'likely to have discoverable information that the disclosing party may use to support its claims or defenses.' The duty also includes documents prepared for individuals to the extent that those documents can be readily identified (e.g., from the "to" field on emails). 220 F.R.D.212, 218-219.

In the present case, the Defendants were well aware of the broad scope of relevance. The Defendants had litigated the compliance issue at length in 2001, and during those proceedings they had been required to make discovery on the very same topics that are the subject of present discovery requests. They had received specific written discovery that remained partially unanswered when the moratorium took effect in November 2004.[7] The Defendants cannot claim that any of the discovery requests that they received this year were unforeseeable.

To discharge its document preservation responsibilities, the State was obligated to issue "litigation hold" letters to state officials. Such letters should have communicated directly with "key players" about the need to preserve evidence in their possession; *Zubulake v.UBS Warbug, LLC*, 229 F.R.D. 422, 431-433 (S.D.N.Y. 2004)( "*Zubulake* V"). The letters should have been reissued periodically as necessary to remind key employees that the preservation duty still existed; this was only part of the larger obligation to take affirmative steps to ensure that parties were complying with the duty to preserve. *Telecom. Int'l Am. Ltd v AT&T Corp,*189 F.R.D.

---

7  When the State partially answered the Plaintiffs' Second Set of Interrogatories and Requests for Production in July 2004, it objected to certain discovery requests on the basis of deliberative process privilege. In a June 18, 2004 ruling , the Court upheld the objection for the time being, but held that the privilege would no longer justify the withholding of relevant documents, once the Defendants had concluded their deliberations and had finalized decisions re. policies affecting EPSDT compliance. (Doc. 409) Thus, when the moratorium went into effect, the State knew that it would have to supplement its answers to the outstanding discovery requests, in addition to anticipating further discovery relating to its current compliance status, once the moratorium ended.

76,81(S.D.N.Y.1999).  The State should have also made sure that back up media were identified and stored in a safe place. (*Zubulake V*, at 431-433 )

*The confirmations and clarifications sought by the Plaintiffs are essential to ensure the integrity of these proceedings and the accuracy and fairness of the fact-finding process.*

The questions ask for assurances that the State has met its responsibilities under applicable case law discussed above. Responding to the questions involves no burden or imposition. No investigation should be necessary, since defense counsel had to have satisfied themselves regarding such matters before signing the State's response to the interrogatories and requests for production of documents.  If the Defendants have met their discovery obligations, they need only provide a simple "yes" to all but two of the questions. The remaining two queries, Questions 2 and 5, merely seek the identification of responsible individuals and a copy of any document retention instructions issued in fulfillment of the Defendants' duties. If, on the other hand, an unambiguous "yes" is not possible under the facts surrounding the State's actions, the Plaintiffs and the Court are entitled to know those facts.

**B.   *Specific Interrogatories and Document Requests***

*Plaintiffs' Discovery Request*

<u>INTERROGATORY NO. 49</u>

Identify all present and  former employees of the Defendants, their contractors or consultants, other than those already listed in your answers to previous interrogatories, who possess information concerning whether Defendants have complied or failed to comply with the Consent Decree during the period since December 2001.  For each individual identified, in addition to the other information specified in the instructions that precede these interrogatories, please provide the time period during which he/she was involved, and the category for which the individual can provide such information (outreach, screening, diagnosis and treatment, coordination of services, and DCS).

*Defendants' Response*

The Defendants objected on the grounds that gathering the names and contact information of current and former employees who possessed information concerning

Defendants' compliance is unreasonable and burdensome. They objected that it would require them to "reach hordes of individuals (presumably thousands) who work for the State as well as countless individuals." To meet this objection the Plaintiffs narrowed their request in an August 16, 2006 letter to "*former* employees, contractors or consultants" and "present employees, contractors or consultants who formerly had major responsibilities for some aspect of monitoring or implementing the Consent Decree." The Defendants still objected. On September 12, 2006, Plaintiffs further limited their request by restricting information on former employees to those separated from employment since September 1, 2003 and only those who had substantial responsibilities related to EPSDT compliance. Moreover, Plaintiffs' offered to review a State personnel registry of employment positions, and to limit their request to those whose job descriptions suggested a strong tie to EPSDT implementation. The Defendants adamantly refuse to provide such information.

