# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JOHN B., CARRIE G., JOSHUA M.,  )
MEGAN A. and ERICA A., by their next friend, L.A.; )
DUSTIN P.,by his next friend, Linda C.; )
BAYLI S. by her next friend, C.W.; )
JAMES D. by his next friend, Susan H.; )  NO. 3:98-0168
ELSIE H. by her next friend, Stacy Miller; )  JUDGE HAYNES
JULIAN C. by his next friend, Shawn C.; )
TROY D. by his next friend, T.W.; )
RAY M. by his next friend, P.D.; )
ROSCOE W. by his next friend, K.B.; )
JACOB R. by his next friend, Kim B.; )
JUSTIN S. by his next friend, Diane P.; )
ESTEL W. by his next friend, E.D.; )
individually and on behalf of all others )
similarly situated, )
 )
  *Plaintiffs,* )
 )
DAVE GOETZ, Commissioner, Tennessee Department )
of Finance and Administration; DARIN  GORDON, )
Deputy Commissioner, Bureau of TennCare; and )
VIOLA MILLER, Commissioner, Tennessee )
Department of Children's Services, )
 )
  *Defendants.* )

# M E M O R A N D U M

# TABLE OF CONTENTS

**I.      History of this Litigation**                                                    10

    A.      Consent Decree and Earlier Proceedings                              10

    B.      The Court's 2001 Findings of the Defendants' Noncompliance          16

    C.      The Court's 2004 Findings of the Defendants' Noncompliance          26

    D.       The Recusal Order and Reassignment                                 30

    E.       The 2006 Discovery Proceedings                                     34

**II.     Plaintiffs' Renewed Motion to Compel**                                   42

    A.      Findings of Fact                                                    42

        1.      Information Requirements and  Discovery Rights under the
             Consent Decree                                             43

        2.      The Lack of Preservation of Relevant Records                45

        3.      Inadequacies in the Defendants' 2006 Paper Production       56

        4.      The Necessity of Plaintiffs' ESI  Discovery Requests        65

        5.      The Costs of ESI Production                                 68

        6.      Privileged Information in the ESI Production                76

        7.      Defendants' Failures to Answer Plaintiffs' Requests for
             Admissions and to Comply with the January 14th Order        90

        8.      Other ESI Production Issues                                 101

    B.      Conclusions of Law                                                  101

        1.      Discovery from the MCCs                                     102

        2.      Discovery Standards                                         107

        3.      Discovery Rules on Electronic Discovery                     109

2

| | 4. | Duty to Preserve | 118 |
| | 5. | The Undue Burden Analysis | 129 |
| | | (i) Types of ESI Data | 130 |
| | | (ii) Defendants' and MCCs' Databases | 138 |
| | | (iii) The Costs of Production | 139 |
| | 6. | The Good Cause Showing and the Rule 26(b)(2)(C) factors | 143 |
| | 7. | Privilege Issues | 153 |
| | | a. Attorney -Client Privilege | 158 |
| | | b. Work Product Privilege | 164 |
| | | c. Joint Defense Privilege | 166 |
| | | d. Deliberative Process Privilege | 168 |
| | | e. State Statutory Privileges | 169 |
| | 8. | Defendants' Failures to Answer Plaintiffs' Requests for Admissions and to Comply with the January 14th Order | 177 |
| **III.** | **Remedies** | | 184 |

3

Plaintiffs, John B., and other minors through their next friends, filed this action on behalf of themselves and other similarly situated minors under 42 U.S.C. § 1983 asserting jurisdiction under 28 U.S.C. § 1331, the federal question jurisdiction statute, with its statutory counterpart, 28 U.S.C. § 1343(a)(3) and (4). Plaintiffs' action is on behalf of a class of approximately 550,000 children who are entitled under federal law to medical services that include early and periodic screenings for their physical well being, including their dental and behavioral health needs. Federal law also requires any necessary follow-up medical services. The Plaintiffs' class includes children who are in the state's custody through the state's juvenile court system and other children's programs provided by the State of Tennessee.

Plaintiffs seek to enforce their rights under Title VI of the Social Security Act, 42 U.S.C. §§620-629 and 670-679 and Title IX of that Act, 42 U.S.C. § 1396 et seq. as well as remedies for violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. In essence, Plaintiffs allege that the Defendants deprived them of their rights to early and periodic screening, diagnosis and treatment (EPSDT) services and related medical care for children under State's TennCare program and children who are in the Defendants' legal custody are also entitled to such services under Title VI.

The original Defendants were Nancy Menke, Commissioner, Tennessee Department of Health; Theresa Clarke, Assistant Commissioner, Bureau of TennCare; and George Hattaway, Commissioner, Tennessee Department of Children's Services. The successors in office and current Defendants are: David Goetz, Commissioner, Tennessee Department of Finance and Administration;

J.D. Hickey, Assistant Commissioner, TennCare Bureau[1]; and Viola Miller, Tennessee Department of Children's Services. The Defendants are state officials who are in charge of the State programs for these services that are federally funded by Congress under Title VI of the Social Security Act, 42 U.S.C. §§620-629 and 670-679 and Title IX of that Act. The medical services at issue are provided under the State's TennCare program, a waiver program approved by the Center for Medicare and Medicaid Services ("CMS"). The actual providers of these medical services are the Managed Care Contractors ("MCCs") or Managed Care Companies ("MCOs") that have contracts with the State detailing their responsibilities. Some MCCs provide only management services and some MCCs specialize in dental or behavioral health services.

Contemporaneous with the filing of the complaint, Plaintiffs requested class certification and the parties agreed to entry of a Consent Decree to remedy Plaintiffs' claims and to certify the class. (Docket Entry No. 3). The Court certified the class and entered the Consent Decree (Docket Entry No. 12) that granted declaratory and injunctive relief on Plaintiff's EPSDT claims. The Consent Decree enjoined the Defendants, as state officials, from depriving Plaintiffs and members of their class of their rights to EPSDT services; set minimum percentages of screenings for different groups of children over a period of years for compliance with EPSDT laws; and required a detailed, multi-year remedial plan to ensure the Defendants' compliance with Consent Decree. Lengthy and complex proceedings followed, including several show cause and contempt hearings. (Docket Entry Nos. 79, 228, 270, 291, 465 and 558).

After a series of hearings and conferences on the parties' current discovery disputes, the Court

---

[1]The Defendant Hickey has since left state employment and substitution of his successor has not been sought.

Case 3:98-cv-00168   Document 1028   Filed 10/09/07   Page 5 of 47 PageID #: 11268

ordered that discovery of electronically stored information ("ESI")[2] shall be provided and directed the parties' computer experts to develop a protocol for ESI discovery from the Defendants and their MCCs. On December 6, 2006, the Plaintiffs' and the State's computer experts agreed to a protocol for the ESI discovery, that was subject to modifications for the search terms and consultations with the MCCs. (Docket Entry No. 764 at pp. 14-26 and Docket Entry No. 765). The Defendants continued to oppose the terms for production of Plaintiffs' ESI discovery. Plaintiffs then renewed their motion to compel.

Before the Court is the Plaintiffs' renewed motion to compel (Docket Entry No. 826) that asserts their discovery rights to ESI from the Defendants and the MCCs under Orders of the Court, the Federal Rules of Civil Procedure and the Consent Decree. Plaintiffs contend that the ESI is necessary to assess the Defendants' contention that they are now in compliance with the Consent Decree and to discover whether the Defendants' remain noncompliant, as earlier found by the Court. Plaintiffs ask the Court to compel the Defendants' compliance with the Court's earlier Orders for the Defendant to produce ESI and to require certain key custodians to certify that documents covered by the Plaintiffs' discovery requests have not been removed or destroyed. For their motion, Plaintiffs rely upon the Court's earlier Orders compelling the Defendants' production of:

      1.       Documents, ESI and information in the possession or control of the State's

---

[2] ESI can be defined as "any information created or stored in digital form whenever a computer is used to accomplish a task" Chung & Byer, The Electronic Paper Trail: Evidentiary Obstacles to Discovery and Admission of Electronic Evidence, 4. B.U. J. SCI. & TECH. L. 5, para. 8 (1998) or "any electronically-stored information subject to pre-trial discovery" Scheindlin & Rabkin, Electronic Discovery in Federal Civil Litigation: Is Rule 34 Up to the Task?, 41 B.C. L. REV. 327, 332-33 (2000).

contractors.[3]

2.      ESI in the possession of the State's key custodians.[4]

3.      The identities of former employees of the State and its contractors with substantial EPSDT responsibilities.[5]

4.      Certifications from key custodians whether any responsive ESI has been removed.[6]

5.      Files for a sample of TennCare children who sought care from the Children's Special Services (CSS) program.[7]

6.      Answers, signed by all key custodians who participated in preparing the State's discovery response, to the plaintiffs' requests for admissions and interrogatories seeking assurances that responsive documents and ESI had not been destroyed and had been produced.[8]

(Docket Entry No. 826, Plaintiffs' Renewed Motion to Compel at pp. 2-3). In sum, the Plaintiffs

assert that their ability to protect the interests of the class requires a complete ESI production from

the Defendants and their MCCs because a complete ESI production is a essential guide through the

_____

[3] Bench ruling of November 6, 2006 (Docket Entry No. 734 at pp. 72-73) and Order of November 21, 2006 (Docket Entry No. 743 at pp. 1-2).

[4] Bench ruling of November 6, 2006 (Docket Entry No. 734 at pp. 29, 68); Order of November 21, 2006 (Docket Entry No. 743 at p. 2).

[5] Bench ruling of November 6, 2006 (Docket Entry No. 734 at p. 49) and Order of November 21, 2006 (Docket Entry No. 743 at p. 3).

[6] Order of January 14, 2007 (Docket Entry No. 789 at p. 3), citing Docket Entry No. 785-2, Tigh Affidavit, ¶ C.

[7] Bench ruling of November 6, 2006 (Docket Entry No. 734 at p. 65) and Order of November 21, 2006 (Docket Entry No. 743 at p. 4).

[8] Bench ruling of November 6, 2006 (Docket Entry No. 734 at pp. 56-64); bench ruling of December 20, 2006 (Docket Entry No. 786 at pp. 41-42); Order of November 21, 2006 (Docket Entry No. 743 at p. 3). The Defendants filed partial responses on January 30, 2007. (Docket Entry No. 799). Yet, nine former employees, including two former TennCare directors or supervisors and the Governor, did not respond personally.

State's and MCCs' complex systems on this statewide healthcare system.

In their responses, (Docket Entry Nos. 893, 898, 907, 929 and 953), Defendants and the MCCs assert, in essence, that Plaintiffs' ESI production requests are unduly burdensome based upon the extraordinary costs of production. These costs are for the actual technical production costs and substantial personnel and lawyer time to conduct the necessary privilege reviews. Moreover, the Defendants cite their earlier production of hard copies of responsive documents for the period for 2004 to April 6, 2006.[9] In their view, that paper production precludes an ESI production for the same time period. In addition, the Defendants and MCCs rely upon federal and state privacy laws that preclude the discovery of some information sought by the Plaintiffs. The MCCs also cite the need to exclude information protected by their contracts with other businesses and Medicaid programs in other states.

