# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JOHN B., CARRIE G., JOSHUA M., )
MEGAN A. and ERICA A., by their next friend, L.A.; )
DUSTIN P.,by his next friend, Linda C.; )
BAYLI S. by her next friend, C.W.; )
JAMES D. by his next friend, Susan H.; ) NO. 3:98-0168
ELSIE H. by her next friend, Stacy Miller; ) JUDGE HAYNES
JULIAN C. by his next friend, Shawn C.; )
TROY D. by his next friend, T.W.; )
RAY M. by his next friend, P.D.; )
ROSCOE W. by his next friend, K.B.; )
JACOB R. by his next friend, Kim B.; )
JUSTIN S. by his next friend, Diane P.; )
ESTEL W. by his next friend, E.D.; )
individually and on behalf of all others )
similarly situated, )
            )
      *Plaintiffs,* )
            )
DAVE GOETZ, Commissioner, Tennessee Department )
of Finance and Administration; DARIN GORDON, )
Deputy Commissioner, Bureau of TennCare; and )
VIOLA MILLER, Commissioner, Tennessee )
Department of Children's Services, )
            )
      *Defendants.* )

## M E M O R A N D U M

Plaintiffs, John B., and other minors through their next friends, filed this action on behalf

of themselves and other similarly situated minors under 42 U.S.C. § 1983 asserting jurisdiction

under 28 U.S.C. § 1331, the federal question jurisdiction statute, with its statutory counterpart, 28

U.S.C. § 1343(a)(3) and (4). Plaintiffs' action is on behalf of a class of more than 500,000

children who are entitled under federal law to medical services that include early and periodic

screenings for their physical well being, including their dental and behavioral health needs.

-1-

Federal law also requires any necessary follow-up medical services. Plaintiffs' class includes children who are in the state's custody through the state's juvenile court system and other children's programs provided by the State of Tennessee.

Plaintiffs seek to enforce their rights under Title VI of the Social Security Act, 42 U.S.C. §§620-629 and 670-679 and Title XIX of that Act, 42 U.S.C. § 1396 et seq. as well as remedies for violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. In essence, Plaintiffs allege that the Defendants deprived them of their rights to early and periodic screenings, diagnosis and treatment (EPSDT) services and related medical care for children under State's TennCare waiver program under the Medicaid Act. The children who are in the Defendants' legal custody are also entitled to such services under Title VI.

The Defendants are state officials who are in charge of the State programs for these services that are federally funded by Congress under Title VI of the Social Security Act, 42 U.S.C. §§620-629 and 670-679 and Title XIX of that Act. The medical services at issue are provided under the State's TennCare program, a waiver program approved by the Center for Medicare and Medicaid Services ("CMS"). The actual providers of these medical services are the Managed Care Contractors ("MCCs") or Managed Care Companies ("MCOs") that have contracts with the State detailing their responsibilities. Some MCCs provide only management services and some MCCs specialize in dental or behavioral health services.

Contemporaneous with the filing of the complaint, Plaintiffs requested class certification and the parties moved for entry of a Consent Decree to remedy Plaintiffs' claims. (Docket Entry No. 3). The Court certified the class and entered the Consent Decree (Docket Entry No. 12) that granted declaratory and injunctive relief on Plaintiff's EPSDT claims. In sum, the Consent

-2-

Decree enjoined the Defendants, as state officials, from depriving Plaintiffs and members of their class of their rights to EPSDT services; set minimum percentages of screenings for different groups of children over a period of years for compliance with EPSDT laws; and required a detailed, multi-year remedial plan to ensure the Defendants' compliance with Consent Decree. Lengthy and complex proceedings followed, including several show cause and contempt hearings (Docket Entry Nos. 228, 270, 291, 465 and 558) as well as extensive Memoranda (Docket Entry Nos. 227, 465, 1028 and 1069).

Before the Court are the following motions: (1) Defendants' motion to vacate the Consent Decree and dismiss case (Docket Entry No. 738); (2) Plaintiffs' motion for sanctions (Docket Entry No. 1045); (3) Defendants' motion for protective order (Docket Entry No. 1048); (4) Plaintiffs motion to compel compliance with the Court's October 10, 2007 Order and for a finding of contempt (Docket Entry No. 1052); (5) Defendants' motion for protective order (Docket Entry No. 1055); (6) Plaintiffs' motion for sanctions (Docket Entry No. 1210); and (7) Plaintiffs motion to approve their proposed process for in camera review of the Defendants' documents for which a privilege is asserted (Docket Entry No. 1274).

This Memorandum addresses the Defendants' motion to vacate the Consent Decree in this action. Yet, however this motion is resolved, the Plaintiffs' motions for sanctions and contempt on the discovery issues will not be moot. Red Carpet Studios Division of Source Advantage Ltd. v. Sater, 465 F.3d 642, 645-47 (6th Cir. 2006). The Defendants have been under an Order to produce to Plaintiffs' counsel electronic and other information, including from their MCCs, to assess compliance since the entry of the Consent Decree in 1998 (Docket Entry No. 12 at ¶¶ 91, 105), and those issues will be addressed in a separate Memorandum.

-3-

## I. Defendants' Motion to Vacate

In this motion, the Defendants contend, in sum, that Westside Mothers v. Oleszewski, 454 F.3d 532 (6th Cir. 2002) ("Westside Mothers II") and Brown v. Tennessee Dept. of Finance & Admin., 561 F.3d 542 (6th Cir. 2008) are significant new legal developments that require vacating of the Consent Decree as provided in paragraph 15 of the Consent Decree. In Paragraph 15 of the Consent Decree, the Defendants did "not waive any right to seek modification of this consent decree if controlling precedence establishes lack of § 1983 enforceability as to" §§ 1396(a)(43) and 1396d(r) [(the "Medicaid EPSDT Provisions")] and §§ 671(a)(16) and 675(1) and (53) [(the "Specified AAA Provisions"[1])]." (Docket Entry No. 12, Consent Decree at ¶ 15). Defendants also cite Doe v. Briley, 562 F.3d 777 (6th Cir. 2009) for the timeliness of their motion. In response, Plaintiffs assert that the Defendants' motion to vacate is untimely; that neither Westside Mothers II nor Brown represents a new legal development; and that as a matter of law, the Defendants can agree to assume obligations that federal law does not require.

For the reasons set forth below, the Court concludes that based upon express statements in Brown, Westside Mothers II represents a significant change in the law and thereby renders the

---

[1] 42 U.S.C. § 671(a) provides that

> In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which provides for the development of a case plan (as defined in section 675(1) of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in section 675(5)(B) of this title with respect to each such child.

42 U.S.C. §§ 675(1) and (5) list requirements for the case plan and case review system mentioned in 42 U.S.C. § 671(a)(16).

Defendants' motion to vacate timely and appropriate. Yet, neither Westside Mothers II nor Brown requires vacating the Consent Decree. Westside Mothers II expressly recognizes Plaintiffs' claim under 42 U.S.C. § 1396a(a)(43) for effective denial of outreach services to substantial numbers of class members that is the principal remedial purpose of the Consent Decree. Westside Mothers II, also recognizes as a potential claim where, as here, substantial members of the Plaintiffs' claims are effectively denied any medical services mandated by 42 U.S.C. § 1396r that are required under the State waiver plan.

Applying Gonzaga University v. Doe, 536 U.S. 273 (2002) and Westside Mothers II, the Court further concludes, consistent with several circuits, that Congress expressly mandated the provision of specific medical services for eligible children under a State's waiver plan so as to create enforceable rights under 42 U.S.C. § 1983. These statutory mandates for specific medical services distinguish the Medicaid statutes for children from the general statutory standards for the community waiver programs in Brown that involved only reimbursement assistance and a waiting list for home and community based services for mentally disabled residents. The legislative history of the Medicaid Act also confirms Congress's clear intention to confer upon eligible children as entitlements, specific and basic medical services and benefits that are also mandated by this Consent Decree. The relevant legislative history also establishes that Congress did so with the express knowledge and expectation that the eligible children possess the private right of action under 42 U.S.C. § 1983 to enforce these Congressional mandates against State officials that operate waiver plans under the Medicaid Act. Thus, the Defendants' motion to vacate should be denied.

To decide this motion and to understand the related issues, the Court deems a brief

discussion of the history of this litigation necessary. Under <u>Westside Mothers II</u>, the Court must consider the amenability of the issues in this action to a judicial remedy. 454 F.3d at 543. Under <u>Brown</u>, the Court must also consider the purposes of the consent decree. 561 F.3d at 546-47. Under <u>Gonzaga</u> , the key inquiry is Congressional intent. <u>Westside Mothers II</u>, 454 F.3d at 452.

### A. History of this Litigation

### 1. Plaintiffs' Complaint

In their original complaint, Plaintiffs alleged that the Defendants were denying eligible children under the Title VI and Title XIX the medical and related services to which they were entitled under the State's waiver plan approved under 42 U.S.C. § 1315. Plaintiffs' specific claims were that:

> 28. About one-third of all persons residing in Tennessee who are under 21 years old are TennCare beneficiaries. According to the 1994 Current Population Survey, Tennessee's population under 21 years of age totaled 1,509,356. Of that number, approximately 500,000 are currently enrolled in TennCare, according to state figures.

> 29. The Tennessee Commission on Children and Youth (TCCY) reports that approximately 12,000 children were in state custody in the fiscal year 1997, an increase of nearly 500 children from 1996. Over ninety percent of these children are enrolled in TennCare, and hence are members of the State Custody Subclass.

> \* \* \*

> 32. Questions of fact common to the entire class or subclass include, whether:

> a. Defendants fail to ensure that the families of children enrolled in TennCare are adequately informed of their children's right to receive EPSDT services, or how they might obtain such services;

> b. Defendants fail to provide, or require MCOs and BHOs to provide, appropriate screening and diagnosis services for TennCare children, including, but not limited to, medical, vision, hearing, dental, mental health and developmental screening at appropriate intervals that meet reasonable standards of medical practice;

-6-

c. Defendants fail to provide, or require MCOs and BHOs to provide, treatment to alleviate or treat conditions consistent with the broad definition of medically necessary care in the Medicaid Act;

d. Defendants fail or refuse to develop and implement a coordinated system of care that provides for the mental health and developmental needs of class members;

e. Defendants fail to provide an adequate array of mental health or developmental services, including residential and nonresidential treatment;

f. Defendants fail to provide or require MCOs and BHOs to provide nonresidential mental health or developmental services or to provide such services on a timely basis;

g. Defendants fail to identify the mental health and developmental needs of children by allowing unlawful limitations and restrictions on screening and diagnostic services;

h. Defendants fail to inform responsible parties of the right to EPSDT services when a child enters the foster care system and fails to provide information needed to access these services;

i. Defendants fail to provide foster children who have mental disabilities with timely placements and services appropriate to their particular needs;

j. Defendants fail to provide foster children with legally required health services necessary to prevent them from deteriorating physically and psychologically while in state custody;

k. Defendants fail to develop and implement on a timely basis individual care plans for short and long term treatment for children in its custody; and

1. Defendants fail to monitor individual case plans as they affect treatment and adjust them to meet the needs of the class members.

33. Questions of law common to the entire class or subclass include whether:

a. Defendants' acts and omissions deprive plaintiffs of EPSDT services in violation of the Medicaid Act, 42 U.S.C. §1396a, 1396d(a) and (r) and regulations promulgated pursuant thereto.

-7-

b. Defendants' acts or omissions deprive members of the State Custody Subclass of services necessary to address children's health needs, in violation of the Adoption Assistance Act and the Due Process Clause of the Fourteenth Amendment to the Constitution.

