# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| JOHN B., *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:98-cv-0168 |
| | ) | |
| MARK EMKES, Commissioner, Tennessee | ) | Judge Thomas A. Wiseman, Jr. |
| Department of Finance and Administration, | ) | |
| *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

In this class-action challenge to Tennessee's managed care program, TennCare, Plaintiffs allege that the defendants, Tennessee officials charged with implementing TennCare (hereinafter referred to collectively as the "State," in the singular), failed to provide early and periodic screening, diagnosis and treatment ("EPSDT") services to Tennessee children (ages 21 and under) covered by TennCare, in violation of the Medicaid Act. Shortly after the lawsuit was filed in early 1998, the parties jointly filed a Consent Decree (Doc. No. 12[1]) ("Decree") under which they have been operating, and sporadically litigating, throughout the nearly fourteen years since its entry.

## I.    PROCEDURAL BACKGROUND

The case has a lengthy and tortuous procedural history, much of which has been exhaustively detailed in prior orders and opinions and will not be restated here. A brief summary of relatively recent events may prove helpful, however.

In September 2009, this Court (Haynes, J.) entered a Memorandum Opinion and Order (ECF Nos. 1328, 1329) denying the State's first motion to vacate the Consent Decree, filed in November 2006 (ECF No. 738). In that motion, the State argued that its consent to the entry of the Decree was expressly premised upon the assumption that the Adoption Assistance Act and the EPSDT statutes and regulations

---

[1] Documents available for viewing on line through the Court's electronic filing system are referenced herein by their electronic case filing ("ECF") number. This case was filed well before this Court adopted electronic case filing in 2005. Thus, older documents like the Consent Decree were not filed electronically and are not available for on-line viewing (except insofar as they have been attached as exhibits to later filings) and are therefore referenced by "Document" number only.

were enforceable under 42 U.S.C. § 1983, but that "recent controlling precedent" from the Sixth Circuit, specifically *Westside Mothers v. Olszewski*, 454 F.3d 532 (6th Cir. 2006) ("*Westside Mothers II*"), had established that the referenced statutory provisions were not, as a matter of law, individually enforceable through an action brought pursuant to 42 U.S.C. § 1983. The State immediately appealed the denial of its motion, and on November 30, 2010 the Sixth Circuit entered an opinion reversing in part the district court's denial of the motion, and remanding the matter for reassignment to a different judge and reconsideration of the State's motion to vacate in light of the court's holding. The matter was reassigned to the undersigned.

After additional briefing by both parties, this Court has, by separately entered Memorandum Opinion and Order, granted in part and denied in part the first motion to vacate. The Court determined that a limited number of paragraphs of the Consent Decree were rendered invalid and unenforceable as a result of Sixth Circuit precedent, but that the Decree as a whole, and the principal provisions in it, remained enforceable.[2]

Meanwhile, shortly after remand, the State filed a second motion to vacate, this one styled Motion to Vacate All Injunctive Relief, Terminate the Decree and Dismiss the Case (ECF No. 1465). This more recent motion is premised, not on a legal argument that the Consent Decree was itself unenforceable as a result of changes in the law, but instead on the State's claim that it was in substantial compliance with the Decree's requirements and therefore entitled to a declaration that the Decree had expired in accordance with its terms. Specifically, the 116th paragraph of the Decree[3] provides that the Decree shall expire "upon proof that [the State has] reached an Adjusted Periodic Screening Percentage ('APSP') of 80% and a Dental Screening Percentage ('DSP') of 80% [as those terms are defined in the Decree],

---

[2] Specifically, the Court found that paragraphs 43, 58, 60(v)–(vi), 61(ii)–(iii), 62, 71(ii), and 73–84 have been rendered unenforceable through Sixth Circuit precedent. In addition, several other paragraphs, including paragraphs 45, 48, 49, 50, 72, and 73, have been rendered moot by the passage of time, and others, including paragraphs 85–87, do not create any substantive obligations on the part of Defendants. The parties did not address and the Court's ruling is not concerned with the enforceability of paragraphs 1–38 and 105–116 of the Decree, which make up the sections entitled Introduction, Background, Intent Statement and Definitions, and Findings, as well as subsections of the "Order" section concerning Plaintiff Access to records, Meetings of Parties, Attorney Fees, Reservation of Rights, and Notice to Class Members. (*See generally* Doc. No. 12.)

[3] As a result of a typographical error in the Decree, there are two paragraphs numbered 113. The second paragraph 113 referring to the expiration of the Decree, the last paragraph thereof, should have been numbered 116.

and [is] in current, substantial compliance with the [other] requirements" set forth in the Decree. The Plaintiffs filed their response in opposition to the motion to vacate (ECF No. 1472). The parties conducted expedited discovery, and the matter proceeded to an evidentiary hearing on the State's motion beginning on October 31, 2011. Over the course of the next month, both parties presented witnesses and documentary evidence. In addition, both parties submitted pre- and post-hearing Proposed Findings of Fact and Conclusions of Law.

The question presented at the hearing and by the State's motion is whether the State is in substantial compliance with those portions of the Consent Decree that were not vacated by the ruling on the first motion to vacate. Based upon the Court's consideration of all the documentary proof as well as the testimony of witnesses and their credibility, and for the reasons set forth herein, the Court finds that the State has established that it has met the criteria set forth in the Decree for expiration thereof by its terms. The motion to vacate the Consent Decree will therefore be granted.

## II.     FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.     Overview of TennCare and Its EPSDT Program

The Consent Decree requires Tennessee's Medicaid managed-care program, known as TennCare, to implement the early and periodic screening, diagnosis and treatment ("EPSDT") requirements established by the federal Medicaid Act and implementing federal regulations. As the Court has previously explained:

> EPSDT covers a broad range of services. As the name suggests, the purpose of EPSDT is to ensure that all Medicaid-eligible children receive regular screening, vision, hearing, dental and treatment services consistent with established pediatric standards. The Federal Code requires that the children receive "such other necessary health care, diagnostic services, treatment and other measures . . . to correct or ameliorate defects and physical and mental illnesses under the State plan." 42 U.S.C. § 1396d(r)(5). The purpose of EPSDT is to ensure that underserved children receive preventive health care and follow-up treatment. EPSDT is premised on the idea that early detection of problems will lead to treatment of minor problems before they become major healthcare issues. By preemptively screening, diagnosing and treating current problems, EPSDT staves off larger healthcare problems in the future, and ultimately results in a more efficient and effective healthcare system with a proactive, comprehensive, and long-term focus.

*John B. v. Menke*, 176 F. Supp. 2d 786, 790 (M.D. Tenn. 2001).

In 2001, after a three-week hearing, the Court determined that the State was at that time not in compliance with the Consent Decree. The State's prior non-compliance having been adjudicated by the Court and admitted by State officials in 2001, and because the Court's 2001 Findings of Fact and

Conclusions of Law have never been disturbed on appeal, the State bears the burden of proving, by a preponderance of the evidence, that changed circumstances compel the conclusion that the State is now in substantial compliance with the Decree.

In its effort to meet that burden, the State called eight witnesses: Pamela Baggett, Director of TennCare Services, Tennessee Department of Health; John Couzins, Director of External Quality Review, Q-Source; Dr. Deborah Gatlin, Chief Medical Officer, Department of Children's Services; Darin Gordon, Director, Bureau of TennCare; Dr. Wendy Long, Chief Medical Officer, Bureau of TennCare; Margaret O'Kane, President, National Committee for Quality Assurance ("NCQA"); Lynn Pollard, Nurse Consultant Manager, Department of Children's Services; and Dr. Michael Lu, Associate Professor, Department of Obstetrics & Gynecology, David Geffen School of Medicine at UCLA. The Court found each of these witnesses to be credible within the scope of their areas of knowledge and expertise, and earnestly concerned about the welfare of children generally. Based to a large extent upon their testimony, as well as the documentary evidence introduced by these witnesses, the Court finds and rules as follows.

TennCare currently covers approximately 1.2 million people, of whom approximately 750,000 are children under the age of 21. (ECF No. 1526, at ¶ 4 (Agreed Factual Stipulations).) Approximately 7,500 children enrolled in TennCare are in the custody of the Department of Children's Services ("DCS"). (ECF No. 1526, at ¶ 7.)

TennCare services are offered pursuant to contracts the Bureau of TennCare has entered with Managed Care Organizations ("MCOs"). In each of the three grand divisions of the State (East, Middle and West), two MCOs provide medical and behavioral healthcare services to TennCare enrollees: UnitedHealthcare and Blue Cross Blue Shield of Tennessee in East and West Tennessee, and UnitedHealthcare and Amerigroup in Middle Tennessee. In addition, BlueCross BlueShield of Tennessee administers TennCare Select, which operates in all three grand divisions to serve certain special populations such as children receiving Supplemental Security Income and children in state custody. (ECF No. 1526, at ¶ 9.)

The MCOs in turn contract with the healthcare providers—for example, doctors, hospitals, therapists, residential treatment providers—who provide medical and behavioral healthcare services to

TennCare enrollees. (Vol. 2 (Long), at 303.[4]) TennCare pharmacy benefits are "carved out" of the package of benefits administered by the MCOs. (*Id.* at 304.) The State contracts with a Pharmacy Benefits Manager ("PBM"), SXC Health Solutions, that administers TennCare coverage of prescription drugs. (ECF No. 1526, at ¶ 10.)

TennCare dental benefits are also "carved out" of the package of benefits which the MCOs administer. (Vol. 2 (Long), at 306.) The State contracts with a Dental Benefits Manager ("DBM"), Delta Dental, for the provision of dental services to children under age 21. (ECF No. 1526, at ¶ 11; Vol. 2 (Long), at 306.) The current DBM in turn contracts with dentists who provide dental services to TennCare enrollees under age 21. (Vol. 2 (Long), at 306.)

Each TennCare enrollee is assigned to an MCO upon enrollment, and each enrollee has a primary care provider ("PCP")—a pediatrician, family practitioner, or nurse practitioner—who is responsible for coordinating the child's healthcare. To ensure that health care providers are qualified, each MCO is required to have a process for credentialing the providers with whom it contracts. (Vol. 2 (Long), at 309.) When more specialized care is necessary, the PCP is to refer the child to an appropriate specialist. (Vol. 2 (Long), at 324.)

As noted above, TennCare children in DCS custody are all assigned to a single MCO, TennCare Select, which provides both medical and behavioral services. (Vol. 5 (Pollard), at 1032.) While DCS also provides some limited behavioral services through DCS-contracted providers to children in custody, approximately 85 percent of children in DCS custody receive all of their behavioral care through TennCare Select. (*Id.* at 1033.)

The core elements of the State's EPSDT program, as required by federal law and the Consent Decree, are (1) outreach to make sure that enrollees and parents are aware of the availability and importance of screening services, (2) early and periodic screening to detect physical or mental problems, and (3) appropriate diagnosis and treatment services to address those problems. (Vol. 2 (Long), at 321.)