*The requested information is discoverable and owed the Plaintiffs by law*

Obtaining the names and addresses of the individuals who had responsibility for carrying out certain provisions of the Consent Decree is crucial to Plaintiffs' claim that the Defendants have failed to comply with the Consent Decree. Defendants' sole argument in refusing to produce the requested information is that providing the information would be burdensome. Defendants' objection is of no moment. "It is well established that the scope of discovery is within the sound discretion of the trial court." *Chrysler Corp. v. Fedders Corp.,* 643 F.2d 1229, 1240 (6th.Cir.1981). In many instances courts have granted Plaintiffs broad discovery of personnel files. *Coughlin v. Lee*, 946 F.2d 1152, 1159 (5th Cir.1991), *See, e.g., Trevino v. Celanese Corp.,* 701 F.2d 397, 405-06 (5th Cir.1983); *See also Smith v. University of Pennsylvania,* Slip Copy, 2006 WL 1722402 (E.D. Pa.)(granting Plaintiffs motion to compel

name, race, address and telephone number of people employed in 1995 and name, race, address and telephone number of each employee or former employee receiving workers compensation.)

Further, while Plaintiffs maintain that the State misread the original request to make it appear unduly burdensome, they have sharply narrowed the request to remove any perceived burden Defendants claim exist. The information now sought does not require the Defendants to contact anyone, or to develop any information that is not already in the State's automated personnel records, or those of their managed care contractors. Plaintiffs' seek the names, job titles, and last known addresses and contact numbers of former employees with EPSDT-related responsibilities. It will be up to the Plaintiffs to do the "leg work" of contacting those individuals to see if they are willing and able to provide relevant information regarding EPSDT compliance. If the last known contact information in the State's or its contractors' files is now out-of-date, the burden will be on the Plaintiffs, not the Defendants, to try to locate the individuals. Providing a printout of names and contact information for former employees is clearly not a burdensome task.

The Defendants also refuse to provide the information on the basis of their objection to "Plaintiffs' counsel contacting any employee (current or former) who Plaintiffs contend speak for the State and whose testimony is a party admission as such individuals may only be contacted through counsel or its contractors." That objection is no justification for refusing to provide the information requested. Few of the individuals who have knowledge of discoverable matters, and whose identity is requested, will fall in a category that restricts the Plaintiffs' counsel from contacting them except through defense counsel. The State has no right to impede Plaintiffs' investigation of the case by preventing their counsel from communicating with a group of knowledgeable individuals who no longer are constrained by their employment from candidly

disclosing the state of TennCare's EPSDT compliance. And for the small subset of such

individuals who are subject to ethical limitations on communications with Plaintiffs' counsel,

those limitations do not excuse the Defendants' refusal to make discovery. Their identification is

needed to aid the Plaintiffs' decisions regarding whom to depose.

*Plaintiffs' Discovery Request*

> DOCUMENT REQUEST NO. 9
>
> For the period since April 1, 2005, please produce all communications and
> documents in the possession of the Defendants and/or the Title V Maternal and Child
> Health/Crippled Children's Services and/or Children's Special Services programs and
> that pertain to any child who was a member of the plaintiff class and on whose behalf
> services were sought from the Title V Maternal and Child Health/Crippled Children's
> Services and/or Children's Special Services program(s).

*Defendants' Response*

The Defendants refused to provide the requested documents, objecting that the request

was "overly broad and unduly burdensome" and that the State could not identify which children

seeking CSS services were TennCare eligible.[8] Following further negotiations, the Plaintiffs

offered to accept the CSS and TennCare records of a randomly selected set of 100 children, plus

all CSS and TennCare records where CSS coverage of medical foods had been sought by

TennCare children with Phenylketonuria (PKU).[9] The State objected that the request was still too

burdensome, because CSS records on a single child are maintained in three different locations.

The Plaintiffs narrowed their request to CSS records from the single location that maintains the

most complete records. The State still objected on grounds of burdensomeness to producing

---

8    When the Plaintiffs pointed out in an August 17 letter that the State had been able to identify
     TennCare children seeking CSS services in 2001, the State acknowledged that it would not
     be a problem.

9    Children with PKU were singled out, because they seek services that the State has recently
     excluded as never being medically necessary. If CSS found that those services were
     medically necessary and should be covered, those children's files would provide evidence of
     a systemic violation of EPSDT.

more than fifty randomly selected cases. Consistent with its general refusal to produce contractor files, the State also refused altogether to provide any TennCare records on these children that are in the possession of the managed care contractors.

*The requested information is discoverable and owed the Plaintiffs by law*

The *John B.* Consent Decree enforces a federal statutory mandate that guarantees that every TennCare child receive such health care services as are medically necessary, without limits or exclusions. (Doc. 12 at 13-14, Paragraphs 36-37)  Children's Special Services (CSS) is a state-administered health program for children, federally funded under Title V of the Public Health Act.  CSS provides health care services to children with severe medical needs, and who lack other means of obtaining such care. Because of the scope of services guaranteed by the Consent Decree is so comprehensive, no child in the plaintiff class should have to resort to Children's Special Services to obtain any medically necessary health care. Documentation of plaintiff class members having to resort to this program to obtain medically necessary care is evidence that TennCare is failing to meet its obligation under the Decree.