Also before the Court are the MCCs' related motions to allocate discovery costs. (Docket Entry Nos. 920, 921, 935) to which the Defendants responded. (Docket Entry No. 946). The MCC Doral filed a reply (Docket Entry No. 964). The MCC, BlueCross /BlueShield, has filed a motion to alter or amend the June 1, 2007 Order or motion for a partial new trial. (Docket Entry No. 931).

---

[9]The Defendants also assert that if the Court would grant their pending motion to vacate the Consent Decree, these discovery issues would be moot. First, the Court previously addressed the contentions in their motion to vacate and the Court denied that motion. (Docket Entry No. 646, April 17, 2006 Conference at pp. 9-12). The Defendants did not appeal that ruling. Second, under Local Rule 16.01(e)(1), the pendency of a dispositive motion does not stay discovery. Third, the Court had been working on the Defendants' motion to vacate and from its research and the state of the record, the Court remains confident that ruling on the discovery disputes is appropriate. If the Defendants had not been so intransigent on discovery issues requiring extraordinary amounts of the Court's time, there would have been a ruling on the motion to vacate. The Court will continue its research on that motion, but the Court also has to give attention to other actions on this Court's docket because rulings in other actions have been delayed because of the extraordinary amount of time the Court has had to expend on the ESI issues in this action.

8

After extensive proceedings on the issues raised by the Plaintiffs' renewed motion to compel and shortly before the Court's filing of this Memorandum on Plaintiffs' renewed motion to compel, the Defendants filed a "Notice" of mootness. (Docket Entry No. 1023). Defendants stated that in contemplation of the Court's imminent adverse ruling, the Defendant were proceeding to produce the ESI discovery. Thus, the Defendants suggested the Plaintiffs' renewed motion to compel was moot. The Court delayed filing this Memorandum to allow Plaintiffs and any MCC the opportunity to respond to the Defendants' Notice. As reflected in the Plaintiffs' responses (Docket Entry No. 1024 and 1025) to which the Defendants filed a reply (Docket Entry No. 1027), Plaintiffs contend that the Defendants' Notice does not moot their renewed motion to compel and in fact, raises more issues. The Defendants' Notice among other things, would set a January 2007 time limit to the ESI production and limit any privilege review to a word search. Plaintiffs argue that the Defendants' Notice reflects the Defendants' bad faith litigation tactics that caused the Plaintiffs, MCCs and the Court to expend extraordinary resources on issues the defendants now declare moot.

The Court respectfully declines the defendants' suggestions of mootness. First, the Plaintiffs' responses to the Defendants' Notice reflect the actual lack of mootness and additional issues created by this Notice. Moreover, as set forth in this Memorandum and as established by the record in this action, the Court observes: (1) that the Defendants have repeatedly violated their agreements set forth in the Consent Decree; (2) that the Defendants have failed to comply with Judge Nixon's Order to submit an Initial Work Plan to remedy the Defendants' violation of federal law to conform to the Consent Decree; (3) that the Defendants refused to corporate with the Special Master appointed by the Court to develop a plan for compliance with federal law as required by the Consent Decree; (4) that the Defendants have disavowed a clear command of the Consent Decree to develop a specific

9

remedial plan; (5) that the Defendants breached their agreement with the Plaintiffs on the dates for ESI discovery and the ESI protocol; (6) that the Defendant have ignored Court's directions to provide ESI to Plaintiffs; and (7) that the Defendants failed to comply with the Court's Orders on discovery. In these circumstances, the Court lacks confidence in the Defendants' assertions that the discovery disputes in this action are moot.

## I. History of this Litigation

To decide the Plaintiffs' renewed motion to compel and to understand the related issues before the Court, a brief discussion of the history of this litigation is necessary.[10] This review provides insights to understand the ESI discovery sought by the Plaintiffs and the necessity for that discovery.

### A. The Consent Decree and Earlier Proceedings

The Consent Decree certified the class, conferred substantive relief to the members of the Plaintiffs' class and imposed obligations upon the Defendants and the MCCs to provide EPSDT services to the class members and to report on their provisions of such services. (Docket Entry No. 12). Here, the pertinent substantive provisions of the 1998 Consent Decree found certain facts and established criteria for compliance, subject to practical limitations and those provisions are as follows:

29.     The timetable negotiated by the parties affords the state a period of more than five years within which to achieve full compliance with EPSDT and related laws. Settlement thus gives the state a grace period within which to achieve compliance, thereby countenancing partial noncompliance for five more years.

---

[10] This section of the Memorandum is organized for the purpose of analyzing the factors in Fed. R. Civ. P. 26(b)(2)(C) as well as other rules in light of the 2006 amendments of the Rules of Civil Procedure governing ESI. The Court deeply regrets the length of the Memorandum, but a reasoned resolution of the parties' contentions requires its length.

Case 3:98-cv-00168   Document 1028   Filed 10/09/07   Page 10 of 47 PageID #: 11273

30.     Nonetheless, present officials cannot correct problems overnight which have been years in the making. **Their development of the remedial plan is itself evidence of their genuine commitment to reform...**

\*     \*     \*

33.     The fact that state policy is still being developed poses special challenges for the drafting of an appropriate order in this case. On the other hand, **present problems point up the need to afford immediate protection to children who plaintiffs allege are not now receiving the care to which the law entitles them and who are liable to suffer serious, irreparable harm if such care is not provided. They cannot be asked to wait for additional months or years to know if policies now under development by the defendants will some day adequately protect their rights.**

\*     \*     \*

46.     A baseline periodic screening level will be calculated by the TennCare Bureau using HCFA 416 mathematical methodology and enrollment and encounter data to determine the number of periodic screens that should have occurred in the federal fiscal year ending September 30, 1996. The CPT-4 and ICD-9CM codes specified in HEDIS 3.0 as well-care visits and adolescent well-care visits will be the primary determinants of which encounters are counted as periodic screens. The baseline periodic screening ratio for the period from October 1, 1995 through September 30, 1996 will be calculated using HCFA 416 methodology. This baseline periodic screening ratio will be multiplied by 100 to calculate the baseline periodic screening percentage. Subsequent periodic screening percentages will be calculated using methodology identical to that used in calculation of the baseline periodic screening percentage.

\*     \*     \*

50.     **For the period of October 1, 2000 through September 30, 2001, the [Adjusted Period Screening Percentage] APSP shall be no less than 80.** The APSP for the federal fiscal year ending on September 30, 2001 will be calculated by TennCare and made available to the plaintiffs by April 30, 2002.

**For the period of October 1, 2002 through September 30, 2003, the DSP shall be no less than 80.** The DSP for the federal fiscal year ending on September 30, 2003 will be calculated by TennCare and made available to the plaintiffs by April 30, 2004.

\*     \*     \*

11

52.     **The Defendants shall achieve complete screening of 100% of TennCare children in DCS custody within 18 months of the entry of this order, and shall maintain that level of screening thereafter.** The tracking system developed by DCS shall be the system which shall be used to report compliance with this standard.

                                    *       *       *

54.     **Defendants shall ensure that within their respective spheres of responsibility, TennCare, the MCCs and DCS provide children all medically necessary EPSDT services as listed in 42 U.S.C. § 1396d(a) and as defined in corresponding Medical regulations. Services which are required under EPSDT law, when medically necessary, are as follows:**

        (a)     Inpatient hospital services (other than services in an institution for mental illness);

        (b)     Outpatient hospital services; rural health clinic services; and services offered by a federally-qualified health center;

        (c)     Other laboratory and x-ray services;

        (d)     EPSDT services, and family planning services and supplies;

        (e)     Physicians' services; medical and surgical services furnished by a dentist;

        (f)     Medical care, or any other type of remedial care recognized under state law, furnished by licensed practitioners within the scope of their practice as defined by state law;

        (g)     Home health care services;

        (h)     Private duty nursing services;

        (i)     Clinic services;

        (j)     Dental services;

        (k)     Physical therapy and related services;

        (l)     Prescribed drugs, dentures, and prosthetic devices; eyeglasses;

                                    12

(m)     Other diagnostic, screening, preventive, and rehabilitative services;

(n)     Services in an intermediate care facility for the mentally retarded (other than in an institution for mental diseases);

(o)     Impatient psychiatric services for individuals under age 21;

(p)     Services furnished by a nurse-midwife;

(q)     Hospice care;

(r)     Case management services and TB-related services;

(s)     Respiratory care services;

(t)     Services furnished by a certified pediatric nurse practitioner or certified family nurse practitioner;

(u)     Personal care services furnished to an individual who is not an inpatient or resident of a hospital, nursing facility, intermediate care facility for the mentally retarded, or institution for mental disease; and

(v)     Any other medical care, and any other type of remedial care recognized under state law, specified by the Secretary of the Untied States Department of Health and Human Services.

In addition to the services identified in the above list, the TennCare waiver allows the used of cost-effective alternative services in certain situations. These cost-effective alternative services are identified as services which may or may not be included in the above list and which are medically appropriate and cost-effective when delivered in place of other services on the list which have been determined to be medically necessary for an individual enrollee. The parties recognize that there are many kinds of services which fit under the above list of covered services and that delivery of medically necessary services may involve different service delivery mechanisms.

55.     **The defendants shall review MCO practices with regard to making decisions about medical necessity and identify any practices that are inconsistent with the federal laws cited herein. The defendants shall issue clarifications and ensure compliance with such federal law, regarding medically necessary treatment,** including but not limited to, the following clarifications:

13

(a)    The prior authorizations and medical determinations shall be made on a case-by-case basis for each service sought for a class member.

(b)    That services are provided if necessary "to correct or ameliorate defects and physical and mental illnesses and conditions. . . ." 42 U.S.C. § 1396d(r)(5).

(c)    That the definition of medical necessity shall be applied so that services are covered if they correct, compensate for, improve, or prevent a condition from worsening, even if the condition cannot be prevented or cured.

(d)    That medically necessary services shall be provided, whether or not the screener is under contract with the particular managed care entity.

(e)    That defendants and their contractors and subcontractors are in compliance with HCFA Office of Managed Care Operational Policy Letter No. 96.045 (December 3, 1996), and do not have financial or contractual arrangements which undermine class members' access to covered services. (See Attachment 1).

(Docket Entry No. 12 at ¶¶ 29, 30, 33, 46, 50, 52, 54, and 55) (emphasis added).

The Consent Decree also set a series of deadlines for the Defendants to accomplish these substantive provisions:

39.    Within 180 days of entry of the decree, the State shall adopt any policies and procedures necessary to ensure TennCare rules and guidelines clearly describe and allocate responsibility for and require compliance with each specific outreach and informing requirement under federal law...