\* \* \*

35. Defendants have failed or refused to act on grounds generally applicable to the class, making declaratory and injunctive relief with respect to the class as a whole appropriate and necessary, as more fully set forth in Section V, infra. The nature of the violations complained of here is such that, absent broad systemic relief for all TennCare children, it is impossible to adequately protect the rights of any single plaintiff.

(Docket Entry No. 1 at 6-8).

## 2. The Consent Decree and Earlier Proceedings

With the filing of the complaint, the parties agreed to certification of the class of more than 500,000 children and to the entry of the Consent Decree. This decree recognized Plaintiffs' substantive rights created by the Medicaid Act to Early Periodic Screening Diagnosis and Treatment ("ESPDT") services and any necessary and specific medical services. The Consent Decree also imposed specific obligations upon the Defendants and their MCCs to provide these medical services and care to the class members and to provide information of their compliance to class counsel. (Docket Entry No. 12 at ¶¶ 91-97). The parties agreed that "present problems point up the need to afford immediate protection to children who plaintiffs allege are not now receiving the care to which the law entitles them, and who are liable to suffer serious, irreparable harm if such care is not provided. They cannot be asked to wait for additional months or years to know if policies now under development by the defendants will some day adequately protect their rights." Id. at ¶ 33.

The pertinent substantive provisions of the Consent Decree are as follows:

-8-

52.   **The Defendants shall achieve complete screening of 100% of TennCare children in DCS custody within 18 months of the entry of this order, and shall maintain that level of screening thereafter.** The tracking system developed by DCS shall be the system which shall be used to report compliance with this standard.

\*   \*   \*

54.   **Defendants shall ensure that, within their respective spheres of responsibility, TennCare, the MCCs and DCS** provide children all medically necessary EPSDT services as listed in 42 U.S.C. § 1396d(a) and as defined in corresponding Medical regulations. **Services which are required under EPSDT law, when medically necessary,** are as follows:

(a)   Inpatient hospital services (other than services in an institution for mental diseases);

(b)   Outpatient hospital services; rural health clinic services; and services offered by a federally-qualified health center;

(c)   Other laboratory and x-ray services;

(d)   EPSDT services, and family planning services and supplies;

(e)   Physicians' services; medical and surgical services furnished by a dentist;

(f)   Medical care, or any other type of remedial care recognized under state law, furnished by licensed practitioners within the scope of their practice as defined by state law;

(g)   Home health care services;

(h)   Private duty nursing services;

(i)   Clinic services;

(j)   Dental services;

(k)   Physical therapy and related services;

(l)   Prescribed drugs, dentures, and prosthetic devices; eyeglasses;

(m)   Other diagnostic, screening, preventive, and rehabilitative services;

Case 3:98-cv-00168   Document 1328   Filed 09/18/09   Page 9 of 53 PageID #: 21431

(n)     Services in an intermediate care facility for the mentally retarded (other than in an institution for mental diseases);

(o)     Impatient psychiatric services for individuals under age 21;

(p)     Services furnished by a nurse-midwife;

(q)     Hospice care;

(r)     Case management services and TB-related services;

(s)     Respiratory care services;

(t)     Services furnished by a certified pediatric nurse practitioner or certified family nurse practitioner;

(u)     Personal care services furnished to an individual who is not an inpatient or resident of a hospital, nursing facility, intermediate care facility for the mentally retarded, or institution for mental disease; and

(v)     Any other medical care, and any other type of remedial care recognized under state law, specified by the Secretary of the Untied States Department of Health and Human Services.

In addition to the services identified in the above list, the TennCare waiver allows the used of cost-effective alternative services in certain situations. These cost-effective alternative services are identified as services which may or may not be included in the above list and which are medically appropriate and cost-effective when delivered in place of other services on the list which have been determined to be medically necessary for an individual enrollee. The parties recognize that there are many kinds of services which fit under the above list of covered services and that delivery of medically necessary services may involve different service delivery mechanisms.

Id. at ¶¶ 52, 54.

The Consent Decree also set a series of deadlines for the Defendants to accomplish the delivery of these medical services:

39.     Within 180 days of entry of the decree, the State shall adopt any policies

-10-

and procedures necessary to ensure TennCare rules and guidelines clearly describe and allocate responsibility for, and require compliance with each specific outreach and informing requirement under federal law. . . .

\*   \*   \*

40.   The Defendants or their contractors shall achieve within 240 days and shall maintain thereafter, EPSDT outreach efforts designed to reach all members of the plaintiff class with information and materials conform with Section V(B)(1)(a).

\*   \*   \*

45.   Within 120 days after this order is entered, a baseline percentage of screening compliance shall be determined. The defendants, in consultation with the plaintiffs, shall determine the percentage based on the best available data on recent screening levels.

\*   \*   \*

53.   Within 120 days of the entry of this order, the defendants shall establish and maintain a process for reviewing the practices and procedures of the MCOs and DCS, and require such modifications of those practices and procedures as are necessary to ensure that children can be appropriately referred from one level of screening or diagnosis to another, more sophisticated level of diagnosis as needed to determine the child's physical health, behavioral health and development needs, as to medically necessary services.

\*   \*   \*

60.   Within 120 days of this decree, TennCare shall develop a provider handbook to specify the responsibilities of MCOs and DCS related to the provision of medically necessary services for children in DCS custody. This handbook shall assist in delineating service duty responsibilities in the area where there is the most potential for overlap, and said provider book shall provide . . . [and identifies a number of requirements.]

\*   \*   \*

62.   Beginning no later than 180 days after the entry of this Order, the defendants shall require MCOs to provide each primary care provider participating in the EPSDT program an up-to-date list of specialists to whom referrals may be made for screens, laboratory tests, further

-11-

Case 3:98-cv-00168   Document 1328   Filed 09/18/09   Page 11 of 53 PageID #: 21433

diagnostic services and corrective treatment. This list shall be supplemented quarterly to indicate additions or deletion and shall comply with the access/availability standards of the 1115 waiver.

\* \* \*

65. Within 180 days of this order, the State shall issue any necessary policy clarifications so that the defendants and their contractors understand their duty to provide EPSDT diagnosis and treatment services consistent with 42 U.S.C. Section 1396 (D), Subsection (r). Thereafter, the defendant shall inform, in a timely manner and on an ongoing basis, all of their contractors about what federal Medicaid law requires with respect to specific screens, diagnoses and treatments.

\* \* \*

72. Within 30 days of the entry of this Order the defendants shall submit a notice of proposed rulemaking to withdraw state rules establishing lifetime dollar limits and absolute service limits on behavioral health services to children under 21.

73. Within 120 days of the entry of this Order, the state or the state's contractor shall monitor a sample of children entering DCS custody and assess the adequacy of services provided to them by TennCare contractors prior to their entry into custody. The review will include an assessment of the effectiveness of the services provided to the child prior to the custody arrangement being made.

\* \* \*

82. Within 180 days, the defendant shall issue regulations and policy guidance to their contractors which incorporate strategies for ensuring coordination of EPSDT services among contractors and with other programs and services enumerated above.

\* \* \*

88. Within 120 days, the service testing process currently performed by the Tennessee Commission on Children and Youth which assesses all services, (medical, and non medical) provided to children in DCS custody, shall include on an ongoing basis an audit of EPSDT compliance with regard to the children sampled. Such testing may be conducted by the

-12-

State or a DCS contractor(s).

\* \* \*

92. . . .[W]ithin 60 days thereafter, the parties shall submit to the Court a
proposed agreed order containing a specific remedial plan addressing
the coordination and delivery of services under EPSDT law and laws
contained herein for children.

Id. at ¶¶ 39, 40, 45, 60, 62, 65, 72, 73, 82, 88 and 92 (emphasis added).

Other pertinent provisions of the 1998 Consent Decree require the establishment of

criteria to measure the Defendants' compliance and to monitor the Defendants' MCCs'

compliance.

46. A baseline periodic screening level will be calculated by the TennCare
Bureau using HCFA 416 mathematical methodology and enrollment and
encounter data to determine the number of periodic screens that should
have occurred in the federal fiscal year ending September 30, 1996. The
CPT-4 and ICD-9CM codes specified in HEDIS 3.0 as well-child visits
and adolescent well-care visits will be the primary determinants of which
encounters are counted as periodic screens. The baseline periodic
screening ratio for the period from October 1, 1995 through September 30,
1996 will be calculated using HCFA 416 methodology. This baseline
periodic screening ratio will be multiplied by 100 to calculate the baseline
periodic screening percentage. Subsequent periodic screening percentages
will be calculated using methodology identical to that used in calculation
of the baseline periodic screening percentage.

\* \* \*

50. For the period of October 1, 2000 through September 30, 2001, the
[Adjusted Period Screening Percentage] APSP shall be no less than
80. The APSP for the federal fiscal year ending on September 30,
2001 will be calculated by TennCare and made available to the plaintiffs by
April 30, 2002.

\* \* \*

55. The defendants shall review MCO practices with regard to making
decisions about medical necessity and identify any practices that are

-13-

**inconsistent with the federal laws cited herein. The defendants shall issue clarifications and ensure compliance with such federal law, regarding medically necessary treatment,** including but not limited to, the following clarifications:

(a)     The prior authorizations and medical determinations shall be made on a case-by-case basis for each service sought for a class member.

(b)     **That services are provided if necessary "to correct or ameliorate defects and physical and mental illnesses and conditions. . . ." 42 U.S.C. § 1396d(r)(5).**

(c)     That the definition of medical necessity shall be applied so that services are covered if they correct, compensate for, improve, or prevent a condition from worsening, even if the condition cannot be prevented or cured.

(d)     That medically necessary services shall be provided, whether or not the screener is under contract with the particular managed care entity.

(e)     That defendants and their contractors and subcontractors are in compliance with HCFA Office of Managed Care Operational Policy Letter No. 96.045 (December 3, 1996), and do not have financial or contractual arrangements which undermine class members' access to covered services. (See Attachment 1).

Id. at ¶¶ 46, 50 and 55 (emphasis added).

### 3. The 2001 Findings of the Defendants' Non-Compliance

In several post-consent decree filings, the parties' counsel submitted several documents reflecting the Defendants' intention to file a "remedial plan." (Docket Entry Nos. 27, 31 and 38). The Defendants later filed a remedial plan, but after a period of time operating under that plan, the Defendants moved to stay and to modify the Consent Decree (Docket Entry No. 69) and the Plaintiffs moved for a finding of contempt (Docket Entry No. 79). After an evidentiary hearing, the Honorable John T. Nixon, the then presiding judge, found the Defendants' remedial plan to

Case 3:98-cv-00168   Document 1328   Filed 09/18/09   Page 14 of 53 PageID #: 21436

be fatally defective in structure and performance. In his ruling filed on December 18, 2001

(Docket Entry No. 227), Judge Nixon made the following pertinent findings of fact and

conclusions about the Defendants' remedial plan and their proposed revised remedial plan:

## I. Findings of Fact

### A. Defendants' Revised Remedial Plan– Findings of Fact

1. Pursuant to the Consent Decree, the parties were to submit a specific remedial plan addressing the coordination and delivery of services under EPSDT law for children in State custody or at risk of entering State custody. After extensive negotiations, the parties jointly submitted a Remedial Plan for Children in State Custody and the Plan for children at Serious Risk for Entering State Custody (collectively, "Remedial Plan") on May 11, 2000. The Court approved the Remedial Plan on May 16, 2000, in two Agreed Orders. (Doc. Nos. 58, 60).

2. The May, 2000 Agreed Orders imposed on the Defendants several requirements designed to improve the care of children in, or at risk of entering, State custody. The children became a subclass that was to be carved out from the larger class implicated by the Consent Decree. The Remedial Plan had four basic components. First, Defendants were to develop a Best Practice Network (BPN) comprised of primary care providers and other health care resources. The BPN would coordinate the dissemination of medical and behavioral health services to children in the subclass.