### 1.    *EPSDT Outreach*

TennCare, the MCOs, the Department of Health ("DOH"), and the Department of Human Services

---

[4] Citations to the transcript of the trial proceedings are formatted as follows: Vol. [#] ([witness name]), at page [#]. The entire transcript is filed at ECF Nos. 1533, 1534, 1535, 1536, 1537, 1538, 1543, 1545, 1546, 1548, 1549, 1550, 1551, 1556, 1557, 1558, 1559, and 1560 (Vols. 1–18).

("DHS"), among others, collaborate to ensure that enrollees and parents are made aware of the importance and the availability of EPSDT services. (Vol. 2 (Long), at 324–25.) Families with children enroll in TennCare at the county offices maintained by DHS. (Vol. 2 (Long), at 325.) During the enrollment process, DHS provides information to families concerning the available benefits and the importance of accessing preventive services. (Vol. 2 (Long), at 325.) Specifically, families are urged to take their children to the doctor for a checkup (*i.e.*, a screening). (*See* DX 114[5] (TENNderCare Brochure); Vol. 2 (Long), at 326.)

Upon enrollment, all TennCare families receive a welcome letter from TennCare that includes a section informing them of the availability of free screening services (both medical and dental), and urging them to make an appointment with their primary care provider for a checkup and to obtain any needed immunizations. (*See* DX 59 (Welcome to TennCare Letter); Vol. 2 (Long), at 326–27.) The MCOs also send parents and members a member handbook, which contains detailed information on the availability and importance of getting children screened. (Vol. 2 (Long), at 327.) In addition, the MCOs separately call the parents of all newly enrolled children on TennCare in order to inform them of the availability of free checkups, dental care, and immunizations, and to urge them to make an appointment with their primary care provider for the first screening. (*See* Vol. 2 (Long), at 327–28; DX 77 (UnitedHealthcare call script).)

The parents of all children enrolled in TennCare receive quarterly newsletters from their MCO which include a reminder of the importance and the availability of free screening services. (*See, e.g.,* DX 67 (Quarterly Newsletter); Vol. 2 (Long), at 328.) The parents of all children enrolled in TennCare receive an annual postcard around the child's birthday reminding them that the child is due for a screen. (*See, e.g.*, DX 88 (Annual Postcard Reminder); Vol. 2 (Long), at 329.)

If the date for a child's screen has passed and the child has not come in for a screen, the MCO sends another reminder, emphasizing the importance of getting a checkup and the fact that it is free. (*See, e.g.*, DX 92 (Reminder Mailing); Vol. 2 (Long), at 330.) TennCare separately sends a notice emphasizing the importance of scheduling a checkup and urging the parents to do so if the child has

---

[5] The State's trial exhibits are referenced as "DX [number]." Plaintiffs' trial exhibits are denominated "PX [number]."

gone a year without a screen. (*See* DX 100 (TennCare Reminder Mailing); Vol. 2 (Long), at 331.) Finally, the MCOs send yet another reminder if the child has not accessed any TennCare services in a year. (*See, e.g.*, DX 99 (Overdue Notice); Vol. 2 (Long), at 331.)

Children enrolled in TennCare who are not up-to-date on their screens are also the subject of a home-visit program conducted by DOH, through its TENNderCare Community Outreach Program. Utilizing a list provided monthly by TennCare, community-outreach workers attempt face-to-face communication with the child's family regarding the availability and importance of free EPSDT screens, dental screens and benefits, and transportation services. (Vol. 8 (Baggett), at 1743–44.)

All of the written materials sent out by TennCare and the MCOs are reviewed by TennCare for readability, and are written at no greater than a 6th-grade reading level. (Vol. 2 (Long), at 332.) All TennCare materials are printed in both English and Spanish. (Vol. 2 (Long), at 333.) All written materials include telephone numbers that enrollees can call if they are having difficulty understanding the material. (*Id.*)

The State has collaborated with appropriate agencies and advocacy organizations to ensure that outreach efforts appropriately target illiterate, blind, deaf, and limited-English enrollees and their parents. (Vol. 2 (Long), at 333; *see also* Vol. 8 (Baggett), at 1734–36 (discussing activities of the DOH's community outreach program targeted to these enrollees).)

With respect to the children in state custody, DCS ensures that resource families (*i.e.*, foster families, relative placements, etc.) are informed about the health services available for children in state custody, that they know how to access those services, and that they understand the importance of EPSDT. (*See* DX 199 (Coordinating Health Services for My Children) (DCS resource guide); *see also* Vol. 5 (Pollard), at 1072–73 (explaining that DCS expects resource families to be advocates for the health-care needs of their children, and that DCS provides training, information, and support regarding accessing health services).)

DOH's outreach efforts consist of three components: (1) a community-outreach program that is operated in each of the DOH's thirteen regions across the State; (2) the EPSDT Call Center, which makes phone calls to all newly enrolled or newly re-certified TennCare families with children under the age of twenty-one; and (3) the Prenatal Call Center, which attempts phone contact with newly enrolled pregnant

women.  (Vol. 8 (Baggett), at 1692.)

The community-outreach program is a grassroots effort conducted at the community level within the thirteen DOH regions across the State, utilizing personnel devoted exclusively to EPSDT outreach activities.  (Vol. 8 (Baggett), at 1724–26.)  Each region's outreach activities are directed to specified target age groups within the under-twenty-one population, to target populations with particular characteristics, broadly to TennCare enrollees, and to the general public. (*Id.* at 1725–28, 1730–38); *see also* DX 40 (TENNderCare Program 2010 Annual Community Outreach Report) at 1–4.)  For example, TENNderCare community outreach efforts targeted to pregnant teenagers involve collaboration with schools, community pregnancy resource centers and other teen-oriented community agencies, and other DOH-administered programs to provide information regarding prenatal care and the availability and importance of EPSDT benefits for the pregnant teen herself, as well as to her baby after birth.  (Vol. 8 (Baggett), at 1737–38.) The community outreach activities of the thirteen regions are tracked and are compiled on a statewide cumulative basis in Community Outreach Reports that are generated quarterly and annually.  (Vol. 8 (Baggett), at 1728–29; *see also* DX 40 (TENNderCare Program 2010 Annual Community Outreach Report).)

The EPSDT Outreach Call Center, operated out of the DOH Central Office, makes phone calls to all newly enrolled or newly recertified TennCare families with children under the age of twenty-one.  (Vol. 8 (Baggett), at 1749–-50, 1756.)  All newly enrolled or newly recertified families with children under age twenty-one on each of the weekly lists provided to the Call Center by TennCare are the subject of up to three attempted contacts, as necessary, with the initial attempt made within one week of receipt of the list and all three contact attempts made within two weeks.  (Vol. 8 (Baggett), at 1757–58.)  The attempts are made using telephone numbers recently reported by the family during the eligibility process.  (*Id.* at 1756, 1758; DX 38, at 7 (TENNderCare Program 2010 Annual EPSDT Call Center Report).)  During these calls, families are provided with information about the TENNderCare program and services available, including free checkups and dental benefits.  (Vol. 8 (Baggett), at 1751.)  Each enrollee successfully contacted is offered assistance in scheduling an EPSDT screen with the child's primary care provider or a local health department, and transportation assistance for those appointments.  (*Id.*)  The activities of the Call Center are tracked and are compiled in quarterly and annual reports.  (*Id.* at 1752–53; *see* DX 38 (2010 Annual

EPSDT Call Center Report); DX 36 (First Quarter 2011 EPSDT Call Center Report).)

The DOH also provides outreach to pregnant women through a centralized Nursing or Prenatal Call Center. (Vol. 2 (Long), at 337–38.) The Call Center attempts to contact each of the women on TennCare's weekly list of newly enrolled pregnant women. (*Id.* at 338; Vol. 8 (Baggett), at 1715–16.) When contact is made, information is provided regarding the availability of prenatal care for the woman and EPSDT services for her child upon birth, the availability of TennCare dental benefits if the pregnant woman is under age 21, along with education intended to promote a healthy pregnancy. (*Id.* at 1716–18.) If the woman has not already scheduled a prenatal care appointment, the Prenatal Call Center offers assistance in making that appointment, and will attempt, if the woman agrees, to make the appointment via a three-way call with the provider's office or by contacting the office the next day, followed by appointment confirmation to the pregnant woman. (*Id.* at 1716–17.) The activities of the Prenatal Call Center are tracked by codes entered by the operators in a call-center database and are compiled into both quarterly and annual reports. (*Id.* at 1718–19; see DX 42 (2010 Annual Nursing Call Center Report).)

All pregnant women on each of the weekly lists provided to the Call Center by TennCare are the subject of actual contact or at least three contact attempts, with the initial attempt made within one week of receipt of the list and all three contact attempts made within two weeks. (Vol. 8 (Baggett), at 1721, 1723–24.)

In the case of pregnant women, the federal Centers for Medicare and Medicaid Services ("CMS") allow states the option of implementing a prenatal presumptive-eligibility process, which Tennessee has elected to do in order to facilitate early entry into prenatal care. (Vol. 2 (Long), at 336–37.) Under the presumptive-eligibility process, a woman may go to any of 120 county health department clinic sites to confirm her pregnancy with a pregnancy test, or to present verification of pregnancy that was confirmed by another health-care provider, and then may be presumptively enrolled in TennCare that same day. (*Id.* at 337; *see also* Vol. 8 (Baggett), at 1695, 1697–99.) The woman completes a one-page application, and can simply self-attest to the information required (with the exception of pregnancy). (Vol. 2 (Long), at 337; Vol. 8 (Baggett), at 1697–98; DX 276 (Medicaid Presumptive Eligibility application).) If it appears that the woman would be eligible based on the information she provides, she is enrolled in TennCare

immediately, enabling her to access to the full range of TennCare benefits. (Vol. 2 (Long), at 337; Vol. 8 (Baggett), at 1698–1700.) A copy of the presumptive-eligibility form is provided to the woman as temporary proof of her eligibility for TennCare through the presumptive-eligibility process, with the form itself reflecting the certification that the woman is eligible for TennCare benefits. (Vol. 8 (Baggett), at 1699.) That same day, county health department staff enter information reflecting the pregnant woman's eligibility into a presumptive-eligibility system, and that information is uploaded the same night to the TennCare eligibility database. (*Id.*) Accordingly, in addition to viewing a woman's presumptive-eligibility form itself, a provider can verify the existence of the TennCare eligibility of a presumptively eligible woman by accessing the TennCare Bureau's online eligibility database, which also indicates the MCO to which the woman has been assigned. (*Id.* at 1699–1700.)