The information requested will enable the Plaintiffs to establish that the State is allowing its MCC contractors to violate their contracts and to cost shift to other state programs. As a result of this, children who are not eligible for Children's Special Services will face similar denials, but will not have the state program to meet their needs. They will go without medical care guaranteed by the Consent Decree.

Even TennCare children who qualify for Children's Special Services may not have their medical needs met, if they are unable to obtain EPSDT services from TennCare.  Children Special Services is a limited pot of money. When it is spent, children go without care, even if the program would cover the service otherwise.

The Court has previously rejected the arguments that the State is making now. In 2001, the Plaintiffs sought similar information regarding children in the plaintiff class who had sought services from CSS as a reflection of their inability to access EPSDT services through TennCare. The State refused to provide the information, and asserted objections similar to those that it asserts now. (Doc. 90: State's Memorandum in Support of Protective Order, pp. 10, 16-18) The issues were fully brief and argued at a hearing before the Magistrate. (Docs. 92, 93, 94 and 96) The Court found that the information was not overly burdensome and must be produced. ( Doc. 103, p. 10; Doc. 100). The information led to evidence of systemic denials of EPSDT services, and Plaintiffs relied on information obtained from discovery on this topic in their post-hearing brief. (Doc. 209, pp 57-58)

Although, by the terms of the Court's previous ruling, the Plaintiffs would be entitled to substantially broader production, in the interests of limiting discovery to the very minimum needed, they have substantially narrowed their request for CSS-related documents. The State has arbitrarily refused to provide more than fifty cases and has refused to provide any TennCare records on any of these children except in the small number of cases where the children have appealed the MCOs' denial of care. The refusal to produce records of the MCOs' or BHOs' denial of care to these children, based on the State's broader refusal to seek relevant documents in the possession or control of its managed care contractors, is insupportable and makes it impossible, except in cases where an appeal has been filed, to know why the children were denied TennCare services. The State's position is without either practical justification or support in the law.

**Conclusion**

For the foregoing reasons, the Plaintiffs are entitled to an order compelling the

Defendants to make discovery by providing the information and documents that the State

has improperly withheld.

Dated this 13th day of October, 2006.

Respectfully submitted,

TENNESSEE JUSTICE CENTER

s/Michele M. Johnson.
Michele M. Johnson, Tenn. BPR # 16756
301 Charlotte Avenue
Nashville, TN 37201-1101
Phone: 615-255-0331
FAX: 615-255-0354

Gregory T. Heyman
Albert H. Kass
Junaid Khalil
Victoria Reznik
Shira J. Schlaff
KIRKLAND & ELLIS, LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Phone 212-446-4800

Jeffrey S. Goldman
Robert T. Joseph
SONNENSCHEIN NATH & ROSENTHAL
7800 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6404
Phone 312.876.8000

Counsel for the Plaintiffs

# CERTIFICATE OF SERVICE

I certify that a copy of this document has been served on the state defendants and the monitors on the 13th day of October, 2006, by the Electronic Court Filing system addressed as follows:

COUNSEL FOR THE DEFENDANTS:

Ms. Linda Ross
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-1771
linda.ross@state.tn.us

Mr. Aubrey B. Harwell, Jr.
Mr. Ronald G. Harris
Mr. Philip D. Irwin
NEAL & HARWELL, PLC
2000 One Nashville Place
150 Fourth Avenue North
Nashville, TN 37219-2498
(615) 244-1713
aharwell@nealharwell.com
rharris@nealharwell.com
pirwin@nealharwell.com

Mr. Charles J. Cooper
Mr. Michael W. Kirk
Ms. Nicole J. Moss
Mr. Derek L. Shaffer
COOPER & KIRK, PLLC
555 11th Street N.W., Suite 750
Washington, D.C. 20004
(202) 220-9600
ccooper@cooperkirk.com
mkirk@cooperkirk.com
dshaffer@cooperkirk.com
nmoss@cooperkirk.com

COURT-APPOINTED MONITORS:

Ms. Susan Kay
susan.kay@vanderbilt.edu

Mr. Alex Hurder
alex.hurder@vanderbilt.edu

Mr. Michael Passino
passino@mpassino.com

Mr. Robert L. Smith
rlsmith@shbhlawfirm.com

Ms. Leilani Boulware
lboulware@mmc.edu


s/ Michele M. Johnson
Counsel for the Plaintiffs