\*   \*   \*

40.    The Defendants or their contractors shall achieve within 240 days and shall maintain thereafter, EPSDT outreach efforts designed to reach all members of the plaintiff class with information and materials conform with Section V(B)(1)(a).

\*   \*   \*

45.    Within 120 days after this order is entered, a baseline percentage of

14

screening compliance shall be determined. The defendants, in consultation with the plaintiffs, shall determine the percentage based on the best available data on recent screening levels.

\* \* \*

53.  Within 120 days of the entry of this order, the defendants shall establish and maintain a process for reviewing the practices and procedures of the MCOs and DCS, and require such modifications of those practices and procedures as are necessary to ensure that children can be appropriately referred from one level of screening or diagnosis to another, more sophisticated level of diagnosis as needed to determine the child's physical health, behavioral health and development needs, as to medically necessary services.

\* \* \*

60.  Within 120 days of this decree, TennCare shall develop a provider handbook to specify the responsibilities of MCOs and DCS related to the provision of medically necessary services for children in DCS custody. This handbook shall assist in delineating service duty responsibilities in the area where there is the most potential for overlap, and said provider book shall provide... [And then it identifies a number of requirements.]

\* \* \*

62.  Beginning no later than 180 days after the entry of this Order, the defendants shall require MCOs to provide each primary care provider participating in the EPSDT program an up-to-date list of specialists to whom referrals may be made for screens, laboratory tests, further diagnostic services and corrective treatment. This list shall be supplemented quarterly to indicate additions or deletion and shall comply with the access/availability standards of the 1115 waiver.

\* \* \*

65.  Within 180 days of this order, the State shall issue any necessary policy clarifications so that the defendants and their contractors understand their duty to provide EPSDT diagnosis and treatment services consistent with 42 U.S.C. Section 1396 (D), Subsection (r). Thereafter, the defendant shall inform in a timely manner and on an ongoing basis all of their contractors about what federal Medicaid law requires with respect to specific screens, diagnoses and treatments.

\* \* \*

15

72.   Within 30 days of the entry of this Order the defendants shall submit a notice of proposed rulemaking to withdraw state rules establishing lifetime dollar limits and absolute service limits on behavioral health services to children under 21.

73.   Within 120 days of the entry of this Order, the state or the state's contractor shall monitor a sample of children entering DCS custody and assess the adequacy of services provided to them by TennCare contractors prior to their entry into custody. The review will include an assessment of the effectiveness of the services provided to the child prior to the custody arrangement being made.

*   *   *

82.   Within 180 days, the defendant shall issue regulations and policy guidance to their contractors which incorporate strategies for ensuring coordination of EPSDT services among contractors and with other programs and services enumerated above.

*   *   *

88.   Within 120 days, the service testing process currently performed by the Tennessee Commission on Children and Youth which assesses all services, (medical, and non medical) provided to children in DCS custody, shall include, on an ongoing basis, an audit of EPSDT compliance with regard to the children sampled. Such testing may be conducted by the State or a DCS contractor.

*   *   *

92.   **Within 60 days thereafter, the parties shall submit to the Court a proposed agreed order containing a specific remedial plan addressing the coordination and delivery of services under EPSDT law and laws contained therein for children.**

Id. at ¶¶ 39, 40, 45, 53, 60, 62, 65, 72, 73, 82, 88 and 92) (emphasis added).

### B. The 2001 Findings of the Defendants' Non-Compliance

In several post-consent decree filings, the parties' counsel submitted several documents reflecting the Defendants' intention to file a "remedial plan." (Docket Entry Nos. 27, 31 and 38). The Defendants later filed a remedial plan, but after a period of time operating under the

16

Defendants' remedial plan, the Defendants moved to stay and to modify the Consent Decree (Docket Entry No. 69) and the Plaintiffs moved for a finding of contempt (Docket Entry No. 79). After an evidentiary hearing, the Honorable John T. Nixon, the then presiding judge, found the Defendants' remedial plan to be fatally defective in structure and performance. In a ruling filed on December 18, 2001 (Docket Entry No. 227), Judge Nixon made the following findings of fact and conclusions about the Defendants' remedial plan and their proposed revised remedial plan:

## I. Findings of Fact

### A. Defendants' Revised Remedial Plan– Findings of Fact

1. Pursuant to the Consent Decree, the parties were to submit a specific remedial plan addressing the coordination and delivery of services under EPSDT law for children in State custody or at risk of entering State custody. After extensive negotiations, the parties jointly submitted a Remedial Plan for Children in State Custody and the Plan for children at Serious Risk for Entering State Custody (collectively, "Remedial Plan") on May 11, 2000. The Court approved the Remedial Plan on May 16, 2000, in two Agreed Orders. (Doc. Nos. 58, 60).

2. The May, 2000 Agreed Orders imposed on the Defendants several requirements designed to improve the care of children in, or at risk of entering, State custody. The children became a subclass that was to be carved out from the larger class implicated by the Consent Decree. The Remedial Plan had four basic components. First, Defendants were to develop a Best Practice Network (BPN) comprised of primary care providers and other health care resources. The BPN would coordinate the dissemination of medical and behavioral health services to children in the subclass.

\* \* \*

6. **Soon after the entry of the May 2000 Agreed Orders, the Remedial Plan proved to be unworkable.** The State created the Implementation Team, which wad headed by a capable pediatrician, Dr. Larry Faust. Dr. Faust began recruiting for the Best Practice Network in May, 2000, by contacting pediatricians all over the State via e-mail, telephone, and in person, and also spoke to Steering Panel members. The Steering Panel was appointed, and subcommittees were formed. The Steering Panel and the Executive Oversight Committee met frequently.

17

7.       However, the State has not fully adhered to the Remedial Plan. First, the State was unable to recruit sufficient physicians for the BPN. The providers were hesitant to contract with the State's MCOs because of past negative experiences with the MCOs. The State was unable to contract with COE's because they, too, had concerns about dealing with the MCOs and about ultimately serving as "safety nets". These concerns were not unfounded, given the fact that Xantus was in receivership and Access MedPlus went into supervision. The Court notes that access MedPlus is no longer part of the TennCare system. Hence, the Remedial Plan was never fully implemented.

8.       The State has now proposed a revised Remedial Plan. Central to the State's proposed revisions is a "carve-out" for the delivery of health services to children in State custody. The plan contemplates that these children will be enrolled in a single MCO and BHO, rather than being distributed among all of the TennCare contractors. As of July 1, 2001, the State has already reassigned all children in State custody to TennCare Select, to be administered by BlueCross.

9.       The State believes that limiting the plan to only one MCO and one BHO will address many of the problems that providers had with the original Remedial Plan, including the hassle of having to deal with multiple TennCare contractors. The Revised Remedial Plan also allows advocates other than DCS to make referrals to the Implementation Team, and requires the State to contract with an advocacy group to make available additional resources for concerned individuals seeking to access services for children at risk of entering State Custody. Although the revised Remedial Plan proposes other changes, the forgoing are the most salient proposals.

10.      The Revised Remedial Plan was formally approved by both the Steering Panel and the Executive Oversight Committee, with only Plaintiffs' counsel and an advocate disapproving. The State has begun to move forward with its plans for the revised Remedial Plan by working with Blue Cross to develop the infrastructure necessary to create the Best Practice Network. The State opines that only this Court's Order is necessary for it to proceed with the Revisions.

                              *     *     *

### B. EPSDT Failures

**Outreach**

8.       . . . [T]he evidence presented at trial demonstrates that some outreach

18

activities are more effective than others. While State officials have opined that "[n]o strategy [has] necessarily been proven better than the other, they implicitly acknowledge that other states have effectively and creatively conducted outreach activities. **The evidence submitted at trial proves that the State's strategy of mailing fliers and brochures to inform TennCare recipients of their EPSDT rights is inadequate. The State is aware that its outreach strategies are insufficient.** In fact, at least one TennCare employee recognized that a statewide broadcast and media campaign was necessary in order to inform children and their parents of EPSDT...

*   *   *

10. Most importantly, the trial record demonstrates that at least some TennCare members and their parents were unaware of what EPSDT represents, or even that it conferred certain benefits upon them. . . .

### *Screenings*

11. Under the Consent Decree, the State must comply with the federal requirements for EPSDT screens. An adequate screen must contain all components required by EPSDT law. The State was to create a committee that would devise a plan and specific guidelines to ensure the effectiveness of the screens. Additionally, the Consent Decree specified a method for quantifying and measuring screening performance, and established goals over time for adjusted periodic screening percentage (APSP) rates.

12. **Specifically, the State agreed to improve its APSP annually, and reach a goal of 80% by September, 2001. The Defendants proof submitted at trial indicated that the State has failed to meet its goals. The adjusted screening rate for 1999 was 19.8% and rose to 31.5% in 2000, far short of the baseline goals for those years, and the ultimate goal of 80% for 2001. Dental Screening rates also fell short of their targets.**

13. **The Consent Decree also required that 100% of Children in State custody were to receive full EPSDT screening after September 1999. As of May, 2001, 91% of children in State custody had received the appropriate screens.** Although this figure is still short of the 1999 target, **the 91% may be inflated** because it may not represent fully EPSDT compliant screens **because the Department of Children's Services (DCS) reports a child having been adequately screened even if that child has not received the seven components required by federal law...**

*   *   *

### [Conclusions of Law]

**The Court agrees that the current Remedial Plan is unworkable, and that modification may, in theory be appropriate. However, the Court is not convinced that the revised Remedial Plan adequately addresses the main problem associated with the original Remedial Plan.** Specifically, the managed care structure of Tenncare may create the problems encountered by and among the State, MCOs and BHOs and providers. The new premedical plan does nothing to assuage the providers' distrust of the MCOs. **The Revised Remedial Plan also does not address the apparent disconnect between the Bureau of TennCare and the Implementation Team at the Department of Health. A new Remedial Plan that still operates under the very same managed care system may not adequately address the Court's concerns with the TennCare system as it relates to the under-21 population. The Defendants have not made a showing of how the revised Remedial Plan will ultimately succeed where the current Remedial Plan has failed.**

The Court also does not find sufficient reasons for modifying any part of the Consent Decree at this time, for the reasons discussed in relation to the Agreed Orders. The Defendants have failed to show how the factual situation in this case mandates revision of the Consent Decree under the <u>Rufo</u> test.

(Docket Entry No. 227 at pp. 40-41, 42-44, 10-11, 12-14, and 45-46) (emphasis added and footnotes omitted).