\* \* \*

6. **Soon after the entry of the May 2000 Agreed Orders, the Remedial Plan proved to be unworkable.** The State created the Implementation Team, which was headed by a capable pediatrician, Dr. Larry Faust. Dr. Faust began recruiting for the Best Practice Network in May, 2000, by contacting pediatricians all over the State via e-mail, telephone, and in person, and also spoke to Steering Panel members. The Steering Panel was appointed, and subcommittees were formed. The Steering Panel and the Executive Oversight Committee met frequently.

7. However, the State has not fully adhered to the Remedial Plan. First, the State was unable to recruit sufficient physicians for the BPN. . . Hence, the Remedial Plan was never fully implemented.

-15-

8. The State has now proposed a revised Remedial Plan. Central to the State's proposed revisions is a "carve-out" for the delivery of health services to children in State custody. The plan contemplates that these children will be enrolled in a single MCO and BHO, rather than being distributed among all of the TennCare contractors. As of July 1, 2001, the State has already reassigned all children in State custody to TennCare Select, to be administered by BlueCross.

9. The State believes that limiting the plan to only one MCO and one BHO will address many of the problems that providers had with the original Remedial Plan. The Revised Remedial Plan also allows advocates other than DCS to make referrals. . . and requires the State to contract with an advocacy group . . . Although the revised Remedial Plan proposes other changes, the forgoing are the most salient proposals.

10. The Revised Remedial Plan was formally approved by both the Steering Panel and the Executive Oversight Committee, with only Plaintiffs' counsel and an advocate disapproving. The State has begun to move forward with its plans for the revised Remedial Plan . . . The State opines that only this Court's Order is necessary for it to proceed with the Revisions.

Id. at 40-44 (emphasis added and footnotes omitted).

*B. EPSDT Failures*

**Outreach**

8. . . . [T]he evidence presented at trial demonstrates that some outreach activities are more effective than others. While State officials have opined that "[n]o strategy [has] necessarily been proven better than the other, they implicitly acknowledge that other states have effectively and creatively conducted outreach activities. **The evidence submitted at trial proves that the State's strategy of mailing fliers and brochures to inform TennCare recipients of their EPSDT rights is inadequate. The State is aware that its outreach strategies are insufficient.** In fact, at least one TennCare employee recognized that a statewide broadcast and media campaign was necessary in order to inform children and their parents of EPSDT. . .

\* \* \*

-16-

10. Most importantly, the trial record demonstrates that at least some TennCare members and their parents were unaware of what EPSDT represents, or even that it conferred certain benefits upon them. . . [.]

### Screenings

11. Under the Consent Decree, the State must comply with the federal requirements for EPSDT screens. An adequate screen must contain all components required by EPSDT law. The State was to create a committee that would devise a plan and specific guidelines to ensure the effectiveness of the screens. Additionally, the Consent Decree specified a method for quantifying and measuring screening performance, and established goals over time for adjusted periodic screening percentage (APSP) rates.

12. **Specifically, the State agreed to improve its APSP annually, and reach a goal of 80% by September, 2001. The Defendants proof submitted at trial indicated that the State has failed to meet its goals. The adjusted screening rate for 1999 was 19.8% and rose to 31.5% in 2000, far short of the baseline goals for those years, and the ultimate goal of 80% for 2001. Dental Screening rates also fell short of their targets.**

13. **The Consent Decree also required that 100% of Children in State custody were to receive full EPSDT screening after September 1999. As of May, 2001, 91% of children in State custody had received the appropriate screens.** Although this figure is still short of the 1999 target, **the 91% may be inflated** because it may not represent fully EPSDT compliant screens **because the Department of Children's Services (DCS) reports a child having been adequately screened even if that child has not received the seven components required by federal law....**

\* \* \*

### [Conclusions of Law]

**The Court agrees that the current Remedial Plan is unworkable, and that modification may, in theory be appropriate. However, the Court is not convinced that the revised Remedial Plan adequately addresses the main problem associated with the original Remedial Plan.** Specifically, the managed care structure of Tenncare may create the problems encountered by and

-17-

among the State, MCOs and BHOs and providers. The new remedial plan does nothing to assuage the providers' distrust of the MCOs. **The Revised Remedial Plan also does not address the apparent disconnect between the Bureau of TennCare and the Implementation Team at the Department of Health. A new Remedial Plan that still operates under the very same managed care system may not adequately address the Court's concerns with the TennCare system as it relates to the under-21 population. The Defendants have not made a showing of how the revised Remedial Plan will ultimately succeed where the current Remedial Plan has failed.**

The Court also does not find sufficient reasons for modifying any part of the Consent Decree at this time, for the reasons discussed in relation to the Agreed Orders. The Defendants have failed to show how the factual situation in this case mandates revision of the Consent Decree under the Rufo test.

Id. at 8, 10-14 (emphasis added and footnotes omitted).

In his accompanying Order, Judge Nixon reiterated the Defendants' lack of an effective plan and stated: "The Court finds that a special master is necessary to mediate, and ultimately to submit to the Court, an EPSDT compliant plan." (Docket Entry No. 228). The predicates for the appointment of a special master are reflected in his findings of the Defendants' deficiencies:

The record demonstrates that the Defendants have been, for the most part, well-intentioned and diligent in attempting to comply with both the Consent Decree and federal EPSDT requirements. In fact, Defendant officials sometimes attempted to implement the very strategies that Plaintiffs' counsel advocated, but were constrained by the realities of State Government.

\* \* \*

3. **However, from the beginning, the State's efforts have been hampered by institutional inefficiencies and fundamental problems associated with the TennCare system.** The record shows that the Defendants' efforts were indeed scuttled because "essential providers and tertiary pediatric care centers refused to contract with all of the managed care companies currently participating in the TennCare program." The record also confirms that the Defendants have faced a challenging task in melding Medicaid and managed care - a challenge that is by no means unique to Tennessee. Nevertheless, the institutional difficulties faced by the Defendants do not excuse their failures to follow the law. **Defendants have not shown why their failure to fully comply with the 1998 Consent**

-18-

**Decree or federal law should be excused, and thus have neither proven
compliance nor any excuse for failure to comply with the federal EPSDT
provisions.**

\* \* \*

5. Pursuant to the Consent Decree, Defendants have a responsibility to achieve
and maintain outreach efforts designed to reach all members of the Plaintiff class
with information and materials in conformance with federal law. . . The record
reflects the fact that the Defendants mostly delegated the responsibility to conduct
outreach to MCOs and BHOs, who have not successfully implemented the
outreach requirements contained in the Consent Decree. However, the
Defendants are ultimately responsible for conducting proper outreach. If the
Defendants choose to delegate this responsibility, they must do so with the
understanding that they will remain ultimately responsible for the failure of any
delegatee.

\* \* \*

**TennCare employees appear to hold a laissez faire attitude toward the
EPSDT outreach procedures of their contractors, preferring to allow the
contractors to creatively reach out to their patient populations. That
approach has not yielded effective outreach.** Creative government is only
effective when that creativity spurs positive change. The MCOs' outreach efforts
have been insufficient, and the State has failed to engage in adequate oversight to
ensure adequate outreach. As the Seventh Circuit Court of Appeals recognized
twenty-seven years ago, "EPSDT programs must be brought to the recipients; the
recipients will not ordinarily go to the programs until it is too late to accomplish
the congressional purpose [of EPSDT]." Stanton v. Bond, 504 F.2d 1246 (7th Cir.
1974). **Indeed, without proper outreach, EPSDT is worthless.**

\* \* \*

**It is clear from the record that not only have Defendants failed to comply
with the Department of Health and Human Services' regulations, but
Defendants have simply failed to meet the bare requirements of the EPSDT
laws.** Defendants indicate that low screening rates in this region are partly
attributable to both an ill-informed physician corps and a patient population that
is not as willing to see a doctor for well-child care. However, Governments'
job is to inform both the provider and consumer communities of the federal
screening requirements. In fact, federal law requires that the State engage in
outreach to inform the patients of EPSDT. The Court agreed that Tennessee may
have a "harder road to hoe" than some other states, but that does not mean that the

-19-

entrenched attitudes of providers and patients can be used as a shield against liability for failure to implement EPSDT requirements. **Defendants concede that they "have not and will not meet the EPSDT percentages required by the Consent Decree." The Court agrees.**

(Docket Entry No. 227 at 6, 7, 8, 28, 30 (emphasis added)).

Judge Nixon cited as a causal factor for the Defendants' noncompliance, the Defendants' wholesale delegation of matters to the MCCs. Judge Nixon found that "most of what TennCare does has to happen through its contracts with the MCOs and BHOs." Id. at p. 25.

> **Coordination between various private health agencies is still inadequate. The lack of coordination among various non-governmental agencies is directly attributable to the very system under which public health is administered. Tennessee State government has failed to properly coordinate and implement proper case management and coordination services.**

Id. at 22.

In 2001, the Defendants relied on their contractors as witnesses to justify their request for modification.[2] Judge Nixon made specific findings and conclusions about the deficient performance of the MCCs or MCOs and BHOs:

> 15. **Defendants have made progress in achieving the target screening rates by contractually requiring their contractors to meet certain EPSDT screening goals. The most recent contracts show that an MCO that has not reached an 80% adjusted screening ratio is now required to contract with the county health department to perform EPSDT screenings. . . .**

\* \* \*

---

[2] See, e.g., Docket Entry No. 156, June 19, 2001 Transcript, Vol. 11, at 282-294. The Defendants acknowledge that "the MCCs play an intricate and important role in ensuring that the State fully complies with its obligations under both the Consent Decree and the federal EPSDT law." (Docket Entry No. 932, Exhibit A thereto).

-20-

17.	As discussed above in relation to outreach and screening, systemic deficiencies have also made compliance with the Consent Decree's diagnosis provisions difficult. **First, where there are overlapping medical and mental health issues, the MCOs and BHOs quibble over which entity is responsible for providing coverage. The State's TennCare contracts contribute to this ambiguity by sometimes failing to specify the responsible party, even though the BHOs do have coordination agreements with MCOs.** In practice, individuals with overlapping issues sometimes "fall in the cracks" and fail to receive services from either a BHO or MCO, as with, for example, attention deficit disorder patients.

18.	**Additionally, the MCO and BHO contractors often refuse to authorize health assessments.** Larry Faust of the Department of Health testified that even when MCOs and BHOs authorized services, they sometimes refused to pay the provider once the service was rendered.

19.	**Even worse, the State's managed care system often provides incentives for financially-motivated denials of coverage by both MCOs and BHOs. TennCare's contractors essentially gamble that they will be able to provide services to TennCare enrollees and still be able to make a profit. Tennessee pays the MCOs and BHOs a set amount of money for all of the services that an individual requires. Hence, the contractors have an incentive to cut costs by denying coverage.**

20.	**Further, as discussed above, MCOs and BHOs often lack adequate provider networks, creating a barrier to adequate diagnostic evaluations. . . [.]**

\* \* \*

22.	**. . .[T]he record demonstrates that even where the TennCare Bureau agrees that the denied services is medically necessary, the State routinely grants the BHOs and MCOs a 'good cause' extension of time in which to provide services that the TennCare Solutions Unit has deemed medically necessary. The trial record is that children often wait for extended periods of time to receive medically necessary services. . . The record reflects similar situations involving medically necessary services that, for various reasons, were either delayed or never provided to the patient.**

-21-

23. On the behavioral/mental health side, the BHOs sometimes fail to connect children to an appropriate diagnostic resource capable of performing the required behavioral health assessment. As with MCOs, there is an inadequate provider network for psychologists, psychiatrists and other behavioral health professionals. The record also demonstrates that State policy makers are well-aware of the limited BHO provider network.