The only difference between an enrollee enrolled through the presumptive-eligibility process and someone enrolled through the standard DHS enrollment process is that presumptive eligibility expires after forty-five days, during which time the pregnant woman must go to the DHS county office and complete the standard enrollment process in order to maintain eligibility after expiration of the forty-five days. (*Id.* at 1700–01.) County health department staff will assist the presumptively eligible pregnant woman with the DHS application process, completing as much information as possible on the application form and faxing the dated and signed application to the local DHS office in order to preserve the date of application as the effective date of eventual regular TennCare eligibility. (*Id.* at 1702–03.) The presumptively eligible woman must then go to the DHS office to complete the application process (*id.* at 1703–04) which, under federal regulation, may take up to forty-five days. 42 C.F.R. § 435.911.

Pursuant to public-health nursing protocols issued by DOH, on the same day a pregnant woman submits her application and is determined to be presumptively eligible, county health department staff offer assistance to the woman in scheduling an appointment with a prenatal-care provider. (Vol. 8 (Baggett), at 1696, 1704; Vol. 2 (Long), at 338.) If the woman declines that scheduling assistance, she will be given a list of prenatal-care providers in the area. (Vol. 8 (Baggett), at 1704.) In addition, during this initial contact with the county health department, the presumptively eligible woman is provided with a supply of prenatal vitamins and is counseled regarding the availability of prenatal care, the availability of EPSDT services if the pregnant woman is herself under age twenty-one, the availability and importance

of EPSDT services for the infant after birth, and the importance of healthy behaviors during pregnancy. (*Id.* at 1707–08.)

Representatives of TennCare, DOH, and the TennCare MCO maternity/OB case-management programs comprise the Maternity Workgroup Collaborative, whose activities focus on ensuring awareness on the part of pregnant women and obstetric providers of TennCare benefits and the services provided by the TennCare MCOs' maternity case management programs. (*Id.* at 1708-09.) For example, the Maternity Workgroup Collaborative launched a campaign geared to both TennCare-enrolled pregnant women and providers to educate them about the expanded TennCare smoking-cessation benefit for pregnant women. (*Id.* at 1713.) In addition, through the educational efforts of the Workgroup, obstetric providers have been supplied information regarding the services available for pregnant enrollees through the MCO maternity case-management programs, and a reference guide for those providers, combining the contact information for the MCO maternity case-management programs, has been developed and disseminated. (*Id.* at 1709–14.)

Plaintiffs do not contest the evidence presented by the State regarding its extensive, expansive outreach efforts. Instead, Plaintiffs contend that the State has not established that these efforts are effective. Specifically, Plaintiffs assert that the State's outreach efforts are flawed because the State makes no attempt to assess the effectiveness of any of its outreach efforts. (ECF No. 1563 (Pls.' Post-Trial Br.), at ¶ 82.) Plaintiffs further object that Dr. Wendy Long's testimony that she "believe[s]" the State's outreach to be effective "as evidenced by the tremendous improvement in our screening rates [and] the huge volume of correspondence and calls and so forth" (Vol. 2 (Long), at 417) is conclusory and unsupported. The Court agrees that the State's efforts are not without flaws and are likely in need of continued work and revision, particularly, as Plaintiffs argue, in the area of providing notice to teenagers and pregnant women.

Policy arguments aside, however, Plaintiffs' objections are somewhat beside the point, as the outreach provisions set forth in the Consent Decree

do not require the State to certify or guarantee the effectiveness of its outreach efforts. Instead, the Decree requires the State to "adopt policies and procedures necessary to ensure that TennCare *rules*

*and guidelines*" clearly require compliance with every outreach requirement under federal law. (Decree ¶ 39 (emphasis added).) The policies and procedures themselves must establish a goal that the outreach efforts be "aggressive[] and effective[]," and that the outreach media otherwise conform with federal mandates, such as through the use of "clear and non-technical terms," the use of outreach systems designed to reach individuals who are illiterate, blind, deaf, or who do not understand English; offering transportation services; informing families of the cost of services, if any, "establishing criteria for determining when an MCO may be required to target specific informing activities to particular 'at risk' groups"; offering information on covered services to pregnant teenagers who enter TennCare through presumptive eligibility, and offering assistance in making a timely first prenatal appointment, and so forth. (*Id.* ¶ 39(a)–(p).) The "Outreach Performance Standard" set forth in the Decree simply obligates the State to achieve and maintain "outreach efforts designed to reach all members of the plaintiff class with information and materials" in conformity with the federal requirements as set forth in paragraphs 39(a)–(p) of the Decree. (*Id.* ¶ 40.) The Court finds that the evidence offered by the State demonstrates that the appropriate policies and procedures are in effect, and that the State is in the process of maintaining outreach efforts in compliance with the Decree. The Court finds it problematic that the State makes no real effort to track the effectiveness of its outreach efforts, but cannot find that the State's myriad outreach efforts are not designed to reach all members of the plaintiff class.

### 2. EPSDT Screening

An EPSDT screen consists of five elements: (i) a comprehensive health and developmental history; (ii) a comprehensive unclothed physical exam; (iii) appropriate immunizations according to age and health history; (iv) appropriate laboratory tests (including an assessment of blood levels of lead); and (v) appropriate health education. (*See, e.g.*, DX 3 (TennCare Standard Operating Procedure (hereinafter "TSOP") 036, Addendum 3) at 2; DX 50 (Form Contractor Risk Agreement (hereinafter "MCO Contract")) § 2.7.6.3.3.) In addition, TennCare children receive vision, hearing, and dental screens at appropriate intervals.

TennCare has adopted the periodicity schedule for physical health screening (*i.e.*, the schedule for when over the course of childhood periodic physical checkups should take place) recommended by the American Academy of Pediatricians. (*See, e.g.*, DX 49a (TennCare Rule 1200-13-13-.04(b)(8)) at 38;

DX 3 (TSOP 036, Addendum 3); MCO Contract § 2.7.6.3.2 (adopting periodicity schedules); DX 159 (Periodicity Schedule for Checkups and Screenings adopted by the State); DX 160 (Recommendations from EPSDT Screening Guidelines Committee regarding Developmental/Behavioral Screening); Vol. 2 (Long), at 322.)  TennCare has adopted the periodicity schedule for dental services recommended by the American Academy of Pediatric Dentists, and has adopted the periodicity schedules for vision and hearing screenings recommended by a committee of experts in those fields.  (*See* DX 161 (Recommendations from EPSDT Screening Guidelines Committee regarding Hearing and Vision Screenings).)

All TennCare screening services are provided upon request at no cost to the enrollee, without any requirement for prior approval, regardless of whether the screen takes place in accordance with the periodicity schedule or is in addition to the checkups recommended under the periodicity schedule.  There is no dispute that an enrollee can get screened simply by calling his primary care provider and scheduling an appointment.  (Vol. 2, at 339 (Long).)

Under contract with TennCare, DOH provides EPSDT screening services at all of its county health department clinic sites across the State and has a participating provider agreement with each of the TennCare MCOs to provide those screens.  (Vol. 8 (Baggett), at 1692–93.)  Under an agreement between DOH and DCS, the county health departments perform EPSDT screens for all children in state custody (with the exception of Davidson County, where children in custody receive their EPSDT screens from a pediatric medical group).  (Vol. 2 (Long), at 339–40; Vol. 8 (Baggett), at 1693; Vol. 5 (Pollard), at 1046–47; DX 193 (DCS/DOH Agreement).)  When a screen is performed at a county health department clinic, a form, referred to as the "PCP letter" (DX 194), is completed reflecting the results and is sent to the child's primary care provider and to DCS if the child is in state custody.  (Vol. 8 (Baggett), at 1747; Vol. 5 (Pollard), at 1052.)  Immunizations are also available at no cost to TennCare children at all county health departments.  (Vol. 8  (Baggett), at 1693.)

DOH undertakes an annual quality improvement review of medical records across all of its regions to verify the presence of documentation that the PCP letter was sent and to evaluate the provision of EPSDT screens to ensure that all required components were covered.  (*Id.* at 1748–49 (Baggett); Vol. 9 (Baggett), at 1798–99.)

CMS requires each state to report two different measures for determining the numbers of children who receive EPSDT screens under the state's Medicaid program: a screening ratio and a participant ratio. (Vol. 2 (Long), at 340.) Paragraph 46 of the Decree adopts the first of these measures, the screening ratio, as the "baseline periodic screening ratio" for purposes of this case. (Decree ¶ 46.) The baseline periodic screening ratio is calculated by dividing the total number of screens received by all enrollees under twenty-one during the year in question by the total number of screens expected to be provided to enrollees under twenty-one during that year. (*See* DX 250 (CMS 416 Instructions); Vol. 2, at 342 (Long) (describing methodology).) For the most recent complete year, FY 2010, the State reported a baseline periodic screening ratio of ninety-nine percent to CMS. (*See* DX 243 (2010 CMS 416 Report) at Line 7.)

Also in accordance with paragraph 46 of the Consent Decree, TennCare annually conducts a medical record review in order to adjust the baseline periodic screening ratio to reflect the extent to which TennCare enrollees receive all of the required components of an EPSDT screen. (Vol. 2 (Long), at 322–23 (describing the required components of an EPSDT screen); *id.* at 352–53 (describing the annual record review and adjustment of the screening ratio).) To conduct this review, a team of TennCare nurses selects at random a statistically valid sample of encounters coded as screens, obtains the underlying medical records from the doctors who provided those checkups, and reviews the records to determine whether all of the required components of an EPSDT screen were provided and documented. (*Id.* at 353–54.) From this review, an overall proportion of required components is calculated and that proportion is then multiplied by the baseline periodic screening ratio to produce an adjusted periodic screening percentage (APSP). (*Id.* at 354.)

For the most recent complete year, FY 2010, the overall component compliance rate was 92.19 percent, and the adjusted periodic screening percentage was 91.3 percent. (*See* DX 149 (FY 2010 EPSDT Medical Record Review Report) at 4; Vol. 2 (Long), at 355.) Over the ten years since 2001, the State's adjusted periodic screening percentage has risen from 31.8 percent to the current rate of 91.3 percent. (*See* DX 149 (FY 2010 EPSDT Medical Record Review Report) at 4.)

The dental screening percentage for FY 2010 was 81 percent, up from 80 percent in FY 2009. (PX 2063 (FFY2010 Dental Screening and Participation); Vol. 2 (Long), at 357.)

The screening percentage for TennCare children in DCS custody has consistently reached or exceeded 95 percent. (*See generally* Vol. 5 (Pollard), at 1055–64 (explaining tracking and calculation of screening ratio for children in DCS custody).) DCS has a policy of taking all children for an EPSDT screen within thirty days of their entering custody, and has implemented a tracking system ("TFACTS database") for monitoring and reporting the screening status of the children in custody. The TFACTS report dated October 26, 2011 showed that 96.42 percent of Plaintiff class members who had been in DCS custody for more than thirty days, who were not on runaway status, and for whom there was no good-cause exception on record, were up-to-date on their annual EPSDT screen. The same TFACTS report indicated that 99.6 percent of those screens were complete, seven-component screens. (DX 196 (October 2011 DCS EPSDT Medical Screening Summary Report); Vol. 5 (Pollard), at 1055–62, 1067.) According to the State's witness, Lynn Pollard, two-thirds of the 3.6 percent of children listed as not up to date on their EPSDT screens in October 2011 had come due for a screen within a month of the report, and likely were not captured as up to date on their screens simply because documentation of the screens had not yet been entered into the TFACTS system. (Vol. 5 (Pollard), at 1055–63.) The remaining third, or approximately 1.2 percent, were not accounted for.