In its accompanying Order, the Court reiterated the Defendants' lack of an effective plan and stated: "The Court finds that a special master is necessary to mediate and ultimately to submit to the Court an EPSDT compliant plan." (Docket Entry No. 228). The predicates for the appointment of a special master are reflected in the following findings of fact of systemic deficiencies:

The record demonstrates that the Defendants have been, for the most part, well-intentioned and diligent in attempting to comply with both the Consent Decree and federal EPSDT requirements. In fact, Defendant officials sometimes attempted to implement the very strategies that Plaintiffs' counsel advocated, but were constrained by the realities of State Government.

\*   \*   \*

**However, from the beginning, the State's efforts have been hampered by**

20

**institutional inefficiencies and fundamental problems associated with the TennCare system.** The record shows that the Defendants' efforts were indeed scuttled because "essential providers and tertiary pediatric care centers refused to contract with all of the managed care companies currently participating in the TennCare program." The record also confirms that the Defendants have faced a challenging task in melding Medicaid and managed care - a challenge that is by no means unique to Tennessee. Nevertheless, the institutional difficulties faced by the Defendants do not excuse their failures to follow the law. **Defendants have not shown why their failure to fully comply with the 1998 Consent Decree or federal law should be excused, and thus have neither proven compliance nor any excuse for failure to comply with the federal EPSDT provisions.**

\*   \*   \*

Pursuant to the Consent Decree, Defendants have a responsibility to achieve and maintain outreach efforts designed to reach all members of the Plaintiff class with information and materials in conformance with federal law. . . The record reflects the fact that the Defendants mostly delegated the responsibility to conduct outreach to MCOs and BHOs, who have not successfully implemented the outreach requirements contained in the Consent Decree. However, the Defendants are ultimately responsible for conducting proper outreach. If the Defendants choose to delegate this responsibility, they must do so with the understanding that they will remain ultimately responsible for the failure of any delegatee.

\*   \*   \*

**TennCare employees appear to hold a laissez faire attitude toward the EPSDT outreach procedures of their contractors, preferring to allow the contractors to creatively reach out to their patient populations. That approach has not yielded effective outreach.** Creative government is only effective when that creativity spurs positive change. The MCOs' outreach efforts have been insufficient, and the State has failed to engage in adequate oversight to ensure adequate outreach. As the Seventh Circuit Court of Appeals recognized twenty-seven years ago, "EPSDT programs must be brought to the recipients; the recipients will not ordinarily go to the programs until it is too late to accomplish the congressional purpose [of EPSDT]." Stanton v. Bond, 504 F.2d 1246 (7th Cir. 1974). **Indeed, without proper outreach, EPSDT is worthless.**

\*   \*   \*

**It is clear from the record that not only have Defendants failed to comply with the Department of Health and Human Services' regulations, but Defendants have simply failed to meet the bare requirements of the EPSDT laws.** Defendants indicate that low screening rates in this region are partly attributable to both an ill-informed physician corps and a patient population that is not as willing

21

to see a doctor for well-child care. However, Governments' job is to inform both the provider and consumer communities of the federal screening requirements. In fact, federal law requires that the State engage in outreach to inform the patients of EPSDT. The Court agreed that Tennessee may have a "harder road to hoe" than some other states, but that does not mean that the entrenched attitudes of providers and patients can be used as a shield against liability for failure to implement EPSDT requirements. **Defendants concede that they "have not and will not meet the EPSDT percentages required by the Consent Decree." The Court agrees.**

Id. at pp. 6, 7, 8, 28, 30.

Judge Nixon cited as a causal factor of the Defendants' noncompliance, the Defendants' wholesale delegation of matters to the MCCs. Judge Nixon found that "most of what TennCare does has to happen through its contracts with the MCOs and BHOs." Id. at p. 25.

The State is also required to issue and implement procedures to facilitate coordination among various contractors. Although the State issued its contracts a list of other agencies and programs with which they should coordinate EPSDT services, the exchange of information between contractors remained "disorganized" and few of the Defendants' proposals to achieve coordination were implemented. **Coordination between various private health agencies is still inadequate. The lack of coordination among various non-governmental agencies is directly attributable to the very system under which public health is administered. Tennessee State government has failed to properly coordinate and implement proper case management and coordination services.**

Id. at p. 22.

In 2001, the Defendants relied on their contractors as witnesses to justify their request for modification.[11] Judge Nixon made specific findings and conclusions about the deficient

_____

[11] See, e.g., Docket Entry No. 156, June 19, 2001 Transcript, Vol. 11, at pp. 282-294 (Dr. Gregory Preston, Chief Medical Officer of Blue Care, testified about the remedial plan and the development of a best practices network and moving all children in DCS custody into a single MCO); Vol. XVII-A, 8-1-01 at 2047-21 15 (Deborah Cagle, Vice President for Planning and Programming at Advocate testified on network adequacy, coordination with the MCOs and PCPs, and prior authorization process and criteria). The Defendants acknowledge that "the MCCs play an intricate and important role in ensuring that the State fully complies with its obligations under both the Consent Decree and the federal EPSDT law." (Docket Entry No. 932, Exhibit A thereto).

22

performance of the MCCs or MCOs and BHOs:

15. **Defendants have made progress in achieving the target screening rates by contractually requiring their contractors to meet certain EPSDT screening goals. The most recent contracts show that an MCO that has not reached an 80% adjusted screening ratio is now required to contract with the county health department to perform EPSDT screening. . . .**

* * *

17. As discussed above in relation to outreach and screening, systemic deficiencies have also made compliance with the Consent Decree's diagnosis provisions difficult. **First, where there are overlapping medical and mental health issues, the MCOs and BHOs quibble over which entity is responsible for providing coverage. The State's TennCare contracts contribute to this ambiguity by sometimes failing to specify the responsible party, even though the BHOs do have coordination agreements with MCOs.** In practice, individuals with overlapping issues sometimes "fall in the cracks" and fail to receive services from either a BHO or MCO, as with, for example, attention deficit disorder patients.

18. **Additionally, the MCO and BHO contractors often refuse to authorize health assessments.** Larry Faust of the Department of Health testified that even when MCOs and BHOs authorized services, they sometimes refused to pay the provider once the service was rendered.

19. **Even worse, the State's managed care system often provides incentives for financially-motivated denials of coverage by both MCOs and BHOs. TennCare's contractors essentially gamble that they will be able to provide services to TennCare enrollees and still be able to make a profit. Tennessee pays the MCOs and BHOs a set amount of money for all of the services that an individual requires. Hence, the contractors have an incentive to cut costs by denying coverage.**

20. **Further, as discussed above, MCOs and BHOs often lack adequate provider networks, creating a barrier to adequate diagnostic evaluations.** The lack of provider networks is attributable, in part, to the failure of the BHOs and MCOs to pay its providers for services rendered. The lack of a provider network is also attributable to a scarcity of certain specialists across the nation. While the State notes this problem, it has been unable to stop the hemorrhaging of the provider networks. The proof at trial demonstrates that, in some circumstances, provider participation has drastically declined. . . .

23

* * *

22.     [T]he record demonstrates that even where the TennCare Bureau
        agrees that the denied services is medically necessary, the State
        routinely grants the BHOs and MCOs a 'good cause' extension of time
        in which to provide services that the TennCare Solutions Unit has
        deemed medically necessary. The trial record is that children often
        wait for extended periods of time to receive medically necessary
        services. . . The record reflects similar situations involving medically
        necessary services that, for various reasons, were either delayed or
        never provided to the patient.


23.     On the behavioral/mental health side, the BHOs sometimes fail to connect
        children to an appropriate diagnostic resource capable of performing the
        required behavioral health assessment. As with MCOs, there is an
        inadequate provider network for psychologists, psychiatrists and other
        behavioral health professionals. The record also demonstrates that State
        policy makers are well-aware of the limited BHO provider network.

24.     The record reveals that a number of the providers within the limited BHO
        provider network are not taking new patients, thus rendering those
        providers unavailable to new TennCare patients.

25.     Additionally, there is only one BHO in Tennessee. The BHO does engage
        in some oversight, as the testimony of Deborah Cagle, Vice President at
        Advocare, demonstrates, Ms. Cagle testified that Advocare reviews and
        audits its providers, and has hired an independent auditor to review
        Advocare's providers. However, the record shows, that although there is
        only one BHO, the State has failed to adequately monitor the BHO's
        provisions of EPSDT and Consent Decree-mandated services. More
        specifically, the State has not ensured that the BHO strictly mandate that its
        providers offer adequate services to their patients. The testimony of Dennis
        Elliot, Manger of the Network Adequacy Unit at TennCare, demonstrates
        that TennCare does not adequately assure that the BHO corrects
        deficiencies in the BHO's provider network.

26.     **Thus, children frequently do not receive appropriate diagnoses through
        the TennCare managed care system. Defendants admit that "sometimes
        the system breaks down, and the Court finds that in this case, the State
        Government's healthcare system has indeed broken down." However,
        the system itself is to blame for TennCare's failures. A depleted
        provider network and lack of proper oversight by MCOs and BHOs is
        directly attributable to the TennCare managed care system, which has
        proven to be unable to fully comply with both the EPSDT and the**

24

Consent Decree's requirements for proper diagnosis of children under 21.

* * *

### [Conclusions of Law]

TennCare does not allow individuals to receive adequate diagnosis and treatment through various providers. The incentives created by capitated payments to the MCOs and BHOs result in a failure of the State system to assure that each State resident under the age of 21 receives the care that EPSDT mandates. As the Court has previously noted, there are "pecuniary incentives that MCOs [and BHOs] have for denying, suspending, or terminating care under the TennCare system. . . ." Daniels v. Wadley, 926 F.Supp.1305, 1308 (M.D. Tenn. 1996)....

* * *

**The proof shows that the State has failed to adequately ensure the coordination of EPSDT services among the various governments, private and non-profit providers of services. The TennCare program, although well-intentioned, is disjointed. ... Although the State has established an office that is essentially dedicated to ensuring EPSDT compliance, that office is powerless to address the Court's greatest concerns with the TennCare program because the office does not have the mandate to directly control the actions of the MCOs or the BHOs. Adding another sailor to a sinking ship will not prevent it from sinking.** In the same way, adding yet another layer of bureaucracy to an ineffective TennCare system will not succeed in reforming it.

**In many instances children lack a case manager.** The <u>Frew</u> court recognized that failure to provide case management services may constitute a violation of EPSDT. 109 F.Supp.2d at 674. **This Court concurs, and finds that failure to provide adequate case management services in this case constitutes a violation of federal law.** Without effective case management, the individual child lacks an effective coordination of various services that he or she needs to ensure that EPSDT services are rendered.

<u>Id.</u> at pp. 15, 16-17, 18-20, 32-33 (emphasis added). Judge Nixon reserved a finding of contempt:

"However, because the Court bases its decision on failure to comply with federal law, the Court will

hold in abeyance a decision whether Defendants' actions thus far constitute civil contempt...The

record indicates that the State made great efforts to comply with the Court's Orders. However, the

Court reserves the right to find the Defendants in contempt in the future." <u>Id.</u> at p. 35.