24. The record reveals that a number of the providers within the limited BHO provider network are not taking new patients, thus rendering those providers unavailable to new TennCare patients.

25. Additionally, there is only one BHO in Tennessee. . . TennCare does not adequately assure that the BHO corrects deficiencies in the BHO's provider network. . . .

26. **Thus, children frequently do not receive appropriate diagnoses through the TennCare managed care system. Defendants admit that "sometimes the system breaks down," and the Court finds that in this case, the State Government's healthcare system has indeed broken down. However, the system itself is to blame for TennCare's failures. A depleted provider network and lack of proper oversight by MCOs and BHOs is directly attributable to the TennCare managed care system, which has proven to be unable to fully comply with both the EPSDT and the Consent Decree's requirements for proper diagnosis of children under 21.**

\* \* \*

### [Conclusions of Law]

TennCare does not allow individuals to receive adequate diagnosis and treatment through various providers. The incentives created by capitated payments to the MCOs and BHOs result in a failure of the State system to assure that each State resident under the age of 21 receives the care that EPSDT mandates. As the Court has previously noted, there are "pecuniary incentives that MCOs [and BHOs] have for denying, suspending, or terminating care under the TennCare system. . . ." Daniels v. Wadley, 926 F.Supp.1305, 1308 (M.D. Tenn. 1996). . . .

\* \* \*

**The proof shows that the State has failed to adequately ensure the coordination of EPSDT services among the various governmental, private and non-profit providers of services. The TennCare program, although well-**

-22-

>    intentioned, is disjointed. . . .**Although the State has established an office that is essentially dedicated to ensuring EPSDT compliance, that office is powerless to address the Court's greatest concerns with the TennCare program because the office does not have the mandate to directly control the actions of the MCOs or the BHOs. Adding another sailor to a sinking ship will not prevent it from sinking.** In the same way, adding yet another layer of bureaucracy to an ineffective TennCare system will not succeed in reforming it.
>
>    **In many instances children lack a case manager. . . .This Court . . . finds that failure to provide adequate case management services in this case constitutes a violation of federal law.** Without effective case management, the individual child lacks an effective coordination of various services that he or she needs to ensure that EPSDT services are rendered.

Id. at 15-20, 32-33 (emphasis added). Judge Nixon, however, reserved a finding of contempt, "because the Court bases this decision on failure to comply with federal law, the Court will hold in abeyance a decision on whether Defendants' actions thus far constitute civil contempt. . .The record indicates that the State made great efforts to comply with the Court's Orders. However, the Court reserves the right to find the Defendants in contempt in the future." Id. at 35.

The Court then directed "[t]he parties. . . [to] attempt to work to reach a consensus on a workable plan. If, and only if, the special master determines that the parties are unable to agree on a plan, the parties shall submit plans to special master for his consideration." (Docket Entry No. 275 at 2). In an August 14, 2002 Order, the Court required the Defendants to prepare an "Itemized Assessment Protocol" ("IAP") as well as an "Initial Work Plan"("IWP"), under the Special Master's supervision. (Docket Entry No. 291 at 3-4). In a subsequent Order, the Court ordered the Defendants to submit an "Initial Work Plan" ("IWP") to the Special Master and later granted the Defendants an extension "that defendants shall submit their initial work plan by December 13, 2002." (Docket Entry No. 303). As discussed below, the Defendants did not prepare the IWP nor the IAP.

-23-

### 4. The 2004 Findings of the Defendants' Non-Compliance

On June 16, 2004, Plaintiffs filed another motion to show cause (Docket Entry No. 403) asserting the Defendants' continuing violations of the Consent Decree. After discovery, the Court held an evidentiary hearing and thereafter entered its Memorandum on October 22, 2004. Citing testimony of two key state policymakers, Judge Nixon found that the Defendants were again not in compliance with the Consent Decree and significantly, that the Defendants lacked a reliable system to measure their progress.

> On June 23, 2004, Plaintiffs deposed Dave Goetz, Tennessee Commissioner of Finance and Administration, and on June 24, 2004, Plaintiffs took the deposition of Manny Martins, Deputy Commissioner of Finance and Administration for TennCare. (Docket Entry No. 420). Both deponents attested to sincerity, good intentions, and hard work of those State employees who have labored since 2001 to comply with EPSDT. Mr. Martins testified that the State is making inroads in the area of outreach. "From 1999 to 2003 we had a 175 percent increase, I believe, in our screening rates from, as an example, 19.8 percent to 53 percent. We've had a 60 percent increase in our dental screening rates, 55, 56 adjusted–the raw is 36 to 62 for 2002, raw 54, adjusted 41.9." [Quoting the Martins Deposition at 57]. Mr. Martins also reported that TennCare has staffed 22 dental clinics and has contracted with the Department of Health for dental outreach, dental operatory, and mobile operatory. Mr. Martins has stated that by the way of a new contract with the Department of Health for $7 million, effective July 1, 2004, every single TennCare enrollee child would be contacted by their local health department from newly set-up call centers. . . .
>
> Mr. Goetz also made statements in his deposition which conveyed progress. With respect to screening results, Mr. Goetz noted "dramatic improvements" over the last couple of years and stated, "efforts to work through the county health officials have borne fruit, and that's also what we were funding, continuing outreach in the budget that was just passed into law" [Quoting the Goetz Deposition at 41]. Nonetheless, while some progress has been made since the Court's approval of the Consent Decree in 1998, testimony from Mr. Martins and Mr. Goetz, along with reports made to the Court by the Special Master, make clear that not enough progress has not been made. **The Court is not convinced that Defendants, acting on their own, will reach full compliance with the terms of the consent decree within a reasonable period of time.** As the well-being of 550,00 children is at stake, something more must be done to ensure that

-24-

the state's EPSDT requirements are met in accordance with the terms of the Consent Decree.

**As recently as August 2004, the Special Master concluded in his status report to the Court that no feasible plan yet exists to achieve compliance for an indispensable section of the Consent Decree. The Special Master reported that the State has failed to honor its renewed commitment to produce an IAP satisfactory to the Special Master, last made in September 2004, and still refuses to engage its key officials in planning efforts to achieve compliance, verification of the quality of its data, and evaluation of the successes or failures in attaining compliance.**

**The Special Master also reports that the State is incapable of reporting progress to the Court because it lacks a valid and reliable system of measuring progress in such key areas as provider network adequacy, case management, outreach, the effective use of information systems, and system level coordination, to name a few.** The Special Master's status report informs the Court that because Defendants have never created a list of precise "outcomes" towards which their efforts are focused, not only have they failed to meet the terms of the Consent Degree, but they are not even in a position to be able to assess their own shortcomings for the purpose of making improvements.

**The Court finds that the deposition testimony of Mr. Goetz and Mr. Martins conclusively support this Court's finding that, to date, the State has not achieved compliance with the terms of the Consent Decree.** Mr. Martins, the senior state official with direct responsibility for EPSDT compliance, testified, "I'm not sure that compliance with the consent decree is achievable." Martin's Dep. 29. He testified that the 100 percent screening requirement for children in state custody mandated by the Consent Decree "should be achievable" and that the Consent Decree's stated dental screening rate "can be achievable over a period of time." Martins Dep. at 33. When asked about barriers to compliance that he saw, Mr. Martins replied, "There are numerous external barriers that are out there. Some of them involve coordination with other departments, some of them involve the inability to have good data in terms of being able to have information on the system - on the child and following that child through the system." Martins Dep. 35. Mr. Martins also discussed the socio-economic barriers to achieving compliance with the consent decree and "barriers in understanding" on part of families of TennCare enrolled children who sometimes do not seek services for their children when they are healthy, in spite of the importance of preventative EPSDT measures to the continuing health of their children. Martins Dep.35-36. Finally, Mr. Martins stated, "I think we have barriers from the standpoint of not totally understanding all the gaps that we have in our delivery systems." Martins Dep. at 36.

Specifically, with respect to the screening requirements in the Consent Decree, **Mr. Martins testified that the State is not meeting the 80 percent standard in the Consent Decree. Mr. Martins testified that while he would like to review the numbers, the last figures he had seen indicated that the state is not meeting the 100 percent screening requirements under the Consent Decree for children who are in State custody. Further, Mr. Martins stated that with respect to dental screening and dental service, the State is not in compliance with the Consent Decree.** Other areas of particular concern testified to by Mr. Martins include the current inadequacy of behavioral health networks, and the State's failure to meet the Consent Decree's required provision of EPSDT services to the children in DCS custody. Martins Dep. 187. . .

\* \* \*

**This is not a finding that the State has acted in bad faith or has intentionally failed to comply with the Consent Decree. To the contrary, the Court acknowledges, as set forth above, that the state has made some progress toward compliance in some areas. However, these efforts have not produced the results mandated by the Consent decree some six years ago. The Court s compelled to grant further relief to the Plaintiffs, 550,000 TennCare enrolled children, to ensure that their EPSDT needs are met as quickly as possible. . . .**

. . .[A] motion for relief looks to the future, rather than the past. In looking to the future, the Court has instructed the Special Master and his experts to create a comprehensive plan to put the State in compliance with the terms of the Consent Decree. The plan is attached to this Order. . . . This plan is not a modification of the terms of the consent decree.

(Docket Entry No. 465 at 4-8) (emphasis added). The Court then set a deadline for objections and authorized depositions and proposed modifications of the plan that was attached to its Memorandum. Id. at 8. The Defendants did not comply with this Order nor the express provisions of the Consent Decree to develop and file a remedial plan.

### B. Conclusions of Law

### 1. Rule 60(b)(5) Requirements

In Paragraph 15 of the Consent Decree, the Defendants did "not waive any right to seek

-26-

modification of this consent decree if controlling precedence establishes lack of § 1983 enforceability as to" §§ 1396a(a)(43) and 1396d(r) [(the "Medicaid EPSDT Provisions")] and §§ 671(a)(16) and 675(1) and (53) [(the "Specified AAA Provisions"[3])]." (Docket Entry No. 12, Consent Decree at ¶ 15). As described earlier, Defendants insist that <u>Westside Mothers II</u> decided in 2006 and <u>Brown</u> decided in 2008 require that the Consent Decree be vacated and this action be dismissed. As an alternate argument, Defendants assert that the Consent Decree should be modified to vacate the portions which depend on the enforcement of a federal right that these Sixth Circuit decisions reject.

The threshold issue raised by the Plaintiffs, is whether the Defendants have satisfied the timeliness requirement of Rule 60(b)(5) and the additional requirement that <u>Westside Mothers II</u> and <u>Brown</u> qualify as a significant changes in the law entitling the Defendants to the relief sought. <u>See</u> <u>Rufo v. Inmates of Suffolk County Jail</u>, 502 U.S. 367, 384 (1992); Fed. R. Civ. P. 60 (b)(5). Plaintiffs insist that the defendants have failed on both requirements. The Defendants respond <u>Westside Mothers II</u>, a 2006 decision, overruled <u>Westside Mothers I</u> a 2002 Sixth Circuit decision, and thus, is a significant change in the law, rendering their motion to vacate

_____

[3]42 U.S.C. § 671(a) provides that

> In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which provides for the development of a case plan (as defined in section 675(1) of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in section 675(5)(B) of this title with respect to each such child.

42 U.S.C. §§ 675(1) and (5) list requirements for the case plan and case review system mentioned in 42 U.S.C. § 671(a)(16).

Case 3:98-cv-00168   Document 1328   Filed 09/18/09   Page 27 of 53 PageID #: 21449

timely and appropriate.