According to Dr. Long, the State has consistently calculated its screening rates on an aggregate basis across its eligible population of children, without capping screens according to the number of screens recommended by the periodicity schedule as applicable to an individual child. (*See* Vol. 2 (Long), at 342–49 (describing calculation methodology); Vol. 3 (Long), at 659–60 (identifying minor changes in methodology, none of which altered the aggregate nature of the calculation).) CMS has confirmed to the State that other states use the same aggregate approach because an individualized approach (like that suggested by Plaintiffs' expert, Dr. Ray) would not be practicable. (Vol. 2 (Long), at 350–51.)

Plaintiffs maintain that the State's screening performance remains inadequate, based on perceived flaws in the State's methodology for calculating the screening ratio. In short, Plaintiffs' expert Dr. Rose Ray testified that the State's reported screening ratio is significantly inflated, because the

numerator of the fraction overcounts screens,[6] while the denominator undercounts the total expected number of screens.[7] Dr. Ray's proposed methodology, however, used a formula for computing these percentages that is peculiar to her and not used by CMS or by any other Medicare agency in the country. The Court rejects the testimony of Dr. Ray and accepts the testimony of Defendants' witnesses regarding the appropriate methodology for calculating the screening ratio.

### 3.    EPSDT Diagnosis and Treatment

In addition to screening, TennCare children are entitled to receive, free of charge, all medically necessary covered diagnosis and treatment services.  Medical necessity is determined on a case-by-case basis in accordance with the State's regulatory definition of medical necessity.  (TennCare Rules Chapter 1200-13-16.)  In general, a covered service will be medically necessary if it is (a) recommended by the child's physician, (b) required in order to diagnose or treat an enrollee's medical condition, (c) known to be safe and effective and not experimental or investigational, and (d) the least costly alternative course of diagnosis and treatment adequate to treat the child's condition.  (TennCare Rule 1200-13-16-.05(1); Vol. 2 (Long), at 359.)  TennCare's medical-necessity rule expressly provides that it must be implemented consistent with federal law, including all EPSDT requirements.  (TennCare Rule 1200-13-16-.02; Vol. 2 (Long), at 360.)  TennCare will remain obligated to continue to cover all medically necessary diagnosis and treatment services after the Decree is vacated; the State maintains that it has no plans to cut EPSDT services to children.  (*See* Vol. 9 (Gordon), at 1821–22, 1861.)

MCO contracts require that the MCOs abide by EPSDT requirements in determining medical

---

[6] According to Plaintiffs, Tennessee's periodicity schedule requires most children to receive one screen per year, and does not require any child to receive as many as ten screens in any one year, but the number of screens counted in a few instances included as many as ten or twenty screens per child per year.  Dr. Long testified that the CMS instructions permit the State to count as many as thirty annual screens for a single child if the child in fact received that many screens in one year.  Plaintiffs contend that the CMS instructions require that a periodic screen is to be provided according to a state's periodicity schedule, and that if "many of these children received even one more screen than the number required in the periodicity schedule, it would affect the screening ratio."  (ECF No. 1563, at 58.)

[7] The denominator of the screening ratio is the aggregate number of screens that children of all age groups should receive (as the number varies according to a child's age).  Plaintiffs contend that CMS instructs states to base their screening ratio on the state's current periodicity schedule.  (*See* DX 250 (CMS 416 Instructions).)  The State maintains that it is adhering to the current periodicity schedule, but that for purposes of calculating its screening ratio for compliance with the Consent Decree, it uses the same periodicity schedule in effect at the time the Consent Decree was executed.  Dr. Long testified that the Consent Decree requires using "identical methodology every year."  (Vol. 17 (Long), at 3688.)  Regardless of the discrepancy in methodology, the Court is persuaded that a screening ratio of at least 80% has been achieved.

necessity.  (Vol. 2 (Long), at 360–61.)  Further, in training provided to the MCOs, TennCare emphasizes that medical-necessity determinations must comply with EPSDT requirements.  (*Id.*)

In practice, the vast majority of diagnosis and treatment services are provided to TennCare enrollees automatically, without any medical-necessity review, when the service is ordered by a licensed provider.  (Vol. 2 (Long), at 363–64.)  The MCOs subject only a small percentage of services to prior authorization under which MCO approval is required before the service will be covered.  (*Id.*)  When prior authorization is required, the ordering physician must provide the MCO with information explaining why the service is needed.  In most cases, a routine fax or telephone call from the doctor's office suffices to ensure approval of the service.   In the small percentage of cases where the MCO has concerns notwithstanding the information provided, the case will be elevated to an MCO doctor, who will consult with the ordering physician in an effort to determine together the appropriate course of treatment for the patient.  (*Id.* at 369.)  In most of that small percentage of cases, the MCO doctor and the treating physician will reach a consensus; in the few cases where they do not, the MCO may deny the request for prior authorization.  (*Id.* at 370.)

When a request for prior authorization is denied, TennCare will issue a notice with instructions that the denial may be appealed simply by calling a toll-free number.  (*Id.* at 371.)  If an appeal is taken, TennCare will ask the MCO to reconsider the denial by having a different physician review the case.  (*Id.*)  If the reconsidering physician agrees with the treating physician, the service will be covered.  (*Id.* at 371–72.)  If the reconsidering physician agrees with the original MCO physician, the TennCare appeals unit will send the case to an independent medical consultant under contract with TennCare for another level of review.  (*Id.* at 372.)  Again, if the independent medical consultant agrees with the treating physician, the service will be covered.  (*Id.* at 373.)  If the independent medical consultant agrees with the MCO physicians, the appeal will be heard by an administrative law judge who will decide, based on the evidence, whether the requested service is medically necessary.  (*Id.* at 373–74.)  The appeal system is governed by the terms of the decree entered in *Grier v. Emkes*, No. 79-3107 (M.D. Tenn.) (Nixon, J.).  (Vol. 2 (Long), at 374.)  Under this system, an MCO's denial of a service ordered by a licensed physician or other provider based on lack of medical necessity will be sustained only if no fewer than three different reviewing physicians (including one who is independent of the MCO) all agree that the service is not

medically necessary.

The same appeals process governs medical-necessity determinations for drugs that are not included on TennCare's list of preferred drugs. (*Id.* at 375–79.) The Pharmacy Benefits Manager is required to process prior-authorization requests within 24 hours. (*Id.* at 379.) For immediate authorization, the prescribing physician may call the Pharmacy Benefits Manager instead of faxing a prior-authorization request. (Vol. 2 (Long), at 380.) Under the *Grier* Consent Decree, even if a prescription is denied for lack of prior authorization, a pharmacist may provide an enrollee with a 72-hour emergency supply while waiting for the prescribing physician to provide more information to demonstrate medical necessity. (*Id.*)

Plaintiffs focus their critique of the State's provision of diagnostic and treatment services on the State's failure adequately to track follow-up care. While the State's failure to track is concerning, Plaintiffs have not successfully linked a supposed obligation to track with any particular requirement expressed in the Decree. Further, Plaintiffs' complaint that TennCare pediatricians are not "up to speed on developmental issues in children" (ECF No. 1563, at 73), as a result of which autism and other developmental disabilities allegedly go undiagnosed, is actually a critique of the medical-care delivery system generally, and one that affects all children in Tennessee regardless of whether they are covered by TennCare.

Plaintiffs also contend that there is a state-wide dearth of TennCare specialists in behavioral health and other areas. Besides the fact that the network-adequacy requirements in the Consent Decree have been determined to be unenforceable pursuant to Sixth Circuit precedent,[8] Plaintiffs have not established that dearth of specialists is a problem peculiar to TennCare patients.

### 4. Monitoring & Oversight of the EPSDT Program

Although the State does not implement all the different monitoring and tracking measures Plaintiffs and their experts recommend, the State does use a number of objective measurements to judge its performance. For instance, in 2006, Tennessee became the first state in the country to require that all of its MCOs obtain full accreditation by the National Committee for Quality Assurance ("NCQA"). (Vol. 3

---

[8] To be clear, the State remains bound by the network-adequacy requirements established by federal statutes and regulations. The Sixth Circuit has simply determined that these provisions are not enforceable by individuals pursuing claims under 42 U.S.C. § 1983.

(O'Kane), at 505; Vol. 2 (Long), at 402.) NCQA is a nonprofit organization that is devoted to improving the quality of health care around the country. (Vol. 3 (O'Kane), at 481–82; Vol. 2 (Long), at 310.) NCQA accreditation is an independent, nationally recognized standard for evaluation of health-care plans. (Vol. 2 (Long), at 402.) To receive NCQA accreditation, a health plan must undergo a rigorous review of its policies and procedures, and then of the plan's performance as tracked according to precise, standardized, carefully constructed measures that enable comparisons between plans and across States. (*Id.* at 310-11; Vol. 3 (O'Kane), at 501–04; DX 10 (NCQA Health Plan Accreditation); DX 11 (2011 NCQA Health Plan Accreditation Requirements).) Two of the State's three MCOs have achieved NCQA's highest overall accreditation rating ("excellent"), and the third received NCQA's second highest accreditation status ("commendable"). (DX 295 (Accreditation Status Update) at 2; Vol. 2 (Long), at 384.) All three of TennCare's MCOs have earned the highest rating—four stars—for both "access to needed care and . . . good customer service" and for "qualified providers." (DX 295 (Accreditation Status Update) at 1, 2; Vol. 2 (Long), at 384–85.)

In addition to NCQA accreditation, TennCare requires its MCOs to report all of the Healthcare Effectiveness Data and Information Set ("HEDIS") measures related to the provision of care to children (as well as many related to adults). (Vol. 3 (O'Kane), at 486 (identifying some measures relevant to children); Vol. 17 (Long), at 3671–73.) HEDIS measures are standardized national metrics developed and superintended by the NCQA that enable TennCare to track the performance of the MCOs in a variety of measured healthcare outcomes over time, to compare the performance of the State's MCOs to each other, and to compare the performance of the MCOs to national averages and benchmarks for Medicaid managed care programs across the country. (Vol. 3 (O'Kane), at 489 (noting that standardized calculation permits "very little room for interpretation" and avoids "problems with comparing one . . . level of performance to another"); Vol. 2 (Long), at 387.) HEDIS measures are all independently validated by NCQA-certified HEDIS auditors. (Vol. 2 (Long), at 387; Vol. 3 (O'Kane), at 498.)