25

The Court then directed "[t]he parties...[to] attempt to work to reach a consensus on a workable plan [, and i]f, and only if, the special master determines that the parties are unable to agree on a plan, the parties shall submit plans to special master for his consideration." (Docket Entry No. 275 at p. 2). In an October 14, 2002 Order, the Court required the Defendants to prepare an "Itemized Assessment Protocol" ("IAP") as well as an "Initial Work Plan"("IWP"), under the Special Master's supervision. (Docket Entry No. 291 at pp. 3-4). In a subsequent Order, the Court ordered the Defendants to submit an "Initial Work Plan" ("IWP") to the Special Master and later granted the Defendants an extension "that defendants shall submit their initial work plan by December 13, 2002." (Docket Entry No. 303). As discussed below, the Defendants did not meet their obligation on the IWP nor the IAP.

### C. The 2004 Findings of the Defendants' Non-Compliance

On June 16, 2004, Plaintiffs filed another motion to show cause (Docket Entry No. 403) asserting the Defendants' continuing violations of the Consent Decree. After discovery and an evidentiary hearing, in a Memorandum entered on October 22, 2004, citing testimony of two key state policymakers, Judge Nixon found that the Defendants were again not in compliance with the Consent Decree and significantly, lacked a reliable system to measure their progress.

> On June 23, 2004, the Plaintiffs deposed Dave Goetz, Tennessee Commissioner of Finance and Administration, and on June 24, 2004, Plaintiffs took the deposition of Manny Martins, Deputy Commissioner of Finance and Administration for TennCare. Both deponents attested to sincerity, good intentions, and hard work of those State employees who have labored since 2001 to comply with EPSDT. Mr. Martins testified that the State is making inroads in the area of outreach. "From 1999 to 2003 we had a 175 percent increase, I believe, in our screening rates from, as an example, 19.8 percent to 53 percent. We've had a 60 percent increase in our dental screening rates, 55, 56 adjusted–the raw is 36 to 62 for 2002, raw 54, adjusted 41.9." [Quoting the Martins Deposition at 57]. Mr. Martins also reported that TennCare has staffed 22 dental clinics and has contracted with the Department of Health for dental outreach, dental operatory, and mobile operatory. Mr. Martins has stated that by the way of a new contract with the Department of Health for $7

26

million, effective July 1, 2004, every single TennCare enrollee child would be contacted by their local health department from newly set-up call centers...

Mr. Goetz also made statements in his deposition which conveyed progress. With respect to screening results, Mr. Goetz noted "dramatic improvements" over the last couple of years and stated, "efforts to work through the county health officials have borne fruit, and that's also what we were funding, continuing outreach in the budget that was just passed into law" [Quoting the Goetz Deposition at 41. Nonetheless, while some progress has been made since the Court's approval of the Consent Decree in 1998, testimony from Mr. Martins and Mr. Goetz along with reports made to the Court by the Special Master, make clear that not enough progress has not been made. **The Court is not convinced that Defendants, acting on their own, will reach full compliance with the terms of the consent decree within a reasonable period of time.** As the well-being of 550,00 children is at stake, something more must be done to ensure that the state's EPSDT requirements are met in accordance with the terms of the Consent Decree.

**As recently as August 2004, the Special Master concluded in his status report to the Court that no feasible plan yet exists to achieve compliance for an indispensable section of the Consent Decree. The Special Master reported that the State has failed to honor its renewed commitment to produce an IAP satisfactory to the Special Master, last made in September 2004, and still refuses to engage its key officials in planning efforts to achieve compliance, verification of the quality of its data, and evaluation of the successes or failures in attaining compliance.**

**The Special Master also reports that the State is incapable of reporting progress to the Court because it lacks a valid and reliable system of measuring progress in such key areas as provider network adequacy, case management, outreach, the effective use of information systems, and system level coordination, to name a few.** The Special Master's status report informs the Court that because Defendants have never created a list of precise "outcomes" towards which their efforts are focused, not only have they failed to meet the terms of the Consent Degree, but they are not even in a position to be able to assess their own shortcomings for the purpose of making improvements.

**The Court finds that the deposition testimony of Mr. Goetz and Mr. Martins conclusively support this Court's finding that, to date, the State has not achieved compliance with the terms of the Consent Decree.** Mr. Martins, the senior state official with direct responsibility for EPSDT compliance, testified, "I'm not sure that compliance with the consent decree is achievable." Martin's Dep. 29. He testified that the 100 percent screening requirement for children in state custody mandated by the Consent Decree "should be achievable" and that the Consent Decree's stated dental screening rate "can be achievable over a period of time."

Martins Dep. at 33. When asked about barriers to compliance that he saw, Mr. Martins replied, "There are numerous external barriers that are out there. Some of them involve coordination with other departments, some of them involve the inability to have good data in terms of being able to have information on the system - on the child and following that child through the system." Martins Dep. 35. Mr. Martins also discussed the socio-economic barriers to achieving compliance with the consent decree and "barriers in understanding" on part of families of TennCare enrolled children who sometimes do not seek services for their children when they are healthy, in spite of the importance of preventative EPSDT measures to the continuing health of their children. Martins Dep.35-36. Finally, Mr. Martins stated, "I think we have barriers from the standpoint of not totally understanding all the gaps that we have in our delivery systems." Martins Dep. at 36.

Specifically, with respect to the screening requirements in the Consent Decree, **Mr. Martins testified that the State is not meeting the 80 percent standard in the Consent Decree. Mr. Martins testified that while he would like to review the numbers, the last figures he had seen indicated that the state is not meeting the 100 percent screening requirements under the Consent Decree for children who are in State custody. Further, Mr. Martins stated that with respect to dental screening and dental service, the State is not in compliance with the Consent Decree.** Other areas of particular concern testified to by Mr. Martins include the current inadequacy of behavioral health networks, and the State's failure to meet the Consent Decree's required provision of EPSDT services to the children in DCS custody. Martins Dep. 187.

Mr. Goetz testified that one factor that impedes implementation of the Consent Decree is the sheer enormity of the task, given the 550,000 children enrolled in TennCare. Goetz Dep. at 37. He also testified to learning that breakdowns in communications have also created barriers to the State's ability to achieve compliance with the terms of the consent Decree. Goetz Dep. at 37.

**This is not a finding that the State has acted in bad faith or has intentionally failed to comply with the Consent Decree. To the contrary, the Court acknowledges, as set forth above, that the state has made some progress toward compliance in some areas. However, these efforts have not produced the results mandated by the Consent decree some six years ago The Court s compelled to grant further relief to the Plaintiffs, 550,000 TennCare enrolled children, to ensure that their EPSDT needs are met as quickly as possible....**

...[A] motion for relief looks to the future, rather than the past. In looking to the future, the Court has instructed the Special Master and his experts to create a comprehensive plan to put the State in compliance with the terms of the Consent Decree. The plan is attached to this Order...This plan is not a modification of the terms of the consent decree.

28

(Docket Entry No. 465, Memorandum and Order at pp.4-8) (emphasis added). The Court then set a deadline for objections and authorized depositions and proposals for modifications of the plan attached to its Memorandum. Id. at p. 8.

On December 13, 2005, the Court ordered that the Defendants "immediately disclose to Plaintiffs and the Special Master the plan, if any, under which the State is operating to comply with the Consent Decree and the EPSDT law as well as file by January 31,2006, its SemiAnnual Report..." (Docket Entry No 558, Order at p.2). On December 19, 2005, Linda Ross, a Deputy Attorney General on behalf of the Defendants wrote the Special Master that:

> Compliance with both EPSDT law and the Consent Decree is a high priority of the State, but neither require that the State develop a single document setting forth a "plan" for maintaining compliance. Rather, the State has put in place a clearly defined process, under the leadership of the Governor's Office of Children's Care Coordination, to ensure that both the spirit and the letter of EPSDT law and the Consent Decree continue to be met.

(Docket Entry No. 559-2).

On January 9,2006, the Defendants' submission to the Court construed the Court's December 13th Order to relieve the Defendants from submission of any plan. This submission reads, in pertinent part:

> **The Court's December 13 Order did not place an affirmative obligation on Defendants to have a written plan, and no such obligation is contained in either the Consent Decree or EPSDT laws.** At one time, the State was subject to an analogous obligation in this case. In its August 14, 2002 Order, *see* Doc. 291, at 3-4, ¶ 4b, the Court appointed a Special Master and his selected Experts to oversee the creation and implementation of an Itemized Assessment Protocol ("IAP") and Initial Work Plan ("IWP") to be used in evaluating the State's compliance with the Consent Decree and federal EPSDT law... The IAP and IWP requirements were not resurrected in the Court's December 13 Order (Doc. No. 558 at 2). In fact, in this most recent order, the Court affirmatively limited the Special Master's responsibilities to "evaluating the State's implementation of the terms of the Consent Decree and EPSDT law." (Doc. No. 558 at 2).
>
> **Following the Court's December 13 Order, the State promptly informed both**

29

**Plaintiffs and the Special Master in a letter dated December 19, 2005 that the State does not have a single document setting forth a "plan." Instead, the State has put in place a clearly defined process to ensure that both the spirit and letter of the EPSDT law and the Consent Decree continue to be met.**

(Docket Entry No. 569-2 at pp. 3-4).[12]

### D. The Recusal Order and Reassignment

In November 2004, Judge Nixon held this action in abeyance to facilitate settlement negotiations. (Docket Entry No. 495). During this suspension, the parties litigated other TennCare actions. (Docket Entry No. 550). The Consent Decree, however, remained in effect (Docket Entry Nos. 509 and 546) and during this period, the Defendants continued their discovery efforts in this action. (Docket Entry Nos. 498, 501, 508, 511, 512, 560 and 562). In particular, the Defendants issued discovery requests to depose the Special Master to inquire about discussions of the Special Master with Plaintiffs' counsel and the Court.

In the midst of these controversies, Judge Nixon set aside the plan that had been filed by the Special Master and recused himself, stating:

> Without taking into account the October 22, 2004 order, the **history of this case reveals that this Court has consistently found the State to be in violation of the**

_____

[12]The Court has concerns about Defendants' counsel's statements that the Consent Decree does not require a "plan." The Consent Decree reads in pertinent part, "Within 60 days thereafter, the parties shall submit to the Court a proposed agreed order containing a specific remedial plan addressing the coordination and delivery of services under EPSDT law and laws contained therein for children." (Docket Entry No. 12, Consent Decree at ¶ 92). As to Defendants' apparent reliance on Court Orders as limiting this provision of the Consent Decree, the Defendants have argued to the Court: "Thus, a consent decree depends, by definition, on the consent of the parties. The scope of the obligation to which the parties have consented is set by the terms and conditions memorialized in the consent decree. Any attempt by a district court to hold a party to terms other than those to which it has agreed is an abuse of discretion per se. See Local No. 93, Intern. Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland, 478 U.S. 501, 529 (1986), United States v. Ward Baking Co., 376 U.S. 327, 334 (1964); King v. Walters, 190 F.3d 784, 788 (7th Cir.1999)." (Docket Entry No. 739, Defendants' Memorandum in Support of Renewed Motion to Vacate the Consent Decree at pp. 2-3).