An examination of Westside Mothers II and Brown reflects that those decisions and the decisions that Westside Mothers II and Brown relied upon, arose from the Supreme Court's 2002 Gonzaga decision that was decided on June 20, 2002. Westside Mothers I was decided on May 15, 2002. Upon remand of Westside Mothers I, and after the Sixth Circuit issued its amended mandate on November 29, 2004, the Michigan defendants filed a motion to dismiss in that action asserting ESPDT claims, contending that Gonzaga required dismissal of that action. Westside Mothers v. Olszewski, 368 F. Supp.2d 740, 742 (E.D. Mich. 2005). Thus, in 2004, other similarly situated defense counsel recognized that Gonzaga raised the issue of whether claims under ESPDT statute and Section 1396a(a)(43) are enforceable. Id. These Defendants did not raise any Gonzaga issue until 2006. (Docket Entry No. 609). From June 2004 until November 2006, the Defendants actively and zealously litigated this action, including pursuit of unnecessary discovery on collateral issues as Judge Nixon found in his recusal Order. (Docket Entry No. 584). The Defendants did not file their motion to vacate until November 20, 2006, (Docket Entry No. 778), after Plaintiffs filed their motion to compel discovery (Docket Entry No. 708) to challenge the defense counsel Charles Cooper's statement at the February 10, 2006 conference that the Defendants were in compliance with the Consent Decree[4].

In these circumstances, the Court would ordinarily conclude that the Defendants' motion is untimely. Yet, in Brown, the Sixth Circuit stated that "Westside Mothers [II] represents an "important change in law," 561 F.3d at 54, and acknowledged "the significance of this change in

---

[4] This assertion is at total variance from the Monitors' Report filed January 26, 2007. (Docket Entry No. 795-1 at 3, 7)

-28-

law". Id. This Court is bound by those statements in Brown that preclude a finding of

untimeliness and require a finding that Westside Mothers II is a significant change in the law.

For these reasons, the Court considers the merits of the Defendants' motion to vacate.

## 2. **Westside Mothers II**

In Westside Mothers II, the plaintiffs asserted the following statutory claims that the

Sixth Circuit rejected in part and permitted in part:

> the defendants had refused or failed to implement the Medicaid Act, its enabling
> regulations, and its policy requirements by: (1) refusing to provide, and not
> requiring participating HMOs to provide, the comprehensive examinations
> required by 42 U.S.C. §§ 1396a(a)(43), 1396d(r)(1) and 42 C.F.R. § 441.57; (2)
> not requiring participating HMOs to provide the necessary health care, diagnostic
> services, and treatment required by 42 U.S.C. § 1396d(r)(5); (3) **not effectively
> informing plaintiffs of the existence of the screening and treatment services,
> as required by 42 U.S.C. § 1396a(a)(43)**; (4) failing to provide plaintiffs the
> transportation and scheduling help needed to take advantage of the screening and
> treatment services, as required by 42 U.S.C. § 1396a(a)(43)(B) and 42 C.F.R. §
> 441.62; and (5) developing a Medicaid program that lacks the capacity to deliver
> to eligible children the care required by 42 U.S.C. §§ 1396a(a)(8),
> 1396a(a)(30)(A), and 1396u-2(b)(5).

454 F.3d at 536 (emphasis added).

The Court then analyzed each statutory claims and concluded as to claims under Section

1396a(a)(8), (10) and (30).

> After examining the text and the structure of the statute, we do not believe §§
> 1396a(a)(8), 1396a(a)(10) require the State to provide medical services directly.
> The most reasonable interpretation of § 1396a(a)(8) is that all eligible individuals
> should have the opportunity to apply for medical assistance, i.e., financial
> assistance, and that such medical assistance, i.e., financial assistance, shall be
> provided to the individual with reasonable promptness. The most reasonable
> interpretation of § 1396a(a)(10) is that medical assistance, i.e., financial
> assistance, must be provided for at least the care and services listed in paragraphs
> (1) through (5), (17) and (21) of § 1396d(a). See Clark v. Richman, 339 F.Supp.2d
> 631, 641 (M.D.Pa.2004). The regulations that implement these provisions also
> indicate that what is required is a prompt determination of eligibility and a prompt

Case 3:98-cv-00168   Document 1328   Filed 09/18/09   Page 29 of 53 PageID #: 21451

payment to eligible individuals to enable them to obtain the necessary medical services. See 42 C.F.R. §§ 435.911, 435.930.

\* \* \*

After examining the text and structure of § 1396a(a)(30), we agree with the First and Ninth Circuits that § 1396a(a)(30) fails the first prong of the Blessing test and does not therefore provide Medicaid recipients or providers with a right enforceable under § 1983. First, § 1396a(a)(30) has an aggregate focus rather than an individual focus that would evince congressional intent to confer an individually enforceable right.

\* \* \*

Furthermore, § 1396a(a)(30) is not confined to particular services; rather, it speaks generally of "methods and procedures." See § 1396a(a)(30)(A). Such broad language suggests that § 1396a(a)(30) is "concerned with overall methodology rather than conferring individually enforceable rights on individual Medicaid recipients." Sanchez, 416 F.3d at 1059-60.

Because the text of § 1396a(a)(30) does not focus on individual entitlements, nor is the "broad and nonspecific" language of this provision amendable to judicial remedy, we are not persuaded that Congress has, with a clear voice, intended to create an individual right that either Medicaid recipients or providers would be able to enforce under § 1983. Without such unambiguous intent, plaintiffs cannot satisfy the first requirement of the Blessing test. We therefore hold that § 1396a(a)(30) does not confer enforceable rights and affirm the district court's dismissal of plaintiffs' § 1396a(a)(30) claim.

Id. at 540, 543.

Yet, Westside Mothers II expressly recognized an enforceable right under Section 1396a(a)(43)(A) for the State Defendants' ineffective outreach services in failing to inform plaintiffs of mandated medical services under the Medicaid Act and reasoned as follows:

The complaint, read in the light most favorable to the plaintiffs, supports a § 1983 claim for violations of § 1396a(a)(43)(A). In order to establish a § 1983 claim, plaintiff's complaint must allege that (1) the conduct in controversy was committed by a person acting under color of law, and (2) the conduct deprived the plaintiff of a federal right, either constitutional or statutory. Lugar v.

-30-

Edmondson Oil Co., 457 U.S. 922, 930 (1982). **The amended complaint alleges that defendants "refused or failed to effectively inform Plaintiffs and their caretakers of the existence of the Medical Assistance children's healthcare program, the availability of specific child healthcare services, and related assistance." (J.A. at 205.)** (Emphasis added.) In concluding that plaintiffs' allegation that defendants failed to "effectively inform" them of the EPSDT services does not state a viable § 1983 claim, the **district court ignored the Medicaid Act's implementing regulations, which obligate participating States to "effectively" inform all eligible individuals. See 42 C.F.R. § 441.56(a). Plaintiffs have stated a cognizable claim under § 1983 for violations of § 1396a(a)(43)(A) and should proceed to discovery for further development of the facts.**

Id. at 543-44 (emphasis added).

Here, the Consent Decree expressly requires the Defendants to provide outreach services to ensure that children and their parents receive information on the availability of mandated medical services under the Medicaid statutes and the State's waiver plan.

> 39. Within 180 days of entry of this decree, the state shall adopt any policies and procedures necessary to ensure that TennCare rules and guidelines clearly describe and allocate responsibility for, and require compliance with, each specific outreach and informing requirement under federal law, including, but not limited to, the following:
>
> (a) "aggressively and effectively" informing enrollees of the existence of the EPSDT program, including the availability of specific EPSDT screening and treatment services (e.g., lead blood assessment, anticipatory guidance, immunizations, case management);
>
> (b) "effectively informing; individuals [and others, set forth in (e) below], in a timely manner, generally within 60 days" of the TennCare MCO's receipt of notification of the child's enrollment in its plan and "if no one eligible in the family has utilized EPSDT services, annually thereafter ..." State Medicaid Manual § 5121 (C);
>
> (c) use of clear and non-technical terms to provide a combination of written and oral information so that the program is clearly and easily understandable, see id.;
>
> (d) use of effective methods (developed through collaboration with agencies who have established procedures for working with such individuals) to inform

-31-

individuals who are illiterate, blind, deaf, or cannot understand English, about the availability of EPSDT services; see 42 C.F.R.5 44L56(a)(3);

(e) designing and conducting outreach to inform all eligible individuals and their biological or foster parents about what services are available under EPSDT, the benefits of preventative health care, where the services are available, and how to obtain them; and that necessary transportation and scheduling assistance is available; for children in institutions, this should include the administrator of the institution; see State Medicaid Manual § 5121(B), (C);

(f) creation of a system so that families can readily access an accurate list of names and phone numbers of contract providers who are currently accepting TennCare; see 42 C.F,R. § 441.61;

(g) offering both transportation and scheduling assistance prior to the due date of a child's periodic examination: see 42 C.F.R. § 441.56(a) (iv) and State Medicaid Manual § 5121(b);

(h) providing recipients assistance in scheduling appointments and obtaining transportation prior to the date of each periodic examination as requested and necessary: id.;

(i) documenting services declined by a parent or guardian or mature competent child, specifying the particular service declined so that outreach and education for other EPSDT services continues;

(j) maintaining records of the efforts taken to reach out to children who have missed screening appointments when scheduled or who have failed to schedule regular check-ups, which shall be available to defendants and plaintiffs' counsel;

(k) informing families of the costs, if any, of these services;

(1) establishing criteria for determining when an MCO may be required to target specific informing activities to particular 'at risk' groups, for example: mothers with babies to be added to assistance units, families with infants, or adolescents, first time eligibles, and those not using the program for over two years, who might benefit most from oral methods of informing: see State Medicaid Manual, 5121(a);

(m) providing information on covered services to adolescent prenatal patients who enter TennCare through presumptive eligibility; and offering them, on the day eligibility is determined, assistance in making a timely first prenatal care appointment; for a woman past her first trimester; this appointment should occur

-32-

within 15 days;

(n) treating a TennCare eligible woman's request for EPSDT services during pregnancy as a request for EPSDT services for the child at birth; <u>see</u> State Medicaid Manual § 5121 (B);

(o) for institutions or homes with a number of eligible children, informing them annually, or more often when the need arises, including when a change of administrators, social workers or foster parents occurs. <u>See</u> State Medicaid Manual § 5121 (B); and

(p) for families of uninsured children who are enrolled in TennCare through county health departments, informing them regarding benefits covered under TennCare and the importance of accessing preventive services.

**Outreach Performance Standard**

40. The Defendants or their contractors shall achieve within 240 days [November 8, 1998] and shall maintain thereafter, EPSDT outreach efforts designed to reach all members of the plaintiff class with information and materials which conform with Section V (B) (1) (a).

(Docket Entry No. 12 at ¶¶ 39, 40).

In 2001, Judge Nixon found that the Defendants failed to monitor the MCCs for adequate outreach efforts and that the Defendants failed to require any specific baseline standards for EPSDT from the MCCs nor engage in any oversight on their contractors. <u>John B. v. Menke</u>, 176 F.Supp.2d 786, 793-94 (M.D. Tenn. 2001). In a word, "[t]he State is aware that its outreach strategies are insufficient." <u>id.</u> at 793, and that "without proper outreach, EPSDT is worthless." <u>Id</u>. at 803.

Although the Defendants subsequently remedied some of the cited deficiencies in the MCCs' contracts, the Monitors appointed by the Court in 2006 reported that in 2003, an expert identified 105 problem areas with the Defendants' outreach efforts, including "the lack of methods for identifying special subgroups" for outreach and "the absence of methods for

-33-

evaluating the effectiveness of the outreach campaign" for these areas. (Docket Entry No. 795-2 at 11). The Monitor's 2007 Report reflects that the Defendants' External Quality Review Organization conducted surveys and found several MCOs' performance of outreach services to be only partially satisfactory for their outreach efforts in 2003, 2004 and 2005. Id. at 28-30. In 2006, the Monitor reported that:

> during the course of conducting the Annual Quality Survey, it became apparent that there were circumstances which made it difficult to score three components of the BHO EPSDT tracking tool: Transportation/Appointment Assistance Offered, Coordination of Care with other agencies, and PCP Notification, as these components are required to be captured at the provider level instead of the "BHO level . . . . " It would appear that a verification of these elements cannot be confirmed by the EQRO.