In general, TennCare's most recent HEDIS results compare favorably to national Medicaid averages. (Vol. 2 (Long), at 389.) They compare even more favorably to the Southeastern regional averages. (Vol. 3 (O'Kane), at 506–07.) In particular, TennCare's HEDIS scores for access to and availability of care for children, timeliness and frequency of prenatal care, child immunization rates, and

effectiveness of behavioral health are all comparable, and in most cases exceed the national Medicaid average. (DX 151 (TennCare 2011 HEDIS/CAHPS Annual Report) at 24–28; Vol. 2 (Long, at 388–93).) Over time, many of TennCare's HEDIS scores related to the provision of healthcare services to children have improved, generally reflecting a steady increase in the quality and accessibility of medically necessary diagnosis and treatment services for TennCare children. (*See* DX 153 (2010 HEDIS/CAHPS Summary and Trending Report) at 20–27; Vol. 2 (Long), at 394–96; Vol. 3 (O'Kane), at 505–06; *cf.* Vol. 1 (Ray), at 184 (acknowledging that Tennessee's rates of EPSDT screenings and prenatal services improved each year from 2007 through 2010).)

Plaintiffs discount both the HEDIS measures and NCQA accreditation on the basis that HEDIS only measures process and policy rather than health outcomes or actual compliance with the policies and procedures that are in place. Plaintiffs further argue that the HEDIS measures and NCQA accreditation are only partial measures because the MCOs do not manage the "carve-outs" of dental, pharmacy, and treatment of behavioral problems. The Court rejects the Plaintiffs' arguments on the basis that the State has complied with—and gone beyond—the measurements required by CMS. Moreover, while the State's performance certainly still has room for improvement, the measures in place have documented steady improvement in nearly every area related to EPSDT services over time. More accurate and precise methods of assessment could certainly be imagined and implemented, but there is nothing in federal law or the Consent Decree that requires more precise assessment.

In addition to HEDIS and NCQA accreditation, TennCare also requires the MCOs to report results on the Consumer Assessment of Healthcare Providers and Systems ("CAHPS") set of standardized surveys, which measures enrollees' satisfaction with their care. (Vol. 2 (Long, at 396–97); *see also* Vol. 3, at 499–500 (O'Kane).) CAHPS reporting is another component of NCQA accreditation. (Vol. 2 (Long), at 396.) The CAHPS child Medicaid measures for "Getting Needed Care" show that 84 to 86 percent of TennCare recipients report that they always or usually get the care they need for their children, compared to only 77 percent of Medicaid recipients nationally who report that they always or usually get the care they need for their children. (DX 151 (2011 HEDIS/CAHPS Annual Report) at 36–37; Vol. 2 (Long), at 398.) Similarly, 90 to 92 percent of TennCare recipients report that they always or usually get the care they need for their children quickly, compared to only 86 percent of Medicaid recipients nationally. (2011

HEDIS/CAHPS Annual Report at 36–37; Vol. 2 (Long), at 398; *see also id.* 458–61 (discussing DX 209, the 2010 results of an annual University of Tennessee study assessing opinions about certain aspects of TennCare, indicating that 88 percent of households perceived the care their children received on TennCare in 2010 as excellent or good, compared to 76 percent in 1998, with 43 percent giving "excellent" ratings in 2010 compared to 27 percent in 1998).)  Plaintiffs' expert, Dr. Darren DeWalt, dismissed the favorable CAHPS results as entirely unreliable based on his assertion that people will register satisfaction with services even if the healthcare they actually receive is "crummy."  (Vol. 7 (DeWalt), at 1411.)  This criticism is somewhat beside the point insofar as CAHPS surveys are not intended to measure the quality of healthcare provided, but consumers' satisfaction with their overall experience in the receipt of healthcare.  Plaintiffs cannot successfully dispute the fact that the recent CAHPS results indicate that an overwhelming majority of class members are satisfied that their children are getting needed care, and getting it quickly.

TennCare contracts with an External Quality Review Organization ("EQRO"), currently Qsource, to provide extensive independent monitoring and review of the performance of the MCOs.  (Vol. 2 (Long), at 398–99; Vol. 4 (Couzins), at 867–72.)  Among other things, the EQRO specifically reviews MCOs' compliance with their contractual obligations, including but not limited to those addressing EPSDT and the Consent Decree in this case.  (Vol. 2 (Long), at 399; Vol. 4 (Couzins), at 867–69, 884–85, 914–15.)  Specifically, for purposes of this case and the Decree, the EQRO rigorously reviews the compliance of each health plan, in each region of the State, with the paragraphs governing outreach, screening, diagnosis, and treatment, aggregating its findings, good and bad, in an "EPSDT Summary Report" it provides the State annually.  (Vol. 4 (Couzins), at 884–85, 903–11, 914–15; DX 30 (EPSDT Summary Report); *see also* DX 12 (2011 Annual Quality Survey).)  The EQRO reviews compliance in reference to an MCO's policies and procedures, combined with random sampling of select medical files to confirm that the MCO is in fact implementing its policies and procedures on the ground.  (Vol. 2 (Long), at 399–400; Vol. 4 (Couzins), at 903–11.)

In addition to the above-referenced measures, TennCare's Quality Oversight Unit works with the EQRO to identify opportunities for improvement and to develop a quality strategy for the State.  (Vol. 2 (Long), at 407–08; Vol. 4 (Couzins), at 875–76; *see also* DX 11 (NCQA Accreditation Requirements)

(describing NCQA's evaluation of a plan's "Quality Management and Improvement (QI)" for purposes of accreditation).) Through the Quality Oversight Unit's Quality Strategy for Medicaid, TennCare reports to CMS annually on the various quality measures reported by the EQRO and NCQA. (Vol. 2 (Long), at 407–09.) In approving TennCare's 2011 Quality Strategy for Medicaid, CMS recognized TennCare's "exemplary commitment to the quality of care received by [the State's] Medicaid beneficiaries." (DX 249 (CMS Approval Letter); Vol. 2 (Long), at 409–10.)

The State is also required by the Decree to file Semi-Annual Reports (SARs) with the Court, and to provide copies to the Plaintiffs, regarding Defendants' compliance with the terms of the Decree. (Decree ¶ 105.) These reports are to contain information validated by the applicable audit and testing procedures outlined in the Decree, and must accurately and fully reflect the status of the state's compliance. (*Id.*) The SARs have been promptly and consistently filed on July 31 and January 31 of each year, and Plaintiffs do not contend that Defendants have failed to comply with this requirement.

The Comptroller of the Treasury of Tennessee conducts periodic audits of the Department of Finance and Administration, a portion of which includes a review of TennCare. In the most recent audit, the Comptroller concluded, based upon his review of reports submitted by the MCOs to TennCare, the independent evaluations of the EQRO, the reports detailing the MCOs' HEDIS and CAHPS results, and their NCQA accreditation, that TennCare had in place an "appropriate process . . . to monitor the quality of care." (DX 247 (2011 Performance Audit, Department of Finance and Administration) at 103.) In addition, based on a random sample of service denials by the MCOs, the Comptroller's audit concluded that the MCOs were meeting their obligations related to the denial of services. (*Id.* at 119.)

TennCare presented other evidence of its efforts to ensure the MCOs' provision of EPSDT services in compliance with the Decree and federal law. An example of these efforts include TennCare's regular monitoring of individual service appeals in order to identify any MCO practices that may inappropriately erect obstacles to the provision of medically necessary diagnosis and treatment services to TennCare children. (Vol. 2 (Long), at 405, 447.) In addition, TennCare regularly analyzes performance measures based upon encounter data to assess effectiveness of care and to identify opportunities for continuous quality improvement in the delivery of diagnosis and treatment services to TennCare children. (*Id.* at 400-02 (describing Health Care Informatics Unit).) TennCare regularly

communicates with TennCare providers, both individually and through provider organizations such as the Tennessee Chapter of the American Academy of Pediatrics, the Tennessee Medical Association, and the Tennessee Hospital Association, in an effort to identify any MCO practices that may inappropriately erect obstacles to the provision of medically necessary diagnosis and treatment services to TennCare children. (*Id.* at 316, 404–05.)  TennCare regularly monitors the activities of DCS with respect to those TennCare services that DCS is responsible for providing to TennCare children in custody.  (*Id.* at 424 (describing EQRO monitoring), *id.* at 453–54 (describing TennCare monitoring of DCS and MCOs); Vol. 3 (Long), at 607 (same).)  And DCS likewise regularly monitors its providers and its processes to ensure that TennCare children in custody are receiving medically necessary medical and behavioral health services. For example, DCS utilizes a number of different tools to monitor and enforce the services provided to children in custody by DCS-contracted providers, including by requiring national accreditation and appropriate licensing, performance-based contract monitoring, Program Accountability Reviews, unannounced site visits, Assessment of Service Quality ("ASQ") reviews, reviews of individual cases through caseworkers' twice-monthly visits with children, and utilization reviews conducted by the DCS regions and DCS Central Office.  (*See* Vol. 8 (Gatlin), at 1546–54; *see also id.* at 1560 (describing Psychiatric Acute Care Coordination ("PACC") process developed by DCS in conjunction with TennCare Select to coordinate services of children entering and exiting acute-care psychiatric hospitals).) TennCare's witness persuasively attested to their conclusion that monitoring, oversight, and experience within DCS demonstrate that there are no systemic barriers precluding children in custody from accessing needed behavioral and mental healthcare for children in custody.

The record before the Court confirms that, compared with its performance in 1998, TennCare has dramatically improved the provision of medical services to its enrollees in every respect.  (*See* Vol. 2 (Long), at 456–57 (noting more demanding requirements for participating MCOs, carved-out pharmacy and dental benefits, increased focus on outreach, new call center and community outreach contracts, better monitoring through NCQA and HEDIS measures, an improved appeals system, and improved medical necessity rules).)  Testimony presented at trial demonstrated that no other state's EPSDT program surpasses that of Tennessee in any salient respect.  To the contrary, Plaintiffs' own expert witness, Manny Martins, former TennCare Director, testified that TennCare's EPSDT program was better

than most, if not all, other states' EPSDT programs even in 2004 (when he was the TennCare Director), and TennCare's EPSDT program has only continued to improve since that time. (Vol. 11 (Martins), at 2406–07.)

The Director of the TennCare Bureau, Darin Gordon, testified that, regardless of whether the Consent Decree remains in effect, TennCare will continue to employ independent, nationally recognized third-party monitoring and oversight tools, including NCQA accreditation, HEDIS reporting, and EQRO review to ensure that children continue to receive the services to which they are entitled under federal law. (Vol. 9 (Gordon), at 1819–20, 1822.) The credibility of this testimony is strongly confirmed by the fact that TennCare employs these measures for adults even though the State is not subject to any judicial decree governing the care provided to adults. (*Id.* at 1819–20.)