Consent Decree and EPSDT requirements. Indeed, the State's own documents show that they are not in compliance with the terms of the Consent Decree. (See docket entry 546 at 1, (showing that, even in 2004, the State is still below screening targets that should have been achieved in 2001)). Notwithstanding this repeated finding, the Court took to the unusual path of not holding the State in contempt or imposing monetary sanctions. Indeed, the Court has attempted to steer this case away from the needless and acrimonious litigation and focused on fashioning a solution that would increase compliance with the Consent Decree and federal EPSDT requirements. This constructive approach has been fueled by one goal: To provide the underserved children of Tennessee the entire spectrum of medical benefits to which they are entitled under federal law.

The State's pending Discovery Motion attempts to push this goal to the wayside and refocus the case on wholly unnecessary, time-consuming, costly, and highly divisive litigation. I refuse to condone a path that will waste resources and time in the face of the urgent need to improve healthcare for the children of Tennessee. Importantly, no substantive activity has occurred in this case since November 2004; it is imperative that the parties now turn their attention to the merits of the case. Accordingly, and after much consideration, I have decided to sua sponte recuse myself from this case to remove any barrier - perceived or real - to the ultimate goal of increasing the State's compliance with EPSDT requirements. Let it be clear, however, that my recusal in no way adjudicates the merits of, or reflects an opinion on the allegations contained in, Defendants' Discovery Motion. Rather, it is a reflection of my view that the healthcare of Tennessee's children must come first.

Thus, I hereby RECUSE myself from the above-styled case, and direct the Clerk of the Court to reassign it to another United States District Court Judge in the Middle District of Tennessee. In light of my recusal, Defendants' Discovery Motion and Defendants' Motion to Expedite are DENIED as MOOT. Pending reassignment of the case, the Office of the Special Master shall remain intact, but INACTIVE. The new presiding Judge may decide the continuing necessity of the Office of the Special Master, and all motions pending at this time.

(Docket Entry No 584, Memorandum and Order at pp. 4-5) (emphasis added). As a related action,

the action was transferred to this member of the Court.

As the succeeding judge, the Court set a status conference on February 10, 2006 to discuss

outstanding issues with the parties' counsel. At that time, a point of contention was whether the

Defendants were required to file a plan to remedy Judge Nixon's earlier findings of their violations

of federal law. The Defendants' position on this issue, as quoted earlier, is as follows:

> Compliance with both EPSDT law and the Consent Decree is a high priority of the State, but neither require that the State develop a single document setting forth a "plan" for maintaining compliance. Rather, the State has put in place a clearly defined process, under the leadership of the Governor's Office of Children's Care Coordination, to ensure that both the spirit and the letter of EPSDT law and the Consent Decree continue to be met.

(Docket Entry No. 559-2, Letter from Linda Ross to Richard Carter, MD). See also, Docket Entry No. 569 at p. 4 and Docket Entry No. 596, Transcript of Hearing of February 10, 2006 at p. 10).

At the February 10th conference, the Court reviewed those portions of the record on this issue. First, paragraph 92 of the Consent decree reads: "Within 60 days thereafter, the parties shall submit to the Court a proposed agreed order containing **a specific remedial plan** addressing the coordination and delivery of services under EPSDT law and laws contained therein for children." (Docket Entry No. 12 at ¶92) (emphasis added). In an Agreed Order submitted by counsel for the parties, counsel cited "the remedial plan called for by paragraph 92 of the consent decree." (Docket Entry Nos. 39 and 40). In an earlier submission, the Defendants reiterated that they were willing to engage a mutually agreeable expert "to facilitate further development of a plan." (Docket Entry No. 31 at p. 2). Later, the Defendants requested a conference with the Court, stating: "The proposed remedial plan was developed pursuant to Paragraph 92 of the consent decree." (Docket Entry No. 52). See also Docket Entry Nos. 54, 55, 57, 58, 59, 60, 76 and 88 that refer to the Defendants' "remedial plan". In one Agreed Order, counsel stated: "Pursuant to paragraphs 88-92 of the consent decree, the parties submitted a "remedial plan." (Docket Entry No. 59). In another Order, the Court stated that the "Consent decree provides for implementation of a remedial plan." (Docket Entry No. 103). See also Docket Entry No. 164, Order.[13] After reviewing these entries

---

[13] To be sure, in a more recent Order, Judge Nixon stated that the Consent Decree does say that the state will implement a "plan" or "process for implementing the consent decree." (Docket Entry No. 578 at p. 4). This member of the Court deems paragraph 92 controlling and

32

and Orders, the Court directed the Defendants to file whatever the Defendants deem to be their plan to comply with the Consent Decree.[14] (Docket Entry No. 601).

After a review of the record, the Court retained the former Special Master and his assistants as technical advisors so as not to lose the most knowledgeable experts who had expended extraordinary resources to inform the Court about the Defendants' compliance efforts. Given Judge Nixon's prior findings of non-compliance, the contentious exchanges between the parties' counsel, the extensive scope of the Consent Decree and the state of the record, the Court deemed necessary the appointment of monitors to assist the parties and the Court in identifying issues that remain for discovery and any evidentiary hearing. A strict protocol was defined for the monitors' activities. The Monitors filed a report that the Court deemed helpful in identifying the remaining issues in the litigation. (Docket Entry Nos. 795 and 796). Regrettably, despite Judge Nixon's prior repeated findings of their non-compliance, the Defendants expressed to the Monitors their concerns about this Court's continuing oversight of this program. (Docket Entry No. 795. Monitors' Report at p. 5).[15]

---------------

the parties' filings establish the requirement for the Defendants' filing and implementation of a remedial plan.

[14] The Defendants filed a series of documents, (Docket Entry Nos. 581-1, 581-2, 624), but upon review, the Court seriously questions whether those submissions constitute a coherent plan. Of course, the Defendant insist that despite its clear language the consent does not require a plan. The Consent Decree reads, in pertinent part: "Nonetheless, present officials cannot correct problems overnight which have been years in the making. **Their development of the remedial plan is itself evidence of their genuine commitment to reform. . .**" (Docket Entry No. 12, Consent Decree at ¶ 30)(emphasis added).

[15] This sentiment was also expressed in the Defendants' memorandum in opposition to Plaintiffs' earlier motion to compel: "As the Court is surely aware, the Governor's commitment to constitutional federalism and his abiding faith in policy-making by democratically elected state officers, **in preference to the commandeering of state agencies by federal judges**, extends far beyond the present dispute over EPSDT." (Docket Entry No. 720 at p. 23) (emphasis

## E. The 2006 Discovery Proceedings

At the February 10, 2006 conference, Michael Kirk, one of the Defendants' counsel announced that the Defendants had achieved compliance with the Consent Decree. (Docket Entry No. 596, Transcript at p. 47). "I would just like to note for the record that it is the State's view that they have been in compliance with the consent decree." Id. That contention resulted in the Plaintiffs' commencement of discovery.

The Court held a series of conferences that included discussions of ESI production. (Docket Entry Nos. 599, 601, 615, 642, 645 and 646). At a February 28, 2006 hearing, the Court heard the testimony of Brent Antony, the chief information officer of the TennCare Bureau on the Defendants' motion for a protective order concerning a utilization data request from Mr. Carter, the former Special Master appointed by Judge Nixon. Anthony's experience is in health care and Antony's computer knowledge was "really from [his] job experience." (Docket Entry No. 614, February 28, 2006 Transcript at p. 82). Anthony described the Defendants' change of computer systems.

At the April 17, 2006 conference on the Monitors' review of relevant state data, the Court "suggested" to the Defendants that "whatever is electronically available . . . be made available to the Monitors and the Plaintiffs in electronic form unless, of course, there is an issue of privilege." (Docket Entry No. 646 at p. 33). This instruction was to provide a common base of information so as to ensure a meaningful dialogue among the parties, the monitors and the Court on contested issues. Id. The Court then denied the Plaintiffs' motion to compel such information (Docket Entry No. 651), but without prejudice to renew because the Defendants were going to provide to Plaintiffs

---

added). In sum, the Court has intervened only when the Defendants repeatedly failed to meet their obligations to the children under the Consent Decree and federal law.

34

any ESI information provided to the monitors. (Docket Entry No. 656).

On March 31, 2006, Plaintiffs propounded discovery requests seeking information and documents, including ESI, related to the State's contention of compliance with the Consent Decree. (Docket Entry No. 711). Plaintiffs' interrogatories and related document requests included the following two definitions:

> 9.     **"Communications" means any transmittal of information in any form or format, whether oral, written, or electronic,** including, without limitation, all correspondence, inquiries, discussions, conversations, negotiations, agreements, understandings, meetings, telephone conversations and message logs, letters, notes, memoranda, telegrams, faxes, **emails,** or recordings. It is understood that all categories of documents described above shall include with respect thereto all communications as defined, whether or not expressly stated. **The production of electronic communications should be accompanied by a description of the software and technology used to prepare the communications and needed to read them.**

*   *   *

> 15.    The term "document" means all writings of any kind, including the originals and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise (including without limitation, correspondence, e-mail, memoranda, notes, diaries, statistics, checks, statements, receipts, returns, summaries, pleadings, affidavits, depositions, pamphlets, books, prospectuses, inter-office and intra-office communications, offer notations of any sort of conversations, telephone calls, meetings or other communications, bulletins, printed matter, **computer print-outs, information contained in any computer although not yet printed in hard copy, teletypes, telefax, invoices, worksheets, and all drafts, alterations, modifications, changes and amendments of any of the foregoing), graphic or oral records or representations of any kind, (including without limitations, photographs, charts, graphs, microfiche, microfilm, videotape, recordings, motion pictures) and electronic, mechanical or electrical records or representations of any kind, (including without limitations, tapes, cassettes, discs, recordings).**

(Docket Entry No.626-2 at p. 3, 4) (emphasis added). Plaintiffs' discovery requests also sought information and documents in the possession of the Defendants' agents and included an instruction that, "when answering an interrogatory, to the extent that an activity or responsibility has been

35

delegated to a contractor, identify the contractor and the scope of the delegation." Id. at 2. Some interrogatories explicitly requested information related to contractors' actions and information.[16]

On May 15, 2005, the Defendants responded, but converted their ESI to hard paper copies. (Docket Entry No.709, Plaintiffs' Brief in Support of Motion to Compel Discovery at pp. 14-15). The Defendants insisted that the hard paper copies were identical to any responsive ESI and therefore did not produce the documents in ESI computer format. (Docket Entry No. 720 at p. 13, Docket Entry No. 815-2 at p. 4 and Docket Entry No. 988 at p. 186). Nicole Moss, a defense counsel conceded the Defendants served discovery requests for electronic discovery. (Docket Entry No. 734, November 6, 2006 Transcript at p. 23). Of particular note, is that the Defendants' following objection: "8. Defendants object to the Interrogatories' definition of "document" to the extent it reaches electronic versions of documents separate and apart from a hard-copy version of the identical document that has been identified and made available in the hard-copy form." (Docket Entry No. 815-2, Defendants' Response to Plaintiffs' Third Set of Interrogatories at p. 4) (emphasis added). The Plaintiffs provided ESI in response to the Defendants' discovery requests. Id. at pp. 24-38). Plaintiffs' ESI production included some metadata. (Docket Entry No. 719, Antony Declaration at p. 5, ¶ 7).