Id. at pp. 30-31.

The monitor also cited a University of Tennessee Social Science Research Institute survey that revealed that:

> [t]he percentage of those surveyed who had heard of the TENNderCare program increased from 6.5 percent to 43.7 percent; that those who heard of EPSDT remained about the same, from 31.0 to 31.3. The surveys demonstrated that the percentage of urban and rural respondents who had heard of TENNderCare differed in that rural respondents were more likely than urban respondents to have heard of TENNderCare. In the original survey 6.9% of urban respondents had heard of the program and increased in the 2006 survey to 41.1%. The rural survey initial percentage was 4.4% and increased to 48.4% in 2006.

> The Ireys Report stated that the Defendants' outreach efforts would be effective when: "At least 80 percent of families with children who have been enrolled in TennCare for at least 12 months will report that they have received information about TENNCare in the last year."

Id. at p. 43-44.

As this data reflects, under Westside Mothers II, Plaintiffs' outreach claims under Section 1396a(a)(43) are enforceable because more than half of the 500,000 plus class members have

-34-

been effectively denied outreach services rendering their rights to EPSDT service worthless.

In addition, Westside Mothers II recognized potential claims under Sections 1396a(a)(8) and (10) for plaintiffs' allegations of effective denial of the right to medical assistance.

> At oral argument, plaintiffs asserted that the payments were insufficient to enlist an adequate number of providers, which effectively frustrates §§ 1396a(a)(8), 1396a(a)(10) by foreclosing the opportunity for eligible individuals to receive the covered medical services. **They now argue, for example, that they want to show that such payments are so inadequate in the Upper Peninsula of Michigan that there are no available providers.** See Health Care for All, Inc. v. Romney, 2005 WL 1660677, at *10-11 (D. Mass. July 14, 2005) ("Setting reimbursement levels so low that private dentists cannot afford to treat Medicaid enrollees **effectively frustrates [§ 1396a(a)(8)]** by foreclosing the opportunity for enrollees to receive medical assistance at all, much less in a timely manner."); Okla. Chapter of Am. Acad. of Pediatrics v. Fogarty, 366 F.Supp.2d 1050, 1109 (N.D. Okla. 2005) (finding a violation of § 1396a(a)(8) and reasoning that "[w]ithout financial assistance (provider reimbursement) sufficient to attract an adequate number of providers, **reasonably prompt assistance is effectively denied**"); Sobky v. Smoley, 855 F.Supp. 1123 (E.D. Cal. 1994) (holding defendants liable for failure to comply with § 1396a(a)(8) where "insufficient funding ... has caused providers of methadone maintenance to place eligible individuals on waiting lists for treatment"). Plaintiffs did not raise this argument in the amended complaint, before the district court, or in their briefs before this court. Because this appeal is from a dismissal for failure to state a claim, we are concerned with the sufficiency of the complaint, which does not contain this allegation. We therefore affirm the district court's dismissal of the claim for violations of §§ 1396a(a)(8), 1396a(a)(10). However, **because plaintiffs may be able to amend the complaint to allege that inadequate payments effectively deny the right to "medical assistance," we modify the district court's order to reflect a dismissal without prejudice to the filing of a motion to amend along with a proposed amendment to the complaint.**

454 F.3d at 540-41 (emphasis added).

As applied here, Judge Nixon found that in 2001, the Defendants were not delivering medical services to a large number of class members who are children:

> Specifically, the State agreed to improve its APSP annually, and reach a goal of 80% by September, 2001. The Defendants proof submitted at trial indicated that the State has failed to meet its goals. The adjusted screening rate for 1999 was

Case 3:98-cv-00168   Document 1328   Filed 09/18/09   Page 35 of 53 PageID #: 21457

19.8% and rose to 31.5% in 2000, far short of the baseline goals for those years, and the ultimate goal of 80% for 2001. Dental Screening rates also fell short of their targets

(Docket Entry No. 227 at 13). In 2004, Judge Nixon similarly found that:.

> **From 1999 to 2003 [the defendants] had a 175 percent increase, I believe, in our screening rates from, as an example, 19.8 percent to 53 percent**. We've had a 60 percent increase in our dental screening rates, 55, 56 **adjusted–the raw is 36 to 62 for 2002, raw 54, adjusted 41.9.** Nonetheless, while some progress has been made since the Court's approval of the Consent Decree in 1998, testimony from Mr. Martins and Mr. Goetz along with reports made to the Court by the Special Master, make clear that not enough progress has not been made. **The Court is not convinced that Defendants, acting on their own, will reach full compliance with the terms of the consent decree within a reasonable period of time. As the well-being of 550,00 children is at stake, something more must be done to ensure that the state's EPSDT requirements are met in accordance with the terms of the Consent Decree.**

*   *   *

> **The Special Master also reports that the State is incapable of reporting progress to the Court because it lacks a valid and reliable system of measuring progress in such key areas as provider network adequacy, case management, outreach, the effective use of information systems, and system level coordination, to name a few. . . .**

> **The Court finds that the deposition testimony of Mr. Goetz and Mr. Martins conclusively support this Court's finding that, to date, the State has not achieved compliance with the terms of the Consent Decree.**

(Docket Entry No. 465 at 4-8) (emphasis added and quoting the Martins Deposition at 57]).

In his 2006 recusal order, Judge Nixon reiterated that the Defendants are not providing medical services to substantial members of children and that "the State's own documents show that . . . even in 2004 the State is below the screening targets that they should have achieved in 2001." (Docket Entry No. 584 at 4). In their January 2007 report, the five Monitors collectively agreed that "the State has failed to establish that it is in compliance with many substantial

provisions of the Consent Decree" and noted "**the State's complete inability and unwillingness to demonstrate the existence of a comprehensive, on-going plan of action, complete with goals and objectives, and designed to assure compliance with the Consent Decree.**" (Docket Entry No. 795-1 at 3, 7) (emphasis added). In summary, "it is the view of the Monitors that the State Defendants have not provided information sufficient to establish that they can 'ensure an effective child health care program' as referenced in Paragraph 81 of the Consent Decree and as required by federal law. 42 C.F.R. § 441.61(c)."[5] Id. at 8.

Here, Judge Nixon's 2001, 2004 and 2006 findings demonstrate the Defendants' effective denial of mandated medical services to substantial numbers of the more than 500,000 children in this certified class. Moreover, the Defendants' longstanding noncompliance since 1998 is effectively frustrating the Congress's award to the Defendants of $7 billion dollars to provide these basic mandated services and the additional hundreds of millions of federal funds to administer this children's health program.[6] The Monitors' 2007 report reflects the Defendants' serious omissions and deliberate refusal to honor their commitments under the Consent Decree and federal law to provide for an "effective child health care program" in its waiver plan. The Court concludes that these facts are much more compelling than the factual allegations the Sixth Circuit found to state a potential claim for effective denial of medical assistance in <u>Westside</u>

---

[5] This regulation provides as follows: "The agency must make appropriate use of State health agencies, State vocational rehabilitation agencies, and Title V grantees (Maternal and Child Health/Crippled Children's Services). Further, the agency should make use of other public health, mental health, and education programs and related programs, such as Head Start, Title XX (Social Services) programs, and the Special Supplemental Food Program for Women, Infants and Children (WIC), to ensure an effective child health program."

[6] (Docket Entry No. 1028 at 75-76) (listing federal funds dispensed to MCCs and citing the Defendants' receipt of millions of dollars in federal funds to administer its waiver program).

Case 3:98-cv-00168   Document 1328   Filed 09/18/09   Page 37 of 53 PageID #: 21459

Mothers II.

Consistent with <u>Westside Mothers II</u>, the Court concludes Plaintiffs' claims for the effective denials of outreach services and medical assistance to large numbers of class members remain enforceable claims.

### 3. **Brown**

<u>Brown</u> involved claims under a "home and community based services" waiver and the specific claims were that the Defendants were: "(1) failing to provide medical assistance in 'adequate amount, duration, and scope' in violation of 42 U.S.C. § 1396a(a)(10); (2) failing to provide eligible defendants a choice between ICF/MR and HBCS waiver services in violation of 42 U.S.C. § 1396n(c)(2); (3) failing to inform eligible individuals of the application process with reasonable promptness in violation of 42 U.S.C. § 1396a(a)(8); (4) failing to serve individuals with reasonable promptness in violation of 42 U.S.C. § 1396a(a)(8); and (5) failing to provide written notices and an opportunity to be heard when services are denied in violation of 42 U.S.C. § 1396a(a)(3) and the due process clause of the Fourteenth Amendment." 561 F.3d at 543-44. Citing <u>Westside Mothers II</u>, the Sixth Circuit summarized its rationale:

> [I]n <u>Bruggeman v. Blagojevich</u>, 324 F.3d 906 (7th Cir.2003), the Seventh Circuit offered an alternative interpretation. Observing that "medical assistance" is defined in the statute as "financial assistance," Judge Posner suggested that the state has no duty to ensure that individuals receive services, but only to provide reimbursement for their costs. <u>Id.</u> at 910. This distinction, he noted, "was missed in <u>Bryson v. Shumway and Doe v. Chiles</u>." <u>Id.</u>
>
> In <u>Westside Mothers II</u>, this Court followed Judge Posner's dicta in <u>Bruggeman</u> and rejected a suit by a class of Medicaid-eligible children who argued that Michigan was violating federal law by failing to provide or arrange for the provision of certain screening, diagnostic, and treatment services. 454 F.3d at 540. Observing that the Medicaid Act defined "medical assistance" as "payment of part or all of the cost of ... care and services," 42 U.S.C. § 1396d(a), we concluded:

-38-

"The most reasonable interpretation of § 1396a(a)(8) is that all eligible individuals should have the opportunity to apply for medical assistance, i.e., financial assistance, and that such medical assistance, i.e. financial assistance, shall be provided to the individual with reasonable promptness." Id. at 540. Thus, we held that plaintiffs had failed to state a claim under either section 1396a(a)(8) because they sought to compel the state to arrange for the provision of such services or provide them itself. Id.

\* \* \*

We believe that the Tenth Circuit's application of Westside Mothers II in Mandy R. accurately states the law of our circuit on a state's obligations to provide "medical assistance" under the Medicaid statute and applies with equal force to this case: absent more, a waiting list for waiver services does not violate federal law because the state's duty is to pay for services, not ensure they are provided.

What matters under Rufo is not that Tennessee agreed to take the actions specified in the settlement, but what those actions were intended to remedy: if the settlement was premised on the understanding that the Medicaid statute imposed upon Tennessee a duty to ensure the provision of medical services, then Rufo counsels that we vacate the agreed order because Westside Mothers II established that no such duty exists.

561 F.3d at 545.

Bruggeman, upon which Westside Mothers II and Brown relied, involved claims by

developmentally disable adults under 42 U.S.C. §§§§1396a(a)(1), (8), (10)(B)(I)(19) and (23).

324 F.3d at 909. The Seventh Circuit then described these statutes as providing:

The statutory entitlement to reasonable promptness of medical services 42 U.S.C.§ 1396a(a)(8) is not infringed by the maldistribution (as it seems to the plaintiffs) of ICF/DDs across the state. It is not as if the plaintiffs require relocation to such a facility on an emergency basis, in which event the remoteness of any such facility from their homes, where they are living at present, would deprive them of prompt treatment. Even if they did require emergency treatment, their theory of violation would be a considerable stretch because the statutory reference to "assistance" appears to have reference to *financial* assistance rather than to actual medical *services*,... Medicaid is a payment scheme, not a scheme for state-provided medical assistance, as through state-owned hospitals. The regulations that implement the provision indicate that what is required is a prompt determination of eligibility and prompt provision of funds to eligible individuals

-39-

> to enable them to obtain the covered medical services that they need, see 42
> C.F.R. §§ 435.911(a), .930(a)-(b); a requirement of prompt *treatment* would
> amount to a direct regulation of medical services.