**B. Compliance with Specific Paragraphs of the Decree**

As both parties recognize, perfection cannot be the standard by which a program as large and complex as TennCare's EPSDT program is judged, for problems will invariably and necessarily arise from time to time in any such program. Instead, the State's substantial compliance must be assessed based upon whether the State has a sound system in place, one pursuant to which problems can be reliably identified and addressed as they arise. Based on the evidence presented at trial, the Court concludes that TennCare easily satisfies this standard, and the Court, as set forth below, finds that Defendants are in substantial compliance with virtually every operative paragraph of the Consent Decree.[9]

The State is in substantial compliance with the requirements of paragraph 39 and its subparts, pertaining to the outreach and informing requirements of federal law. Specifically, as the factual summary set forth above indicates, TennCare has adopted policies and procedures for aggressively and effectively informing enrollees of the existence of the EPSDT program and the availability of specific screening and treatment services. The policies in place require the use of clear and non-technical terms, in oral and written form, to ensure that information about the program is clear and easily understandable. The State has implemented outreach procedures for informing individuals who are illiterate, deaf, blind or cannot understand English about the EPSDT program, and performs outreach to inform all eligible individuals

---

[9] This portion of the Court's Memorandum is informed by the Court's contemporaneously entered ruling regarding the enforceability of each of the individual paragraphs of the Consent Decree. See also note 2, *supra*.

and their biological or foster parents about what services are available under EPSDT, the importance of preventive health care, where services are available and how to obtain them, that assistance with transportation and scheduling is available; and so forth. (*See, e.g.*, See DX 1 (TSOP 036); DX 2 (TSOP 036, Addendum 1), at 2–3 (EPSDT Outreach and Informing Requirements, including requirement that MCOs "use clear and non-technical terms to provide a combination of written and oral information" and use "accepted methods for informing persons who are illiterate, blind, deaf, or cannot understand the English language about the availability and use of EPSDT services"; requiring MCOs to conduct outreach "in a timely manner, generally within 60 days of the TennCare MCO's receipt of notification of the child's enrollment in its plan"; requiring MCOs to provide information about transportation and to provide scheduling assistance; and discussing role of the Department of Children's Services in informing foster parents); DX 49a (TennCare Rules) 1200-13-13-.04(5)(b)) at 53–54; MCO Contract § 2.6.7.1 (no cost sharing or patient liability), § 2.7.4, *et seq.* (Health Education and Outreach), § 2.7.5.2.1 (requiring MCOs to provide or arrange for the provision of medically necessary prenatal care to members beginning on the date of their enrollment in the MCO to include presumptively eligible women), § 2.7.6.1.2 (required use of TENNderCare name), 2.7.6.1.3 (required written outreach policies and procedures), § 2.7.6.2.2 (requirement that outreach include information on offer of transportation and scheduling assistance), § 2.7.6.2 *et seq.*) (required member education and outreach), § 2.7.6.2.8 (requirement that accurate lists of names and phone numbers of providers be given to members), § 2.7.6.2.6 (requirement that MCO require providers have a process for documenting services declined by a parent), § 2.7.6.2.4 (requirement that as part of their TENNderCare policies and procedures MCO have a written process for following up with members who do not get their screenings timely and that the process must document all attempts to reach out to members who have missed screening appointments), § 2.7.6.2.5 (requiring MCOs to make two different attempts to reach out to a member who has had no services in a year), § 2.7.6.2.10.2 (requirement related to outreach to community-based organizations designed to reach LEP enrollees), § 2.7.6.2.9 (requiring MCOs to target specific informing activities to pregnant women and families with newborns), § 2.7.6.3.3.3 (required immunizations), § 2.7.6.2.10.1.1 (requirement that 45 of 150 required community outreach events target counties designated as rural/suburban), § 2.7.6.3.3.5 (requirement for appropriate laboratory tests including lead tests), § 2.7.6.3.3.6 (required health education

including anticipatory guidance), § 2.7.6.4.6 (requirements related to transportation services and scheduling assistance), § 2.17.2.1 (requirement that all member materials be worded at 6th-grade reading level), § 2.17.2.4.3 (requirement related to using the word "free"), § 2.17.2.5 (requirement that all vital documents be translated to Spanish and LEP groups), § 2.17.4.2 (member handbook must be distributed within 30 days of enrollment and annually thereafter), § 2.17.4.7.9 (requirement that written material include a description of TennCare cost sharing or patient liability), § 2.17.4.7.34 (requirement that member handbook contain information on how to get information in alternative formats or how to access translation services for free), § 2.17.4.7.37 (requirement that member handbook make clear member has right to receive information on available treatment options in a manner appropriate to the member's condition and ability to understand), § 2.17.5.2 (requirements related to teen newsletters), § 2.17.8.5 (requirement that provider directory identify non-English languages spoken by PCP), § 2.18.1.3 (requirement that member services hotline be able to handle LEP callers), § 2.18.2.1 (requirement regarding language interpreter and translator services); DX 30 (2011 EPSDT Summary Report) at 29–61; DX 12 (2011 Annual Quality Survey) at 9, 42–44, 46–48, 57; Vol. 8 (Baggett), at 1704–08, 1715–24 (describing outreach and assistance provided to presumptively eligible women at the county health departments and outreach through the Prenatal Call Center), 1734-36 (DOH community outreach, conducted pursuant to contract with TennCare, targets individuals with vision and hearing impairments as well as with limited English proficiency), 1749–58 (describing outreach, pursuant to contract with TennCare, to newly enrolled and newly recertified members under age 21); Vol. 5 (Pollard), at 1072–73 (describing DCS's outreach efforts to resource families and foster families); Vol. 2 (Long), at 314–15, 334-35 (EQRO validation of provider directory), 337–38 (describing outreach to presumptively eligible prenatal care patients through health departments and Prenatal Call Center); DX 114 (TENNderCare Brochure); *see generally* Part II.A.1., *supra*, discussing outreach efforts.)

The State is in current and substantial compliance with the requirements of paragraph 40, as it has maintained, as of the date of this Order, outreach efforts designed to reach all members of the plaintiff class with information and materials that conform to the requirements of the Decree as set forth in paragraphs 39(a) through (p), as demonstrated by the myriad and diverse outreach efforts performed by the State and its contractors. (*See* citations to the record related to compliance with paragraph 39; *see*

*generally* Part II.A.1., *supra*.)

The Court finds that the State is in substantial compliance with paragraphs 41(a) through (n) of the Decree in that it has rules and guidelines that clearly describe, allocate responsibility for and require compliance with each specific screening requirement under federal law, as specifically articulated in the Decree. (*See, e.g.*, TennCare Rule 1200-13-13-.04(1)(b)(5) & (8), at 36–38; DX 3 (TSOP 036, Addendum 3), *passim*; MCO Contract § 2.7.6.1.1 (requirement to provide all EPSDT screening requirements), § 2.7.6.1.4 (requirement to comply with EPSDT screening requirements for vision, dental, and hearing services, and for follow up if initial screen is not completed in a single visit), § 2.7.6.1.7 (prohibition on requiring prior authorization for periodic screens), § 2.7.6.3.2 (adopting periodicity schedules), § 2.7.6.3.3.1 & .2 (pertaining to dietary practice assessments and growth chart comparisons), § 2.7.6.3.3 (describing required components of EPSDT screen and including which immunizations must be covered), § 2.7.6.3.3.4 (requiring MCOs to encourage dental referrals in accordance with the AAPD guidelines, § 2.7.6.3.3.6 (pertaining to vision and hearing screens), § 2.7.6.3.3.5 (requiring the medical screen to include laboratory tests consistent with CMS minimum standards, and pertaining to testing for lead poisoning in children under age six), § 2.7.6.4.1 (required follow up for elevated blood-lead levels) § 2.7.6.3.3.6 (education and counseling to parents on health and life style), § 2.7.6.4.8) (requirement that all medically necessary services be provided regardless of whether the need is identified by a provider whose services had received prior authorization); DX 159 (Periodicity Schedule for Checkups and Screenings adopted by the State); DX 160 (Recommendations from EPSDT Screening Guidelines Committee regarding Developmental/Behavioral Screening); DX 161 (Recommendations from EPSDT Screening Guidelines Committee regarding Hearing and Vision Screenings); Vol. 9 (Baggett), at 1797 (county health departments schedule follow-up appointments if all components of a screen cannot be completed); DX 53 (Dental Benefit Manger Contract) at 6 (requirement that providers in network be properly licensed).)

The State is in substantial compliance with paragraphs 42(a) through (c) in that TennCare rules and guidelines clearly describe and allocate responsibility for, and require compliance with, each specific requirement of federal law governing the provision of interperiodic screening, vision, hearing, dental and diagnostic services which are medically necessary to determine the existence of suspected physical or

mental illnesses or conditions, as set forth in 42 U.S.C. § 1396d(4)(1)–(4) and the State Medicaid Manual § 5040 *et seq.* (DX 4 (TSOP 036, Addendum 4); MCO Contract §§ 2.6.1.3 and 2.7.6.1.7 (no prior authorization required for interperiodic screens), § 2.7.6.4.8 (requiring MCOs to provide needed services regardless of whether the need was identified by a provider whose services had received prior authorization); DX 12 (2011 Annual Quality Survey) at 9–10, 55–56; *see generally* Vol. 2 (Long), at 417–18.)

The State has demonstrated that it has taken the steps outlined in paragraphs 44(a) through 44(f) of the Decree to ensure that each periodic screen accurately identifies children who should be referred for further assessment of behavioral/developmental problems and/or possible hearing or vision impairment. (*See generally* Vol. 2 (Long), at 418–20; DX 160 (Screening Guidelines Committee Recommendations); DX 161 (Screening Guidelines Committee Recommendations for hearing and vision screenings).)

Paragraph 46 of the Decree remains relevant only insofar as it defines the method for calculating the adjusted periodic screening percentage (APSP).

Paragraph 51 recognizes that the State "shall be presumed to be in compliance with [its] screening obligation under the law and the terms of this order" if it meets an 80% screening rate *or* if it shows that the children who have not received complete screenings "have been the subject of outreach efforts reasonably calculated to ensure their participation." As set forth above, the Court finds that the State has demonstrated that it has achieved an APSP and DSP of at least 80 percent, and therefore is presumed to be in compliance with its screening obligation under the law and the terms of the Consent Decree. (Decree ¶ 51; Vol. 2 (Long), at 355.) Perhaps more importantly, the State has also shown that its outreach efforts are reasonably calculated to reach all class members and to ensure their participation in the EPSDT program. (*See generally* Part II.A.1., *supra*; Vol. 2 (Long), at 421.)

Paragraph 52 requires the complete screening of 100% of children in the custody of DCS, and sets forth DCS's responsibilities with regard to the development of a tracking system for reporting compliance with this provision. As set forth above, the State has achieved a screening rate for children in DCS custody in excess of 95% and has demonstrated that it took all actions that could reasonably be expected under the circumstances to achieve a 100% screening rate. Children are characterized differently if they are in "legal" custody but not "physical" custody of DCS and the Decree makes

allowance for this difference in recognition of the difficulties that arise when a child who is technically in DCS custody has been placed in a foster home. (*See generally* Vol. 5 (Pollard), at 1045–46, 1060–61 (explaining why a child in foster care might not get an EPSDT screen in a timely fashion, including an older teen's refusal to go to the doctor, a child's illness at the time a screen is due, scheduling conflicts, etc.).)