The Defendants objected to providing potentially responsive information or documents from the MCCs, contending that these files are not within their own possession, custody or control

---

[16] See Docket Entry No. 626-2, Interrogatory 18 (f) ("Identify each class member whose death or injury has come to the attention of state officials or their contractors and that may have followed a denial of health care to the child or the child's inability to access health care"); Interrogatory 19 (i) (seeking any process in place by Defendants or their contractors to ensure employment of the correct definition of "medical necessity"); and Interrogatory 54 (c) (seeking information related to "any process or measure used by the Defendants or their contractors to assess compliance with the Consent Decree requirements.").

36

except documents already provided to the State by the MCCs.

> The State contends that it can fully and accurately respond to plaintiffs' discovery requests and that it need not require its EPSDT contractors to search their files for potentially responsive information or documents, and that the defendants are only obligated to produce documents or information that the contractors have already provided to the State because the rules only require the production documents in a parties' possession, custody or control. Further, the State contends that to require its contracts to have to independently respond to Plaintiffs' discovery requests would be unduly burdensome and prohibitively expensive.

(Docket Entry No. 711, Joint Discovery Statement at p. 4).

The parties' counsel continued to disagree on discovery issues and in an August 16th letter, the Plaintiffs' counsel reaffirmed that: "On that broader question regarding electronic production, we agreed to disagree, since it continues to be the Plaintiffs' position that we are owed such production under Rule 34." (Docket Entry No. 712-3 at p. 20). Further negotiations between the parties narrowed some issues, but as this Memorandum reflects, the parties did not resolve their significant discovery disputes.

On October 13, 2006, the Plaintiffs filed another motion to compel (Docket Entry No. 708), that the Defendants opposed. (Docket Entry No. 720). The Defendants also filed a motion to compel on non-ESI issues involving Plaintiffs' contacts with advocacy groups and law firms (Docket Entry No. 706) that was denied on First Amendment principles and the work product privilege. (Docket Entry No. 743). In support of their objections to Plaintiffs' ESI discovery requests, the Defendants submitted affidavits, but those affidavits made only generalized assertions of an undue burden and the interruption of the work of state employees to respond to the Plaintiffs' ESI requests. (Docket Entry No. 720 at Exhibits B and C thereto).

The Court held a discovery hearing on November 6, 2006 to decide the parties' pending discovery motions and to mediate the parties' differences on ESI discovery. As to the Plaintiffs'

discovery request for ESI, the Court reiterated its understanding from the April 17, 2006 conference that whatever ESI was given to the monitors was to be provided to the Plaintiffs. (Docket Entry No. 734, November 6, 2006 Transcript at pp. 34-36). The Court also expressed the view: "it makes sense to me that if it's available on an electronic data form, that you all would share that instead of generating all of this paper." Id. at p. 68. The ESI was to be produced for the fifty (50) key custodians as agreed upon by the parties.[17] (Docket Entry No. 734 at pp. 35 and 68; Docket Entry No. 743 at p. 2). The Court further ordered the production of documents and information, including ESI, in the possession of the MCCs (Docket Entry No. 734 at pp. 71-74; Docket Entry No. 743 at pp. 1-2). The Court directed counsel to prepare an Order specifying the information sought from the MCCs, id. at pp. 69-70, because "[a]s I understand it, there is no real objection to producing what the MCOs have." Id. at p. 69. The Court, however, directed that the ESI discovery would be produced under an agreed protocol, id. at pp. 65-66 and told the parties to exchange information about their computers and software among their computer experts. Id. at pp. 66-68, 74-75, and 86-87). The Court granted the Defendants leave to seek relief if the computer experts were unable to agree on the terms of the protocol. Id. at pp. 75, 82, 90.

At the November 6th hearing, Plaintiffs' counsel also expressed concerns about the Defendants' ambiguous responses to their discovery requests on destruction of evidence. The Court ordered the Defendants to give assurances that the State had preserved responsive information and fully and accurately responded to the Plaintiffs' discovery. The Court ordered that individuals identified by the Defendants as key custodians to answer Plaintiffs' revised and simplified requests for admissions about destruction of evidence and to sign their answers personally. (Docket Entry No. 734 at pp. 56-64; Docket Entry No. 743 at p. 3; Docket Entry No.

---

[17] The Plaintiffs' initial designation was for more than 100 key custodians.

Case 3:98-cv-00168   Document 1028   Filed 10/09/07   Page 38 of 47 PageID #: 11301

786 at pp. 40-42). The Plaintiffs propounded their third requests for admissions and fifth set of interrogatories on this issue. (Docket Entry No. 799).

In an Order entered on November 21, 2006, the Court ordered the Defendants to "provide responsive documents that are in electronic format." (Docket Entry No. 743, Order at p. 2.). In response to this Order, the Defendants offered Plaintiffs what the Defendants deemed an "eminently reasonable alternative solution," *i.e.*, to provide "production of supplemental materials and those documents where record of blind carbon copy may have been omitted from prior production." (Docket Entry No. 907 at 13-14). The Defendants offered to produce only ESI after April 15, 2006, and the ESI for any "documents prior to that date that were blind copied to any recipients." Id. at p. 14.[18]

On December 6, 2006, a conference was held with the parties' computer experts to decide unresolved issues on the protocol for the production of ESI under the November 21st Order. (Docket Entry No. 764 at pp. 28, 51).[19] In reliance upon precedents in this district involving complex matters, the Court directed the parties' computer experts to confer, without the presence of their counsel, to develop a protocol and/or memorandum of understanding to address the cited problems with electronic discovery. (Docket Entry No. 764, at pp. 5-6). The "experts only conference" was held without objection by any counsel and yielded positive results that were

---

[18] The Defendants assert that there was not any agreement or ruling previously about how far back discovery should run. (Docket Entry No. 907 at pp. 20-21). The parties agreed that discovery would relate back to June 2004, when the last round of discovery was conducted. This agreement is reflected in the Defendants counsel's letter to the MCCs that they needed to produce information since June 2004. (Docket Entry No. 899, Exhibit A at p. 5).

[19] At this conference Plaintiffs insisted that without an enforced litigation hold, emails of state employees would be routinely destroyed. (Docket Entry No. 764: Transcript of December 6, 2006 at pp. 28-30, 42-50). Plaintiffs' counsel also raised the lack of a litigation hold at the November 6, 2006 hearing. (Docket Entry No. 734 at pp. 61-62).

appreciated by the parties' counsel[20]. At the end of the December 6th conference, the parties' experts announced their ESI discovery protocol and for the prospective preservation of responsive ESI, and electronic searches with keywords to be identified by the Plaintiffs. Id. at pp. 14-20. To ensure that all responsive ESI is preserved and searched, the Defendants were to survey the individuals identified as key custodians and ascertain whether those custodians had saved relevant ESI. At the December 6th conference, the Court also suggested that the parties hold a series of similar conferences with the MCCs, with a court reporter, to negotiate any further protocol issues on ESI production.

As requested, the parties' computer experts submitted an order that reflected their agreement. (Docket Entry No. 784-3 and Docket Entry No. 785). Mr. Tigh, Plaintiffs' computer expert, also submitted his declaration on the need to ask custodians an additional question as to whether the custodians had removed any responsive information to any non-attached media. (Docket Entry No. 785-2, Tigh Declaration ¶ C). On January 14, 2007, the Court entered another Order

_____

[20] Counsel for both parties responded favorably to the first "experts only conference":

[Plaintiffs' Counsel] MR. BONNYMAN: Thank you, Your Honor. We think this process has been very productive. It was very helpful for the two experts to talk. And I will acknowledge that part of the reason why that was so useful was because our side lacked – – until the pro bono help that Mr. Tigh has supplied we've lacked the sophistication to perhaps be as constructive in this as we needed to be. So we really welcome that and welcome to be able to be on a par with the resources of the State.

*    *    *

[Defendants' Counsel] MS. MOSS: Your Honor, the State also welcomed this opportunity. We believe that this has greatly helped in coming up with a reasonable protocol that the State can live with and takes into account the limitations that the State has.

(Docket Entry No. 764, December 6, 2006 Conference at pp. 27, 51).

adopting Tigh's suggestion and ordered that "[t]he Defendants shall file certifications of the key custodians as to whether any material has been removed," citing the Tigh affidavit at ¶ C. (Docket Entry No. 789 at p. 3). In the Court's view, these certifications would ensure all relevant ESI would be retrieved.

Plaintiffs' proof is that the Defendants reneged on the computer experts' agreements at the December 6th conference to use 50 keywords or search terms, (Docket Entry No. 759) and the Defendants unilaterally selected two search terms and insisted upon a date-limited search. (Docket Entry No. 810, Exhibit A). Defendants initially responded that this restriction was necessary to complete the search to meet the Court's date for an earlier scheduled evidentiary hearing. Later, the Defendants would contend that the ESI production was too costly.

Based upon the parties' filings, the Court concluded that the out-of-court conferences of the experts had not been as productive as the Court contemplated. Once the parties left Court, their disputes over basic ESI issues resurfaced. Given the technical nature of the discovery controversy, the Court scheduled an "experts only" conference for April 11, 2007 for the parties' and MCC's computer experts. (Docket Entry No. 857, Order) This conference was to define the parties' technical disputes and to implement the Court's Orders requiring the production of responsive ESI. A series of Orders were entered to ensure that the Court and the participants shared the same core information about the capabilities of the Defendants' and MCCs respective computer systems, including their retention policies and software programs. (Docket Entry Nos. 858 and 859). Such information was ordered to be treated as confidential. Id. All participants were also requested to file a list of outstanding discovery issues. (Docket Entry No. 859). The Defendants filed a statement of disputed issues, requested that "the November 2006 orders be modified" and raised questions about the form of the Plaintiffs' Third Request for Admission and

41

Fifth Interrogatories. (Docket Entry No. 860, Exhibit G thereto).