Id. at 910 (emphasis in the original). The Seventh Circuit noted "the Supreme Court's hostility,

most recently and emphatically expressed in Gonzaga . . . to implying such rights in spending

statutes." Id. at 911.

Brown decided only the "waiting list" and "provider network" claims in the context of the

"medical assistance" and "reasonable promptness" clauses in Section 1396a(8)(A). To be sure,

Brown addressed whether the "medical assistance" is defined in the pertinent statute solely as

"financial assistance." If so, then state has no duty to ensure that individuals receive services, but

only to provide reimbursement for their costs. 561 F.3d at 545 (citing Bruggeman, 324 F3d at

910). Yet, Brown did not address Westside Mothers II express holding on the potential claim for

effective denial of medical services under Section 1396a(10) and Section 1396r to which Section

1396a(10) refers.

In S.D. ex rel. Dickson v. Hood, 391 F.3d 581 (5th Cir. 2004), a post-Gonzaga decision,

the Fifth Circuit, citing decisions from the First, Second, Third and Eleventh Circuits, found that

Section 1396a(10)(A) and 1396r to which it refers, constitute an enforceable right under Section

1983.

> The Medicaid Act provides that "[a] State Plan must provide for making medical
> assistance available, including at least the care and services listed in paragraphs
> (1) through (5), (17) and (21) of section 1396d(a) of this title, to all individuals"
> who meet certain eligibility criteria. 42 U.S.C. § 1396a(a)(10)(A)(I). EPSDT care
> and services are listed in paragraph 4 of § 1396d(a) and, by reference to § 1396d
> (r), include all the health care, treatment, services, and other measures described
> in § 1396d(a) when necessary for corrective or ameliorative purposes. This is
> precisely the sort of "rights-creating" language identified in Gonzaga as critical to
> demonstrating a congressional intent to establish a new right. Accordingly, as the

-40-

Third Circuit concluded, "it [is] difficult, if not impossible, as a linguistic matter, to distinguish the import of the relevant [Medicaid Act] language-'A State Plan must provide' from the 'No person shall' language of Titles VI and IX" which was held up in Gonzaga as the prototypical rights-creating language. Sabree v. Richman, 367 F.3d 180, 190 (3d Cir.2004)(concluding that § 1396a(a)(10)(A) creates a federal right to medical assistance for intermediate care facility services); accord Rabin v. Wilson-Coker, 362 F.3d 190, 201-2 (2d Cir. 2004); Bryson v. Shumway, 308 F.3d 79, 89 (1st Cir.2002).

The only potentially material difference between the rights-creating language contained in § 1396a(a)(10)(A) and that contained in Titles VI and IX is that the Medicaid Act requires state action under a medical assistance plan. The requirement of action under a plan is not, however, dispositive of the question of whether the statute confers rights enforceable by § 1983. "In an action brought to enforce a provision of [the Social Security chapter of the United States Code], such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan" 42 U.S.C. § 1320a-2; see also Harris v. James, 127 F.3d 993, 1003 (11th Cir.1997)("[I]n light of [§ 1320a-2], it is clear that the mere fact that an obligation is couched in a requirement that the State file a plan is not itself sufficient grounds for finding the obligation unenforceable under § 1983.") Thus, for all of the forgoing reasons we conclude that the EPSDT treatment provisions of the Medicaid Act contains the "rights-creating language critical to showing the requisite congressional intent to confer a new right." Gonzaga, supra, 536 U.S. at 274.

Id. at 603.

Aside from the legal analysis of the relevant statutes, Brown made it clear that the district court must also consider the purposes of the Consent Decree and rejected the Defendants' contention that as a matter of law, the Consent Decree had to be vacated.

As a result, we cannot say with certainty that Westside Mothers II had the effect Tennessee contends or warrants the relief it requests. In our view, it is difficult to determine whether this consent decree was undermined to a degree sufficient to justify relief when the basis and meaning of the decree are not clear and the district court has yet to interpret it. As a result, we hesitate to vacate the decree in its entirety at this stage. If plaintiffs' account of the underlying litigation is as revisionist as Tennessee claims, then Tennessee is entitled to full relief from prospective enforcement. But the district court will have to address this matter on remand.

-41-

Second, the settlement is about to expire-its five year term runs out at the end of this year, and Tennessee's duties under it will then cease. So, given that only part of the settlement is in clear conflict with <u>Westside Mothers II</u>, and that Tennessee's obligations will soon end, we do not believe that equity necessarily requires that we vacate the decree in its entirety now.

Third, Tennessee may be able to obtain relief from enforcement of the settlement during its final nine months even if we do not fully grant it here. Tennessee has two safety valves available to it under the settlement itself. First, the agreement provides that Tennessee's duty to enroll additional individuals into the waiver program is conditioned on both the availability of a waiver slot and funding for that slot. J.A. 109. **Second, and more significantly, section IX.B.5.d of the settlement agreement provides that if the parties return to court to litigate claims of non-compliance, "[a]fter two years following the approval of this Agreement, defendants may defend any action for non-compliance on the grounds that defendants are in compliance with the federal laws that are the basis of the underlying action which is the subject of this Agreement." J.A. at 117-18.** Tennessee is currently defending a pending enforcement action on this very ground. If the district court accepts Tennessee's view of the case on remand, Tennessee will avoid all of its obligations under the settlement anyway. Because the district court has yet to rule on this motion or otherwise interpret the provisions of the settlement, we feel it is premature to vacate the settlement in its entirety at this time.

\* \* \*

[W]e do not believe the district court abused its discretion in refusing to vacate the settlement in its entirety. . . . First, we vacate Tennessee's commitment to develop "provider network capacity," J.A. 112, which does not appear to remedy any violation of federal law after <u>Westside Mothers II</u>. Second, any commitment Tennessee arguably made to eliminate the waiting list for services is likewise unenforceable after <u>Westside Mothers II</u>. Absent more, a **waiting list for waiver services is not inconsistent with Tennessee's duty to provide "medical assistance" to individuals eligible for its HCBS waiver with "reasonable promptness."**

<u>Brown</u>, 561 F.3d at 543, 544, 545, 546, 547, 548 (emphasis added).

<u>Brown</u>'s holding concerned only Sections 1396a(a) and 1396a(a)(8), but did not address

Section 1396a(10) and its relationship with Section1396r detailing basic medical services for

-42-

children that the State must provide under its waiver plan. Moreover, here, consistent with Brown, the Consent Decree does not prevent the Defendants from defending and proving their compliance with the Consent Decree as defense counsel stated at the February 10, 2006 conference. Finally, as a factual matter, Plaintiffs have also alleged that physicians are not being compensated, some times for years and thus, the state has failed to provide reimbursement as required by Westside Mothers II and Brown[7].

### 4. Plaintiffs' Claims

Although the Defendants seek to apply Brown broadly, "[o]nly when the complaint is broken down into manageable analytic bites can a court ascertain whether each separate claim satisfies the various criteria we have set forth for determining whether a federal statute creates rights." Blessing v. Freestone, 520 U.S. 329, 342 (1997) (citation omitted). Of course, Westside Mothers II found an potential claim under Section 1396a(a)(10) for effective denial of medical services. Thus, the Court must consider Plaintiffs' claims based upon Sections 1396a(10) and 1396r.

In Westside Mothers II, the Sixth Circuit stated that under Gonzaga, "the appropriate inquiry" is whether Congress "intended to confer individual rights upon a class of beneficiaries." Westside Mothers, 454 F.3d at 542 (quoting Gonzaga, 536 U.S. 285). In Gonzaga, the Supreme Court stated that the focus should be on whether, "the text and structure of a statute provide [any] **indication** that Congress intends to create new rights." 536 U.S. at 286 (emphasis added). Gonzaga and Westside Mothers II applied Blessing's three part analysis.

We have traditionally looked at three factors when determining whether a

_____

[7] See Docket Entry No. 1, Complaint at ¶¶ 55, 74, 80, 84, 87, 114, 140 149 and 152)

-43-

particular statutory provision gives rise to a federal right. First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

Even if a plaintiff demonstrates that a federal statute creates an individual right, there is only a rebuttable presumption that the right is enforceable under § 1983. Because our inquiry focuses on congressional intent, dismissal is proper if Congress "specifically foreclosed a remedy under § 1983." Congress may do so expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.

Id. at 340-41 (citations omitted and quoting Smith v. Robinson, 468 U.S. 992, 1005, n. 9 (1984)).

The Defendants' services to the class arise from the State's waiver plan under the Medicaid Act. 42 U.S.C. § 1315. In Alexander v. Choate, 469 U.S. 287, 289, n.1 (1985), allowing a private action under Section 504 of the Rehabilitation Act, the Supreme Court stated that "[o]nce a State voluntarily chooses to participate in Medicaid, the State must comply with the requirements of Title XIX and applicable regulations." Under Medicaid regulations, each state plan "must specify the amount, duration and scope of each service it provides for . . . each covered group of medically needy" and "[e]ach service must be sufficient in amount, duration and scope to achieve its purpose." 42 C.F.R. § 440.230(a) and (b).

Plaintiffs assert the following statutes under the Medicaid Act, 42 U.S.C. § 1396a(a)(43), 42 U.S.C. § 1396d(a), 42 U.S.C. § 1396(r)(1)(A) and (B), 42 U.S.C. § 1396d(r)(5) and 42 U.S.C. § 671(a), as well as 42 U.S.C. § 1396d(a) that is cited in the Consent decree.[8] for eligible

---

[8] See Appendix A for the referenced Medicaid statutes.

Case 3:98-cv-00168   Document 1328   Filed 09/18/09   Page 44 of 53 PageID #: 21466

children, Section 1397d(a) defines " medical assistance" as "payment of all or part of the cost of the following care and services". For eligible children, Congress defined the ESPDT services to include at a minimum the following services:

(r) Early and periodic screening, diagnostic, and treatment services

The term "early and periodic screening, diagnostic, and treatment services" means the following items and services:

(1) Screening services . . .

(B) which shall at a minimum include--

(i) a comprehensive health and developmental history (including assessment of both physical and mental health development),
(ii) a comprehensive unclothed physical exam,
(iii) appropriate immunizations (according to the schedule referred to in section 1396s(c)(2)(B)(I) of this title for pediatric vaccines) according to age and health history,
(iv) laboratory tests (including lead blood level assessment appropriate for age risk factors), and
(v) health education (including anticipatory guidance).

(2) Vision services . . . .

(B) which shall at a minimum include diagnosis and treatment for defects in vision, including eyeglasses.

(3) Dental services . . . .

(B) which shall at a minimum include relief of pain and infections, restoration of teeth, and maintenance of dental health.

(4) Hearing services . . . .

(B) which shall at a minimum include diagnosis and treatment for defects in hearing, including hearing aids.

(5) Such other necessary health care, diagnostic services, treatment, and other measures described in subsection (a) of this section to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the

-45-

screening services, whether or not such services are covered under the State plan.

Nothing in this subchapter shall be construed as limiting providers of early and periodic screening, diagnostic, and treatment services to providers who are qualified to provide all of the items and services described in the previous sentence or as preventing a provider that is qualified under the plan to furnish one or more (but not all) of such items or services from being qualified to provide such items and services as part of early and periodic screening, diagnostic, and treatment services.