The State has demonstrated substantial compliance with paragraph 53 because it has "establish[ed] and maintain[ed] a process for reviewing the practices and procedures of the MCOs and DCS, and requir[ed] such modifications of those practices and procedures as are necessary to ensure that children can be appropriately referred from one level of screening or diagnosis to another, more sophisticated level of diagnosis as needed to determine the child's physical health, behavioral health and developmental needs, as to medically necessary services." The State has accomplished this through such mechanisms as the required external quality review of the MCOs and resulting annual reports, through NCQA accreditation, by requiring all MCOs to report on all child HEDIS measures, by reviewing monthly appeals statistics for trends and reviewing MCO policies and practices as part of individual appeals, through daily communication between TennCare and its MCOs, DCS and TennCare Select and TennCare and DCS, and the requirement that DCS submit quarterly reports and other data to TennCare. (*See, e.g.*, Vol. 2 (Long), at 421–22; DX 12 (2011 Annual Quality Survey) at 9–10, 48.)

The State has demonstrated substantial compliance with paragraph 54, because TennCare, the MCOs, and DCS collectively cover all the services enumerated in paragraph 54, listed in 42 U.S.C. § 1396d(a), and defined in the corresponding Medicaid regulations. (TennCare Rule 1200-13-13.04(1)(b); MCO Contract § 2.6.1.3, § 2.7.6.4.8; Vol. 2 (Long), at 422.)

The State has shown that it "review[s] MCO practices with regard to making decisions about medical necessity and identif[ies] any practices that are inconsistent with the federal laws cited herein," and it "issue[s] clarifications and ensure[s] compliance with such federal law, regarding medically necessary treatment," as required by paragraph 55. (TennCare Rules Chapter 1200-13-16; MCO Contract § 2.6.3; Vol. 2 (Long), at 422–24; DX 12 (2011 Annual Quality Survey) at 9–10, 50, 68–70.) The State is in substantial compliance with paragraph 55(a) in that prior authorization decisions are made on a case-by-case basis. (TennCare Rule 1200-13-16-.06(9); MCO Contract §§ 2.6.3.1, 2.7.6.1.1, 2.14.1.4.2;

Vol. 2 (Long), at 423.) In accordance with paragraph 55(b), TennCare's rules and policies make clear that "services are provided if necessary 'to correct or ameliorate defects and physical and mental illnesses and conditions. . . .' 42 U.S.C. § 1396d(r)(5)." (TennCare Rule 1200-13-16-.02; MCO Contract § 2.7.6.1.1; TSOP 036, at 1.) Likewise, Defendants have demonstrated that TennCare's rules and policies make clear that "the definition of medical necessity shall be applied so that services are covered if they correct, compensate for, improve, or prevent a condition from worsening, even if the condition cannot be prevented or cured," as required by paragraph 55(c). (TennCare Rule 1200-13-16-.05(4)(a) & (c)); MCO Contract § 2.7.6.1.1.)

TennCare's rules and policies make clear that "medically necessary services shall be provided whether or not the condition existed prior to any screening and whether or not the screener is under contract with the particular managed care entity," as required by paragraph 55(d). (TennCare Rule 1200-13-16-.03(1)6; MCO Contract § 2.7.6.4.8); Vol. 2 (Long), at 423–24.)

And the State is in current substantial compliance with paragraph 55(e), because TennCare's rules and policies make clear that Defendants "do not have financial or contractual arrangements which undermine class members' access to covered services." (MCO Contract § 2.13.8.3.) In addition, all provider contracts are reviewed by the Tennessee Department of Commerce and Insurance to make sure such prohibited financial arrangements do not exist. (Vol. 2 (Long), at 424.)

The State is in current substantial compliance with paragraph 56 of the Decree because it "ensure[s] that the MCOs and DCS use only the definition of 'medically necessary' in the TennCare MCO contracts when making medical necessity decisions" through, for example, its review of individual appeals, EQRO review, NCQA accreditation, daily communications between TennCare, DCS and the MCOs, and contract requirements. (MCO Contract § 2.6.3.1; Vol. 2 (Long), at 424–25; DX 12 (2011 Annual Quality Survey) at 50.)

The State is in compliance with paragraph 57 in that it does not impose absolute amount limitations nor impose duration and scope limitations or monetary caps on EPSDT services. (MCO Contract §§ 2.6.3.2, 2.6.3.3.) Further, the State ensures that utilization controls employed by the MCOs do not "unreasonably delay the initial or continued receipt of services" nor "cause recipients to go without needed care," and that there is "an expeditious process in place to ensure children receive without

interruption any medically necessary services which exceed tentative limits." (Decree ¶ 57.) (Vol. 2 (Long), at 425–27.) The State requires its contractors to issue notice of any "denial of a timely request from the provider who originally prescribed an ongoing service for continuation of the service" and provides continuation of benefits pending appeal "if the denial is appealed in a timely fashion." (Decree ¶ 57.) The appeals process is subject to the Consent Decree entered in *Grier v. Emkes*, No. 79-3107 (M.D. Tenn.) (Nixon, J.). With respect to the final requirement of paragraph 57, the state reviews the MCOs' "prior approval/utilization review process on an annual basis to assure that tentative limits approved by the MCOs are appropriate." (Decree ¶ 57.) (*See* Vol. 2 (Long), at 429; Vol. 4 (Couzins), at 904–07; DX 12 (2011 Annual Quality Survey) at 10, 51, 68–70.)

The State is in current substantial compliance with paragraph 59 because it requires that "MCOs shall provide all medically necessary, covered services regardless of whether or not the need for such services was identified by a provider whose services had received prior authorization from the MCO or by an in-network provider." (*See* TennCare Rule 1200-13-13-.04(1)(a)(2)(i); MCO Contract § 2.7.6.4.8; Vol. 2 (Long), at 429–30.)

The State incorrectly indicates that the Court preliminarily found paragraphs 60(i)–(iv) to be unenforceable. Rather, the Court noted that the State characterized the referenced paragraphs as enforcing subsection 42 U.S.C. § 1396a(43)(C), which the Court found to be individually enforceable. The Order granting in part and denying in part the Defendants' first motion to vacate reconfirms and formalizes that finding. The referenced provisions pertain to the development of a provider handbook spelling out the responsibilities of MCOs and DCS related to the provision of medically necessary services to children in DCS custody. It is unclear whether the State complied with this provision, though it is clear the State requires MCOs to provide their members with member handbooks "based on a template provided by TENNCARE." (MCO Contract § 2.17.4 (Member Handbooks).)

The Court has found that paragraph 61(i) of the Decree is intended to remedy violations of § 1396a(43)(C) and is therefore enforceable. This provision requires that the MCO contracts must inform providers of the package of benefits that EPSDT offers and must require providers to make treatment decisions based upon children's individual medical and behavioral health needs. The State has demonstrated current substantial compliance with paragraph 61(i). (MCO Contract § 2.12.9.56; Vol. 2

(Long), at 430; DX 12 (2011 Annual Quality Survey) at 60.)

The State has demonstrated current substantial compliance with paragraph 62 because it requires MCOs to provide primary care providers up-to-date lists of specialists to whom referrals may be made for various services and requires that this list be supplemented quarterly and to comply with the "access/availability standards of the 1115 waiver." (MCO Contract § 2.14.3.5, § 2.30.7.1; Vol. 2 (Long), at 430–31.)

The State is in current substantial compliance with paragraph 63 because the State requires coverage of rehabilitation services for children, and its definition of rehabilitation services is consistent with the definition in paragraph 63. (MCO Contract § 2.7.6.4.8(13); Vol. 2 (Long), at 431–32.)

The State is in current substantial compliance with paragraph 64 because the State requires coverage of "maintenance services which prevent or mitigate the worsening of conditions or prevent the development of additional health problems" and its definition of maintenance services is consistent with the definition in this paragraph. (MCO Contract § 2.7.6.4.1; Vol. 2 (Long), at 432.)

The State is in current substantial compliance with paragraph 65 because the State "inform[s], in a timely manner and on an ongoing basis, all of [its] contractors about what federal Medicaid law requires with respect to specific screens, diagnoses and treatments." (Vol. 2 (Long), at 432–33.)

The State is in substantial compliance with paragraph 66 and its subsections, because the State and its contractors provide case-management services consistent with federal law. (Vol. 2 (Long), at 304, 433–35; Vol. 5 (Pollard), at 1074–75; MCO Contract § 2.7.6.4.8(19).) In addition, the State continues to offer targeted case management to children in state custody or at risk of entering state custody, as set forth in the parties' Agreed Factual Stipulations (ECF No. 1526, at ¶ 13), per paragraph 67.

The State continues to require in its contracts with MCOs that medical case-management services "be provided to all TennCare children for whom they are medically necessary, subject to relevant change in the TennCare Waiver," in compliance with paragraph 68. (MCO Contract § 2.7.6.4.8(19); Vol. 2 (Long), at 435; DX 12 (2011 Annual Quality Survey) at 53.) Likewise, in accordance with paragraph 69, the State continues to require in its contracts with MCOs that mental health case-management services "be provided to all TennCare children for whom they are medically necessary, subject to relevant change in the TennCare waiver." (MCO Contract § 2.7.2.6.5, and at 373–76 (Attachment I), Behavioral Health

Specialized Service Descriptions; Vol. 2 (Long), at 435–36; DX 12 (Annual Quality Survey) at 53–54.)

The State is in current substantial compliance with paragraph 70 because case-management activities are integrated throughout the operations of the MCOs, case-management activities vary depending on the medical needs of the child, and case-management services are not used exclusively as a tool for prior authorization. (MCO Contract at 373–76 (Attachment I), Behavioral Health Specialized Service Descriptions; Vol. 2 (Long), at 436–37.)

The State is in current substantial compliance with paragraph 71(i) because it ensures the MCOs "involve parents and family members, to the greatest extent possible, in the determination of behavioral health services to be delivered to a particular child." (MCO Contract §§ 2.7.2.6.4 & 2.7.6.1.9); *id.* at 373 (Attachment I), Behavioral Health Specialized Service Descriptions; Vol. 2 (Long), at 437.)