The "experts only" conference was a discussion of the parties' and the MCCs' computer experts without the presence of the Court or counsel,[21] except to announce protocol for the conference and to hear the experts' reports on their progress. (Docket Entry No. 872). At the end of the conference, the parties' and the MCCs' computer experts unanimously agreed that the conference was productive. The Court directed the State's computer expert to prepare a written summary of the experts' agreements and to circulate that document among all experts for comment and file that report with the Court. (Docket Entry No. 872 at p. 228). After the April 11th conference, the parties and the MCCs had out of court conferences, and their disputes resurfaced.

The Plaintiffs renewed their earlier motion to compel on all outstanding discovery and ESI issues and the Court set an evidentiary hearing on that motion. With this brief history of the litigation, the Court sets forth below its findings of fact and conclusions of law on all outstanding discovery disputes.

## II. Plaintiffs' Renewed Motion to Compel

### A. Findings of Fact

#### 1. Information Requirements and Discovery Rights under the Consent Decree

In their motion, Plaintiffs rely, in part, upon the Consent Decree that requires the collection and maintenance of the data on the Defendants' compliance with the Consent Decree.

---

[21] At the beginning of the conference, counsel for two MCCs objected to the conference format. The Court cited the absence of any objections by the parties' counsel to the first such conference and quoted the parties' counsel's favorable reactions to that conference. The Court overruled those objections. A transcript of that conference was deemed confidential and ordered to be filed under seal. At the end of the conference, the Court again inquired whether any counsel objected. Plaintiffs' counsel did not object to this conference, but all counsel for the Defendants' and the MCCs objected. The legal authority for that conference is noted supra.

Case 3:98-cv-00168   Document 1028   Filed 10/09/07   Page 42 of 47 PageID #: 11305

In several paragraphs, under the heading, "Monitoring and Enforcement of MCO and DCS Compliance," the Consent Decree has the following paragraphs requiring the Defendants and the MCCs to track and report the medical screening and services to individual class members:

91.　　Upon request, **the evaluators shall be afforded access to such records (including electronic data files) or persons as necessary to fulfill the responsibilities imposed by this order.　Each party shall have access to information and materials obtained by the evaluators**; however, except for information which originated with the parties' counsel, the evaluators may withhold the source of any information they have received. The evaluators may communicate <u>ex parte</u> with the parties, their agents or counsel; upon request, the evaluators shall disclose to the opposing party the general substance of such communications. The evaluators shall otherwise treat all records as confidential.

\*　\*　\*

94. Within 180 days, **the Defendants shall require their contractors to achieve and maintain the capability of tracking each child in the plaintiff class, for purposes of monitoring that child's receipt of the required screening, diagnosis and treatment.　The tracking system shall have the capacity of generating an immediate report on the child's EPSDT status, reflecting all encounters reported to the contractor more than 60 days prior to the date of the report.**

95.　　**Within 150 days, DCS shall achieve and maintain a tracking system as reflected above.　The tracking system shall have the capacity to generate a report on the child's EPSDT screening status and shall reflect all screens received by the child more that 30 days prior to the report.** DCS shall establish a procedure for notification of TennCare if a DCS case manager suspects that action or inaction by an MCO in performing its duties under the TennCare contract has caused a child to inappropriately enter DCS custody.　TennCare shall receive such notification as part of its complaint processes and take whatever action is appropriate.　DCS shall include this procedure as part of its departmental training.

97.　　**The state shall compile, in a standardized electronic format capable of supporting flexible, customized analysis and reporting, data on all pertinent provider encounters which involve children,** and which are covered by the TennCare program.

98.　　**The state shall conduct ongoing audits for the purpose of authenticating such encounter data.** In order to ensue the integrity of the audit reports, such audits shall be conducted by qualified personnel and shall meet generally accepted standards regarding sample size and selection.

43

(Docket Entry No. 12, Consent Decree at ¶¶ 91, 94, 95, 97 and 98) (emphasis added). In addition, the Consent Decree created a "process for monitoring and reporting [by the Defendants] their compliance with the requirements of this order." Id. at ¶ 96. For these tracking and monitoring systems, the Consent Decree sets a semiannual reporting requirement for the Defendants. Id. at ¶ 104.

Another provision of the Consent Decree also grants Plaintiffs' counsel a right of access to this data on monitoring and tracking compliance through the Defendants. Upon Plaintiffs' counsel's request, the Defendants agreed to produce this data to Plaintiffs' counsel.

> **Upon 30 days prior notice to TennCare, plaintiff's counsel shall have access during normal business hours to any public records relating to the state's compliance with the terms of this order, or to the monitoring, auditing or testing of such compliance. Subject to any applicable federal laws** limiting the authority of a court to grant access to such records, **plaintiffs' counsel shall have access to the records of members of the plaintiff class.** All information related to plaintiff class members provided to plaintiffs' counsel shall be considered to be confidential and shall not be used for functions other than those directly related to compliance with this order. **All such records shall be obtained, if necessary, and provided to plaintiffs' counsel through TennCare, rather than through individual MCOs.**

Id. at ¶ 105. (emphasis added).

The Defendants' and MCCs' contracts contain the following provisions on the Defendants' and other governmental agencies' access to any MCC's information about any TennCare enrollee:

> The CONTRACTOR shall insure within its own organization and pursuant to any agreement the CONTRACTOR may have with any other providers of service, including, but not limited to providers, subcontractors or any person or entity receiving monies directly or indirectly by or though (sic) **TennCare, the TENNCARE representatives and authorized federal, state, and Comptroller personnel including but not limited to TENNCARE, the Office of Inspector General (OIG), the Medicaid Fraud Control Unit (MFCU), the Department of Health and Human Services, Office of Inspector General (HHS OIG) and the Department of Justice (DOJ) and any other duly authorized state or federal**

44

**agency shall have immediate and complete access to all records pertaining to the medical care and services provided to TennCare enrollees.**

(Plaintiffs' Exhibit 28) (emphasis added).

### 2. The Lack of Preservation of Relevant Records

From the Court's perspective, the core of this ESI discovery controversy is the absence of any effective attempt by the Defendants to preserve and segregate relevant ESI, since the filing of this action in 1998. Despite the entry of the Consent Decree in 1998, the proof is that only in March, 2004, did the Defendants prepare a litigation hold memorandum for its employees and MCCs in the TennCare program. This March 17, 2004 memorandum, prepared by then counsel for the Governor and a member of the State Attorney General's office, sets forth a detailed process for the retention, segregation and preservation of documents on this and other TennCare actions.[22]

The March 17th memorandum referred to this action by name and stated that it was "critical that we take every reasonable step now to preserve the information, documents, and/or data produced or received by the work teams, whether in hard copy or electronic form." (Plaintiffs' Exhibit 24A).[23] This memorandum refers to a variety of electronic records to be preserved,

---

[22]The March 17, 2004 memorandum or litigation hold appears to represent a shift in the Defendants' focus to a litigation strategy to seek relief from the Consent Decree on its Medicaid programs in this and related actions. The Defendants' proof is that this shift was because the Governor wanted relief from the Consent Decrees. Another manifestation of this policy shift, beyond the March 17, 2004 litigation hold memorandum, was the retention of new counsel shortly thereafter. (Docket Entry No. 383, 385).

[23]At one point, Defense counsel asserted that their duty was only to issue the litigation hold, not to ensure that it was implemented. (Docket Entry No. 828, Exhibits 9, Moss Letter to Bonnyman at p. 2 ("I did suggest that the State does not have an obligation to preserve all documents simply because a consent decree is in place, but my comment was merely directed to the issue of whether the State had an obligation to do *more* than instruct state officials to preserve documents relevant to this litigation, which the State has done.")). There is not any documentary evidence of a litigation hold issued by current private counsel. Plaintiffs note that current lead counsel describes his firm as well experienced in "cases [that] were paper intensive,

45

including such information from "outside sources":

> [The material that must be preserved] includes, but is not limited to: (1) email and other electronic communications; (2) word processing documents, including drafts of documents; (3) spreadsheets; (4) databases; (5) power point presentations; and (6) personal notes. The material to be preserved also includes any information or data received by a work team from outside sources.

(Docket Entry No. 828, Exhibit 20 thereto).

In summary, this memorandum constituted a "litigation hold" for the preservation of all potentially responsive materials as well as the collection and review of such materials by designated records custodians. Provisions for contemporaneous designation and segregation of privileged materials communications are included, as this memorandum described in some detail:

> **An initial step that needs to be implemented immediately is the appointment of a records custodian for each work group, who will be responsible for maintaining and preserving all data received and produced by each work group. In order to assist these individuals in this task, it is imperative that they receive copies of all documents, including drafts, and other materials and that they be included in all communications , including electronic. Further, any materials that are privileged either as attorney client communication or as attorney-work product should be designated as such, so that the record custodians can segregate out those materials to preserve their confidentiality...**

> Limit written documents, especially the distribution of written documents ... **Mark all draft materials "Working Drafts"**: Keep in mind that any written document could be deemed a "public record" and publicly distributed.

> \*   \*   \*

> **Preservation of all records pertaining to TennCare Reform is of the highest priority. This includes all electronic documents(email, memo[] (etc).**

> \* \* \*

> To preserve documents as efficiently as possible: **All e-mails and attachments should be cc to: AG_TennCare Team.**

---

involving literally millions of documents, which we were able to index store, and search electronically." (Plaintiffs' Exhibit No. 35 at p. 2).

46

**All email and attachments should be cc to: The F&A team Representative ("records custodian")**

**All future documents and email should be saved immediately to the server or as email archive or filed if "hard copy" only.**

Should any employee involved in this effort leave state service, their hard drive should be imaged and retained.

Plaintiffs' Exhibit Nos. 24-F and 24-G. (emphasis added). Notwithstanding these documents, the TennCare Team mailbox was not made available by December 2, 2004, and there remained a "need to establish a policy of centralized retention of all electronic documents, (emails, files, reports, presentations, etc.), for returning to Medicaid." Plaintiffs' Exhibit 24-B.

The extent, if any, of the actual distribution of this Memorandum is unclear as the Defendants did not offer any proof on this issue. The Defendants did not present any proof from the working group's designated records custodians whose positions were identified in the March 17th Memorandum to collect all ESI from their groups so as to implement the memorandum. At the November 6, 2006 hearing, defense counsel stated that privileged documents had not been reviewed nor segregated for the Plaintiffs' ESI discovery requests until beginning in December 2006 or January 2007.

> The State is not equipped today to be able to do this sort of electronic production. It doesn't have the in-house capabilities to do it. Mr. Antony's declaration that we filed with our responses to their motion to compel details the very convoluted and complicated process that we would try to come up with, which would require State officials to try to forward all of their e-mails and electronic documents to a separate e-mail account, then have attorneys to on that account and try to review each one, and then forward it either to a non-responsive e-mail box or a privileged email box.
>
> We're talking a tremendous amount of time and expense, both that attorneys' time certainly in the review, but we're talking time that the State officials are going to have to take time away from their normal obligations to send literally thousands and thousands of e-mails.

47