42 U.S.C. § 1396d(r).

In addition to financial assistance, in other provisions of the statutes,

Congress refers to these basic medical services for any State's waiver plan as mandatory:

**A State plan for medical assistance must provide:**

(A) informing all persons in the State who are under the age of 21 and who have been determined to be eligible for **medical assistance, including services described in section 1396d(a)(4)(B) of this title, of the availability of early and periodic screening, diagnostic, and treatment services as described in section 1396d(r) of this title and the need for age-appropriate immunization against vaccine-preventable diseases,**

(B) **providing or arranging for the provision of such screening services in all cases where they are requested,**

(C) **arranging for (directly or through referral to appropriate agencies, organization or individuals) corrective treatment the need for which is disclosed by such child health screening services . . . .**

42 U.S.C. § 1396a (43)(A)-(C) (emphasis added).

Among the applicable regulations for a State waiver plan for children medical services is

42 C. F. R. § 441.61(c) that provides: "The agency must make appropriate use of State health

agencies, State vocational rehabilitation agencies, and Title V grantees (Maternal and Child

Health/Crippled Children's Services). Further, the agency should make use of other public

health, mental health, and education programs and related programs, such as Head Start, Title

-46-

XX (Social Services) programs, and the Special Supplemental Food Program for Women, Infants

and Children (WIC), **to ensure an effective child health program**." (emphasis added).

The legislative history of the Medicaid Act and Congress's amendments thereto also

reflect Congress's mandate of medical coverage and benefits for ESPDT services.

> **Title XIX of the Social Security Act (Medicaid) provides for mandatory coverage by all participating States** of acute care services for individuals and families receiving either Aid to Families with Dependent Children (AFDC) or Supplemental Security Income (SSI) income support payments. These groups are referred to as the "cash population" within Medicaid. **In addition, participating States must extend coverage to pregnant women and children up to age six with family incomes up to 133 percent of the Federal poverty level and children born after September 1983 up to 100 percent of the Federal poverty level**. The Medicaid program provides States the option to extend coverage of pregnant women and children up to age one up to 185 percent of poverty. There are many other optional and mandatory coverage groups for acute care Medicaid services, one of which is Medically Needy eligibility under which families with significant medical care expenses can "spend down" into Medicaid eligibility.
>
> **Federal law establishes a basic set of mandatory services that States must provide including**: inpatient and outpatient hospital services; laboratory and x-ray services; rural health clinic and federally qualified health center services; nursing facility services; family planning services; **early and periodic screening, diagnostic and treatment (EPSDT) services for children under 21 years old**; home health services; and physician, nurse midwife and certain certified nurse practitioner services. There are many other services a State may choose to offer including: prescription drugs, case management, personal attendant care, physical therapy, rehabilitation, and mental health services.

S. REP. No. 103-323 at 125- 26 (1994) (emphasis added). In another statement of the Medicaid

Act, the Senate Report again stated its view of the existing law: " Under current law, States must

provide, as a minimum, five basic services: inpatient hospital services, outpatient hospital

services, other laboratory and X-ray services, . . . and physician's services." S. REP. No. 90-744

at p. 2867(1967).

The legislative history of the Medicaid Act also reflects the Senate's and the House of

Case 3:98-cv-00168   Document 1328   Filed 09/18/09   Page 47 of 53 PageID #: 21469

Representatives 's recognition that Medicaid created "entitlements" for which recipients could

sue to enforce their rights to these entitlements.

> The entitlement status of the current Medicaid Program permits eligible recipients and certain providers to sue State officials under Federal law. . . .

*   *   *

> Current law.-**The current Medicaid statute permits lawsuits brought against State officials in Federal court. 42 U.S.C. 1983 authorizes such suits against State officials who, under color of State law, are alleged to have deprived any person of rights under Federal law or the Federal Constitution.**
>
> **If a person sues a State official and seeks a Federal court to order that the State official comply with a Federal statute, such an order effectively operates against the State. Such an order, however, may operate prospectively only.**

H.R. REP. No.104-280(II) at 639 (1995) (emphasis added).

Congress also reflected its intention, consistent with the Consent Decree, for the setting

of State goals to achieve its mandates especially for children.

> Current law.-**There are no provisions for objectives and goals, except that States are required to meet participation goals in their early and periodic screening, diagnostic, and treatment [EPSDT] programs for eligibles under age 21.**
>
> Explanation of provision. **A State would be required to include in its MediGrant plan a description of its strategic objectives and performance goals for providing health care services, and the manner in which the plan is designed to meet the objectives and goals. Goals and objectives related to rates of childhood immunizations and reductions in infant mortality and morbidity would be required.** With regard to other objectives and goals, the State could consider factors such as priorities for providing assistance to low-income populations, priorities for general public health and health status for low-income populations, the State's financial resources and economic conditions, and the adequacy of the State's health care infrastructure. **To the extent practicable, a State would be required to establish one or more performance goals for each strategic objective and describe how performance would be measured and compared against goals. Strategic objectives would be**

-48-

**required to cover a period of at least 5 years and would have to be updated
and revised at least every 3 years. Performance goals would have to be
established for dates not more than 3 years apart.**

\*    \*    \*

**Mandatory services for all groups except the medically needy and qualified
Medicare beneficiaries [QMB's] include:** Inpatient and outpatient hospital
services, nursing facilities [NF] services for individuals 21 or older, physicians'
services, laboratory and x-ray services, **early and periodic screening, diagnostic
and treatment [EPSDT] services for individuals under age 21,** family planning
services, home health services for any individual entitled to NF care, rural health
clinic and federally qualified health center [FQHC] services, and services of
nurse-midwives, certified pediatric nurse practitioners, and certified family nurse
practitioners. States may also offer any of a broad range of optional services.

H. Rep No. 104-208(II) at pp. 631-32, 634 (1991) (emphasis added). The Court concludes that

these excerpts from the Medicaid Act's legislative history reflect Congress's intention to

establish enforceable rights for children under the State's waiver plan.

In sum, considering the text, structure and legislative history of the EPSDT  Medicaid

statutes and federal regulations for State waiver plans, the Court concludes that the Consent

Decree appropriately recognizes enforceable rights for this class of Medicaid beneficiaries under

42 U.S.C. §§ 1396a (8), (10), (43) and 1396(r). The Consent Decree's monitoring and time tables

for compliance with federal law are consistent with Congressional history.  Brown's holding

concerned only Sections 1396a(a) and 1396a(a)(8), but did not address Section 1396a(10) and its

relationship with Section1396r detailing basic medical services for children that the State must

provide under its waiver plan.

Thus, the Defendants' motion to vacate the decree in its entirety should be denied.

In addition, the Court has considered the Defendants' alternate argument in favor of modifying

the decree to vacate certain portions.  The Court concludes that the provisions of the decree are

-49-

not premised on a duty to provide network adequacy or to terminate waiting lists subsequently eliminated as discussed in <u>Westside Mothers II</u> and <u>Brown</u>. Therefore, modification of the Consent Decree on that basis is also inappropriate at this juncture.

An appropriate Order is filed herewith.

**ENTERED** this the _____ 18th _____ day of September, 2009.

WILLIAM J. HAYNES, JR.
United States District Judge

Case 3:98-cv-00168   Document 1328   Filed 09/18/09   Page 50 of 53 PageID #: 21472

## APPENDIX A

The Medicaid statutes read as follows:

42 U.S.C. § 1396a(a)(43)

> A **State plan for medical assistance must provide for (A)
> informing all person in the State who are under the age of 21
> and who have been determined to be eligible for medial
> assistance including services described in section
> 1396a(a)(4)(B) of this title, of the availability of early periodic
> screening, diagnostic, and treatment services as described in
> section 1396d(r) of this title** and the need for age appropriate
> immunizations against vaccine-preventable diseases, (B) providing
> or arranging for the provision of such screening services in all
> cases where they are request.

42 U.S.C. § 1396d(a) requires among other services

(2) (A) outpatient hospital services, (B) consistent with State law permitting such
services, rural health clinic services (as defined in subsection (l)(1) of this section)
and any other ambulatory services which are offered by a rural health clinic (as
defined in subsection (l)(1) of this section) and which are otherwise included in
the plan, and (C) Federally-qualified health center services (as defined in
subsection (l)(2) of this section) and any other ambulatory services offered by a
Federally-qualified health center and which are otherwise included in the plan;

(3) other laboratory and X-ray services;

(4) (A) nursing facility services (other than services in an institution for mental
diseases) for individuals 21 years of age or older; (B) early and periodic screening,
diagnostic, and treatment services (as defined in subsection (r) of this section) for
individuals who are eligible under the plan and are under the age of 21; and (C)
family planning services and supplies furnished (directly or under arrangements
with others) to individuals of child-bearing age (including minors who can be
considered to be sexually active) who are eligible under the State plan and who
desire such services and supplies;

(5) (A) physicians' services furnished by a physician (as defined in section
1395x(r)(1) of this title), whether furnished in the office, the patient's home, a
hospital, or a nursing facility, or elsewhere, and (B) medical and surgical services
furnished by a dentist (described in section 1395x(r)(2) of this title) to the extent
such services may be performed under State law either by a doctor of medicine or

-51-

by a doctor of dental surgery or dental medicine and would be described in clause (A) if furnished by a physician (as defined in section 1395x(r)(1) of this title);

\* \* \*

(6) medical care, or any other type of remedial care recognized under State law, furnished by licensed practitioners within the scope of their practice as defined by State law;

(10) dental services;

(11) physical therapy and related services;

(12) prescribed drugs, dentures, and prosthetic devices; and eyeglasses prescribed by a physician skilled in diseases of the eye or by an optometrist, whichever the individual may select;

(13) other diagnostic, screening, preventive, and rehabilitative services, including any medical or remedial services (provided in a facility, a home, or other setting) recommended by a physician or other licensed practitioner of the healing arts within the scope of their practice under State law, for the maximum reduction of physical or mental disability and restoration of an individual to the best possible functional level;

\* \* \*

(16) effective January 1, 1973, inpatient psychiatric hospital services for individuals under age 21, as defined in subsection (h) of this section;

\* \* \*

(19) case-management services (as defined in section 1396n(g)(2) of this title) and TB-related services described in section 1396a(z)(2)(F) of this title;

(20) respiratory care services (as defined in section 1396a(e)(9)(C) of this title);

(21) services furnished by a certified pediatric nurse practitioner or certified family nurse practitioner (as defined by the Secretary) which the certified pediatric nurse practitioner or certified family nurse practitioner is legally authorized to perform under State law (or the State regulatory mechanism provided by State law), whether or not the certified pediatric nurse practitioner or certified family nurse practitioner is under the supervision of, or associated with, a physician or other health care provider;

-52-

* * *

(25) primary care case management services (as defined in subsection (t) of this section);

* * *

(27) subject to subsection (x) of this section, primary and secondary medical strategies and treatment and services for individuals who have Sickle Cell Disease; and

(28) any other medical care, and any other type of remedial care recognized under State law, specified by the Secretary,

42 U.S.C. § 1396(r)(1)(A) and (B)

> [EPSDT] screening services which are provided (I) at intervals which meet reasonable standards of medical and dental practice, as determined by the State after consultation with recognized medical and dental organizations . . . which **shall at a minimum include** (I) comprehensive health and **development history (including assessment of both physical and mental health development, (ii) a comprehensive unclothed physical exam, (iii) appropriate immunizations . . . according to age and health history, (iv) laboratory tests . . ., and (v) health education.**

**42 U.S.C. § 1396d(r)(5)**

> **[and][s]uch other necessary health care, diagnosis services, treatment, and other measures described in subsection (a) of this section to correct or ameliorate defect and physical and mental illness and conditions discovered by the screening services, whether or not such services are covered under the State plan.**

(emphasis added).

-53-