The State is in current substantial compliance with paragraph 71(iii) because it requires its MCOs to "provide for appropriate continuity of care and services following psychiatric or chemical dependency inpatient facility services or residential treatment as specified in a realistic discharge plan in which the patient and his family or other caregivers, clinicians, and social worker [sic] have participated." Further, the State requires that "[t]his discharge plan shall include, but not be limited to, an outpatient visit, which must be scheduled within clinically appropriate time period before discharge which assures access to proper physician, medication follow-up and other medically necessary services." (MCO Contract §§ 2.7.2.6.5.2, 2.9.9.3.2, 2.9.9.3.3, 2.9.9.3.4, 2.9.9.5); Vol. 2 (Long), at 438–39.) The State monitors compliance with these requirements through the annual review by the EQRO and through the review of required reports and data submitted to TennCare by the MCOs. (DX 30 (2011 Annual EPSDT Summary Report) at 69, 75–76, 88, 95, 101–02, 108–09; DX 12 (Annual Quality Survey) at 54–55.)

The State "arrange[s] for provision of all medically necessary services for a child without regard to whether he is designated as Severely Emotionally Disturbed (SED)," in accordance with paragraph 71(iv). In fact, the State no longer uses the SED designation. (Vol. 2 (Long), at 439.)

The State's compliance with paragraphs 72 and 73 is not in dispute, as indicated by the Agreed Stipulations of Fact. (ECF No. 1526, at ¶¶ 25–27.)

The requirements of paragraph 74, 75, 76, and 77, all pertaining to non-emergency transportation, have been met through provisions of the MCO contracts. (*See, e.g.*, MCO Contract §

2.7.6.4.6; *id.* at 446–55 (Attachment XI) and § A.4.1.1; *see also* TennCare Rule 1200-13-13-.04(1)(b)20;

DX 12 (2011 Annual Quality Survey) at 57.)

The State is in current substantial compliance with paragraph 88 of the Decree because DCS, in conjunction with the Tennessee Commission on Children and Youth ("TCCY"), conducts the Quality Service Review ("QSR") process, which "include[s] on an ongoing basis an audit of EPSDT compliance with regard to the children sampled." (Vol. 8 (Gatlin), at 1572–73.) The Court notes that Plaintiffs have filed a Supplemental Proposed Finding of Fact pertaining to this paragraph. Apparently, the Governor's proposed budget for fiscal year 2013 eliminates funding from TennCare and elsewhere for the Children's Program Outcome Review Team ("CPORT"), which is essential to conducting the QSR. The Budget, which was released January 30, 2012 and is awaiting approval by the Tennessee General Assembly, states that DCS "has an existing review process performed by DCS staff." http://forward.tn.gov/stateofthestate/files/2012-2013BudgetVol2.pdf, at 21. However, as Plaintiffs point out, the State's own witness testified at the hearing in this matter that DCS's existing review process is the *same* process that involves the TCCY, such that the defunding of CPORT (and the TCCY review team) will undermine the State's ability to monitor and evaluate the provision of medically necessary services to children in DCS custody, and to the plaintiff class as a whole.

Plaintiffs' concerns are not unfounded, and indeed there remains a risk that the State will dismantle other processes that have been put in place over the years to bring the State in compliance with the Decree. The fact remains that these fears are grounded in speculation as to what the future holds. In addition, the question before the Court *now* is whether the State is *currently* in compliance with the terms of the Decree. The Court finds that the State has established that it is currently in compliance with paragraph 88 of the Decree. The State's obligation, going forward, is not to remain in compliance with each precise term of the Decree but to remain in compliance with federal law regarding the provision of EPSDT services. Future failures to comply with federal law may well result in future lawsuits against the State, but it is beyond the jurisdiction of this Court to maintain oversight of the EPSDT program indefinitely merely out of fear that the State may not continue to remain in compliance with federal law.

The State's compliance with paragraphs 89 through 93 is not in dispute, as indicated by the parties' Agreed Factual Stipulations. (ECF No. 1526, at ¶¶ 28–32.)

The State is in current substantial compliance with paragraph 94 of the Decree because it requires its contractors "to achieve and maintain the capability of tracking each child in the plaintiff class, for purposes of monitoring that child's receipt of the required screening, diagnosis and treatment." Further, the State requires that "[t]he tracking system shall have the capacity of generating an immediate report on the child's EPSDT status, reflecting all encounters reported to the contractor more than 60 days prior to the date of the report." (MCO Contract § 2.7.6.1.8.) The State also complies with this paragraph's requirements by maintaining its own encounter database known as interChange that is likewise able to generate an immediate report on a child's EPSDT status that reflects all encounters reported to the MCO more than 60 days before the date of the report. (Vol. 2 (Long), at 443–44.)

The State is in current substantial compliance with paragraph 95 of the Decree because DCS maintains its own "tracking system" with "the capacity to generate a report on the child's EPSDT screening status" and that "reflect[s] all screens received by the child more tha[n] 30 days prior to the report." (Vol. 5 (Pollard), at 1028–29.) In addition DCS has a procedure for identifying children who may have come into custody due to an action or inaction of an MCO, and operates a Crisis Management Team ("CMT") to identify children at risk of entering state custody to assist those children and their families in accessing TennCare services when appropriate to help prevent children from unnecessarily entering custody. (Vol. 5 (Pollard), at 1055, 1058–59, 1075–78 (generally describing CMT process and fact that DCS will file an appeal to alert TennCare if it is suspected a child came into custody related to a service need).)

The State is in current substantial compliance with paragraph 96 because the State has established "an ongoing process for monitoring and reporting [its] compliance with the requirements of this order." For example, the State uses interChange encounter data to report screening information; the State relies upon NCQA accreditation, HEDIS reporting, review and monitoring of appeals and appeals related data, and review and reporting by the EQRO; and the State has regularly filed Semi-Annual Reports with the Court regarding its compliance with the Consent Decree. (Vol. 2 (Long), at 444–45.)

The State's compliance with paragraph 97. pertaining to the maintenance of encounter data, is not in dispute, as evidenced by the parties' Agreed Factual Stipulations. (ECF No. 1526, at ¶¶ 34–35.) In addition, the State conducts "ongoing audits for purpose of authenticating such encounter data," and

these audits are "conducted by qualified personnel" and "meet generally accepted standards regarding sample size and selection," in compliance with paragraph 98. (*See* Vol. 2 (Long), at 446.)

Compliance with paragraph 99 is not in dispute, as is evidenced by the parties' Agreed Factual Stipulations. (ECF No. 1526, at ¶ 33.)

The State is in current substantial compliance with paragraph 100 of the Decree because the TennCare Bureau has "issue[d] policy clarifications and interpretations as necessary to guide the MCOs and DCS in interpretation and application of the EPSDT mandate" and has shown that it "modif[ies] such policies from time-to-time as necessary to conform with TennCare Appeals Unit experience, and final administrative law and final judicial rulings pertaining to the TennCare program." (Vol. 2 (Long), at 447.)

Likewise, the State has shown that it is in current substantial compliance with paragraph 101 of the Decree because it conducts semiannual "reviews of appeals filed under the TennCare Program to determine whether deficiencies or repeated violations necessitate financial penalties upon [MCOs that] have inappropriately denied EPSDT services to children." The State has in fact financially penalized its MCOs as indicated. (Vol. 2 (Long), at 447–48.)

The State's substantial compliance with paragraphs 102 and 103 of the Decree is not in dispute, as evidenced by the Agreed Factual Stipulations. (ECF No. 1526, at ¶¶ 36, 37.)

As required by paragraph 104, the State files Semi-annual Reports with the Court and Plaintiff's counsel regarding compliance with the Decree. These reports contain information validated by the applicable audit and testing procedures. (*See, e.g.*, ECF Nos. 1427-1, 1500-1 (January 2011 and July 2011 Semi-Annual Reports); Vol. 2 (Long), at 448–50.)

In sum, compared with its performance in 1998, TennCare has improved the provision of medical services to its enrollees in every respect. (*See, e.g.*, Vol. 2 (Long), at 456-57 (noting more demanding requirements for participating MCOs, carved-out pharmacy and dental benefits, increased focus on outreach, new call center and community outreach contracts, better monitoring through NCQA and HEDIS measures, an improved appeals system, and improved medical necessity rules); Vol. 4 (Couzins), at 927–28 ("I do think that there is systemic compliance . . . . I think you see over time the increased compliance.").

In reaching the conclusion that the State has met its obligations under the Consent Decree, the

Court considered but largely rejected the contrary proof offered by Plaintiffs through their experts. This testimony, while interesting and even compelling from a policy perspective, was for the most part not directly related to the question of whether the State is in substantial compliance with the Consent Decree.

The Court also considered the testimony offered through caregivers (often mothers) of individual class members. Rather than supporting Plaintiffs' position, these witnesses largely confirmed that TennCare provides medically necessary diagnostic and treatment services. Indeed, Plaintiffs' witnesses themselves attested to the vast array of treatment and services TennCare provides to children with the most daunting, extensive, and expensive medical and behavioral needs. To be sure, some of these witnesses were able to identify isolated incidents where a service was not provided as promptly as it should have been, where the witness had to avail herself of the TennCare appeals process in order to gain access to or keep a service, or where a specific provider or specialist was not immediately available. But their testimony did not serve to establish the existence of systemic problems within the TennCare program; indeed, Plaintiffs did not identify any instance where needed services were not ultimately provided.

A third class of proof offered by Plaintiffs was the testimony of providers of medically necessary services. Providers testified from their experience and anecdotal events from which they extrapolated to opinions about the efficacy of the Decree. Much of the testimony offered by the medical practitioners was based on unverified, undocumented anecdotal reports from clinic clients and staff, upon which the Court does not place much credence. These witnesses testified to shortages of different types of specialists in various geographic regions. Even accepted at face value, the evidence presented does not suggest non-compliance with the Consent Decree, because the Medicaid statute expressly limits the State's obligation in establishing a provider network "to the extent that such care and services are available to the general population in the geographic area." 42 U.S.C. § 1396a(a)(30)(A). Moreover, the Court has determined that those provisions of the Consent Decree reliant on § 1396a(a)(30(A) are not individually enforceable through a § 1983 action. Finally, Plaintiffs' provider witnesses did not establish that the experiences of their TennCare patients differed substantially from those of their privately insured patients in terms of locating specialists.

In short, while Plaintiffs' witnesses were passionate advocates who testified credibly as to their

beliefs and experiences, their testimony was not sufficient to contradict the overwhelming evidence offered by the State in support of its claim of substantial compliance with the Consent Decree.

## III. CONCLUSION

The Tennessee Justice Center is commended for initiating and pursuing this case over the years. The presentation of the proof before the undersigned has been highly professional by both sides and, much to the credit of both sides, completely devoid of acrimony. The Consent Decree has clearly served its purpose well in bringing about a level of service to the class members that is demonstrative of the compassion that is characteristic of the State of Tennessee and fully compliant with the EPSDT law and regulations.

For all the reasons set forth herein, after careful consideration of all the evidence, the Court will grant motion to vacate the Consent Decree, dissolve any injunctive relief heretofore granted, and dismiss the case. The Court will, however, retain jurisdiction of the action for the purpose of considering outstanding fee applications and cost determinations, and to review contempt citations.

An appropriate order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge